

### Page 1

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT IN AND
FOR BROWARD COUNTY, FLORIDA
CASE NO: 09-062943 07

RAZORBACK FUNDING, LLC, et al,

    Plaintiffs,

vs.

SCOTT W. ROTHSTEIN, et al,

    Defendants.
_____/

DAY 1 - AFTERNOON SESSION

DEPOSITION OF SCOTT ROTHSTEIN

DATE TAKEN:  Monday, December 12, 2011
TIME:      1:00 p.m. - 5:00 p.m.
PLACE:    99 N.E. Fourth Street, Miami, FL

Taken on Behalf of Razorback

Examination of the witness taken before:

Terri Wright
United Reporting, Inc.
1218 Southeast Third Avenue
Fort Lauderdale, Florida 33316
(954)525-2221

### Page 2

1    IN THE CIRCUIT COURT OF THE
       17TH JUDICIAL CIRCUIT IN AND
2    FOR BROWARD COUNTY, FLORIDA
       CASE NO: 09-062943 07
3
4    EDWARD J. MORSE, CAROL A. MORSE,
       and MORSE OPERATIONS, INC.,
5
       Plaintiffs,
6
7    vs.
8    SCOTT W. ROTHSTEIN, et al,
9    Defendants.
       _____/
10
11   Case No: 10-03767 RBR  STETTIN VS. GIBRALTAR PRIVATE
12           BANK & TRUST CO.

13   Case No: 10-03802-RBR STETTIN VS. CENTURION STRUCTURED
           GROWTH LLC, ET AL.
14
15   Case No: 11-02288-RBR STETTIN VS. FIDELITY CHARITABLE
           GIFT FUND
16
17   Case No: 11-02368-RBR STETTIN VS. TD BANK, N.A.
18   Case No: 11-02473-RBR STETTIN VS. REGENT CAPITAL
           PARTNERS, LLC ET AL
19
20   Case No: 11-02604-RBR STETTIN VS. MAPLE LEAF DRILLING
           PARTNERS, ET AL
21   Case No: 11-02605-RBR STETTIN VS. DON KING PRODUCTIONS,
           INC.
22
23
24
25

### Page 3

1
2   APPEARANCES FOR RAZORBACK:
3   WILLIAM R. SCHERER, ESQUIRE
      REID COCALIS, ESQUIRE
4   IVAN KOPAS, ESQUIRE
      CONRAD & SCHERER, LLP
5
6   ADAM MOSKOWITZ, ESQUIRE
      KOZYAK, TROPIN & THROCKMORTON, P.A.
7
            ************
8
9   MARC S. NURIK, ESQUIRE
      Appearing on behalf of SCOTT ROTHSTEIN.
10
11   CHARLES L. LICHTMAN, ESQUIRE
      BERGER SINGERMAN
12   Appearing on behalf of the Chapter 11 Trustee,
      Herbert Stettin.
13
14   HARVEY SERBLOWSKY, ESQUIRE
      Appearing on behalf of Platinum & Centurion Funds.
15
16   JAN ATLAS, ESQUIRE
      Appearing on behalf of Levinson Jewelers.
17
18   MICHAEL GOLDBERG, ESQUIRE
      AKERMAN SENTERFITT
19   Appearing on behalf of Official Committee of
      Unsecured Creditors.
20
21   THERESA M.B. VAN VLIET, ESQUIRE
      JOHN H. GENOVESE, ESQUIRE
      Appearing on behalf of the Trustee.
22
23   CARAN L. ROTHCHILD, ESQUIRE
      GREENBERG TRAURIG
24   Appearing on behalf of TD Bank, N.A.
25

### Page 4

1
2   MARY BARZEE FLORES, ESQUIRE
      MATTHEW DATES, ESQUIRE
      STEARNS WEAVER
3   Appearing on behalf of Gibraltar Bank.
4
5   MICHAEL SCHLESINGER, ESQUIRE
      SCHLESINGER & COTZEN
      Appearing on behalf of Frank Spinosa.
6
7   CHRISTOPHER G. BERGA, ESQUIRE
      LYDECKER DIAZ, LLC
8   Appearing on behalf of Szfranski.
9
10   RAMON A. RASCO, ESQUIRE
      PODHURST ORSECK
      Appearing on behalf of Frank Preve.
11
12   TUCKER CRAIG, ESQUIRE
      BILLING, COCHRAN, LYLES, MAURO & RAMSEY, P.A.
13   Appearing on behalf of Rosanne Caretsky.
14
15   DAVID C. CIMO, ESQUIRE
      GENOVESE JOBLOVE & BATTISTA
      Appearing on behalf of the Trustee.
16
17   ALEX HOFRICHTER, ESQUIRE
      LAW OFFICES OF ALEX HOFRICHTER, P.A.
18   Appearing on behalf of Federal Insurance Company.
19
20   JOHN MULLIN, ESQUIRE
      GEORGE WALKER, ESQUIRE
      TRIPP SCOTT
21   Appearing on behalf of Morses.
22
23   JESUS SUAREZ, ESQUIRE
      Appearing on behalf of the Trustee.
24
25   SCOTT SCHMOOKLER, ESQUIRE
      Appearing on behalf of RLI Insurance, Columbia

EXHIBIT
B
tabbies®

Page 5

```
 1
 2    CASEY CUSICK, ESQUIRE
      Appearing on behalf of Emess Capital, LLC.
 3
      JAMES A. BLACK, JR., ESQUIRE
 4    Appearing on behalf of St. Paul Fire & Marine.
 5    BART HOUSTON, ESQUIRE
      Appearing on behalf of Levinson, Pearson &
 6    Associates, Roger Stone and Watch U-Want, Inc.
 7
      LAWRENCE LAVECCHIO, ESQUIRE
 8    Appearing on behalf of the U.S. Government.
 9
      JACK SIEGAL, ESQUIRE
10    Appearing on behalf of Fepict, MS Group.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1
 2    23  E-mail dated 3/30/09           145
 3    24  E-mail dated 3/30/09           149
 4    25  E-mail dated 12/6/06           150
 5    26  E-mail dated 2/13/07           152
 6    27  E-mail dated 7/31/07           153
 7    28  E-mail dated 9/19/07           155
      29  E-mail dated 12/14/07          157
 8    30  E-mail dated 6/25/08           158
 9    31  E-mail dated June '08          160
10    32  E-mail dated June 30, '08      163
11    33  E-mail                         165
12    34  E-mail                         166
13    35  E-mail 03/09/09                169
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
 1            I N D E X
 2          EXHIBIT INDEX
 3
 4    RAZORBACK'S
 5     1  June 2, 2010 letter to Judge Cohn      40
 6     2  E-mails (Bates Intracoastal 1031 - 1035)   55
 7     3  Composite of Morse Documents          66
 8     4  Morse Triangle                        70
 9     5  E-mail dated 2/16/06                  74
10     6  Composite of e-mails                  76
11     7  E-mail dated 2/26/06                  79
12     8  E-mail dated 8/29/06                  80
13     9  Discrepancy Schedule                  83
14    10 & 6/25/08 e-mail and Promissory Note   87
15    12  Document concerning Promissory Notes  90
16    13  Caputi e-mails                        95
17    14  Summary Chart                         96
18    15  Summary Chart                        104
19    16  Page from Power Point                108
20    17  E-mail Bates Rothstein S000097       110
21    18  E-mail dated 9/6                     112
22    19  Composite                            124
23    20  e-mail                               130
24    21  E-mail dated 11/3/08                 141
25
```

Page 8

```
 1        (WHEREUPON, the following proceedings were had.)
 2        MR. SCHERER:  Good afternoon.  I'm William
 3    Scherer with the firm Of Conrad and Scherer and we
 4    are going to take the rest of the day and tomorrow, I
 5    guess, to ask you questions concerning cases that we
 6    have filed in Fort Lauderdale in the state Court.
 7    It's called the Razorback case, that's the name of
 8    it.  It's a horrible name, I should have put another
 9    little Plaintiff first, it's called Razorback.  I
10    don't know why I did that, but - big mistake.
11        But it's Razorback and 50 other investors, a lot
12    of whom you've met already.  We have a procedure here
13    that, as I understand it, my partner Cocalis worked
14    with Mr. Lichtman and that is that the 2004
15    Examination transcript is going to be for a 2004
16    Bankruptcy Exam.  And we don't have to try to use it
17    in our case, which is really good because bankruptcy
18    is - you can't understand it anyway; it's a place
19    where a dollar goes to become a nickel.
20        So, then we are going to have a transcript with
21    all of the people that are suing you and suing your
22    co-conspirators, alleged co-conspirators.
23        And I also understand that there are adversary
24    proceedings that are considered to be the
25    Plaintiffs.  And so the Plaintiffs are going to
```

2  (Pages 5 to 8)

Page 61

1  were discussing the actual real case, the reason it was
2  becoming so, quote, unquote, tasty because they had
3  information that he had been flying Bill Clinton around
4  and Prince Andrews around, the piece that was missing
5  from the real case was the connection to the young girls.
6      Q   The young girls - connection to the young girls
7  was fiction, it was a lie?
8      A   Not as far as Mr. Epstein is concerned but as
9  far as the other people are concerned, yes.
10     Q   Do you know whether Adler - Mr. Adler
11 or Mr. Edwards injected any of that into the depositions
12 in the real case in order to assist with the Ponzi?
13     A   I don't know -- No, no, I don't know whether
14 they did that or not.  I wouldn't think they would.
15     Q   When you were asked - this morning about Brad
16 Edwards you really hesitated.  I don't know if you know
17 you did that.  You were answering yes, no, maybe so.  On
18 him you really paused.
19     A   On the question as whether or not he would have
20 turned us in, you mean?
21     Q   Whether he was a player or whether he was
22 involved and you didn't quite answer.
23     A   Just because of the way I knew Brad and
24 socialized with him, I did not know that he was at that
25 level.  There are certain people, Barry Stone, second he

Page 62

1  found out about it would have absolutely done what was
2  appropriately - supposed to do from an ethical
3  standpoint.  And then there were people who I would say
4  would never do that.  And then there are people in the
5  middle.  I believe Brad Edwards is probably in the
6  middle.
7      Q   Did you have your investigators, that be Jenne
8  and Wayne Black and Fistas investigate Epstein himself
9  and try to get evidence from Epstein --
10     A   I didn't know --
11     Q   -- do you have of any knowledge of that?
12     A   No, sir.
13     Q   Did you instruct them to file any kind of
14 pleadings in federal Court or anything like that in order
15 to help you promote the Ponzi?
16     A   No.  As far as the Epstein case is concerned,
17 Mr. Scherer, I never asked Mr. Adler or Mr. Edwards or
18 anyone else associated with that case to do anything for
19 the purpose of furthering the Ponzi other than bring me
20 the boxes.  That was all my creation.
21     Q   Thank you.
22         I'm going to talk to you about Ted Morse a
23 little bit.  You said he was one of your best friends, he
24 was one of your intercircle?
25     A   Correct.

Page 63

1      Q   You knew him, I guess, many years.  When did you
2  meet him; '05, '04?
3      A   You know, I don't remember.  As I sit here today
4  it seems like he was always part of my life back at that
5  point in time.  We were best friends.
6      Q   You started doing deals with him, money deals
7  based on Internet, based on e-mails?
8      A   Yes.
9      Q   And then you borrowed money from him also
10 legitimately.  Didn't he loan you money to buy Ricky
11 Williams' house?
12     A   Yes.  When I purchased that house Ted and his
13 father loaned me the money to do it.  We did a standard
14 set of mortgage documents and gave him a mortgage on some
15 other property I owned on the same street and he loaned
16 me the money.
17     Q   You didn't have those kind of documents to
18 support the other deals you were doing with Ted before
19 that; did you?
20     A   No, there was a drastic difference between paper
21 - legitimate deals with Ted and paper and other deals
22 with Ted.
23     Q   These are other deals with Ted.  Did he know
24 they were illegitimate from the beginning, in your mind?
25     A   From the very beginning?  We discussed it after

Page 64

1  we got started.  I don't have a specific point in time in
2  mind.  But yes, very, very quickly he knew that they were
3  not legitimate deals.
4      Q   And you established a man law account.  Do you
5  know where that account was located and how it was --
6      MR. MULLIN:  I'm going to object.  This is John
7  Mullin, Tripp Scott, we're Counsel for Ed and Carol
8  Morse and Morse Operations.
9          You made a big point, Mr. Scherer, of pointing
10 out the particular lawsuits that are pending and have
11 been part of the protocol, which you have gotten
12 permission to go forward.  There's no pending case
13 against the Morses.  They are not listed in your 2100
14 page Complaint and the entire line of questioning
15 about the Morses does not relate to a case in which
16 you have been Court permission to ask questions
17 today.
18         We object to it.  I want a standing objection.
19 And we're going to move to strike any of this
20 testimony from the use at any future cases you may
21 bring that is not yet of record and not given
22 permission.
23     MR. SCHERER:  Thank you.  You reminded me.  May
24 I have the Composite Exhibit of the Morse documents
25 that Mr. Morse filed as a part of these proceedings?

16 (Pages 61 to 64)

Page 65

1   We're going to give that -- we're going to make this
2   a composite Exhibit Number 3.
3       MR. KOPAS:  Composite Exhibit No. 3 are all the
4   documents that the Morse team filed in anticipation
5   of this deposition.  They were labeled as Exhibit 5.
6       (Whereupon, Plaintiff's Exhibit No. 3 was marked
7       for identification.)
8   BY MR. SCHERER:
9       Q   Would you take that and hand to to
10  Mr. Rothstein?
11      What I would like you to do, sir, obviously I
12  don't want you to read all that.  Look through it and I'm
13  going to ask you a couple questions as to what's in those
14  documents.  We're going to get into some of those in a
15  little more detail.  I'll withdraw the man law for now,
16  then I'll do the man law in a minute.
17      Does it appear to be those are communications,
18  e-mails between you and the Morse family and Ted Morse
19  and copies of letters and then maybe Court pleadings on
20  cases including, primarily, Jan Jones that you handled
21  for them?
22      A   Yes.
23      Q   And you can see there's e-mails back and forth
24  relative to that case; correct?
25      A   That's correct.

Page 66

1       Q   Again, I'm not going to have you read the whole
2   thing.  I put that in as a composite because those were,
3   again, for the record, that's the documents that Morse
4   provided in their electronic filing to support their
5   deposition of you, which is going to take place on - I
6   don't know, Wednesday or Thursday.
7       MR. MULLIN:  Let me state for the record the
8       documents that we distributed by the Court deadline,
9       unlike some people, were related to a Court
10      proceeding because we have a separate action that is
11      one of the cases where we've been given Court
12      permission to be here to question the witness on.
13      To the extent that there are Morse documents
14      that are here that doesn't mean we are in anyway
15      waive any objections we have as to using other
16      documents that were circulated including documents
17      that were circulated on time.
18  BY MR. SCHERER:
19      Q   Thank you.  Okay.
20      Thanks.  Now, I'm going to ask again what was
21  the man law account?
22      A   The man law account was an account - I believe I
23  had one and Ted had one.  They were accounts that we
24  placed funds in for the purpose of paying for our extra
25  curricular activities with escorts.

Page 67

1       Q   The funds that went into those accounts, were
2   those -- where did those funds come from?
3       A   They were Ponzi funds.
4       Q   You had a man law account and he had one or did
5   you share the account?
6       A   We had a shared account, but he also had an
7   account that we called the man law account which was - he
8   had a separate account within Morse Operations to hide it
9   from his wife.
10      As far as I know, the way he accessed that was
11  he would tell the CFO, Dennis McGinnis to take a portion
12  of the money that I was sending, for example, back to
13  Morse Operations and they would split it amongst the
14  investors; part might go to Morse Operations, part might
15  go to Ted Patti and part would go into his quote, unquote
16  man law account, the account he used to support his
17  mistresses.
18      Q   When you had the account jointly, what bank was
19  that account in; do you recall?
20      A   I don't recall.  I don't recall.  As a matter of
21  fact, specifically I don't even recall having the joint
22  account.  I think the joint account may have been one of
23  the law firm accounts that we pulled money out of.  The
24  account sticks out most in my head - I was drawing all
25  kinds of money out of our firm and out of every account.

Page 68

1   But the one that we talked about more often than not was
2   the account that Ted had at - actually at Morse
3   Operations.
4       Q   We're going to have some evidence of on that in
5   a minute.  Who was Patti Morse?
6       A   Patti Morse is Ted's wife.
7       Q   And Ed Morse is?
8       A   Ted's father.
9       Q   Carol is?
10      A   Ed Morse's wife.
11      Q   And Morse Operations or MOI?
12      A   The parent company - that is the company that
13  oversees all the business of all the Morse car
14  dealerships and other entities.
15      Q   Now, let me show you we've got a Number 4.  We
16  have a demonstrative prepared here that I want to show
17  you to see if this is an accurate portrayal of the
18  relationship that you --
19      MR. MULLIN:  We object.  It's untimely and
20      improper and it doesn't relate to a case in which you
21      have permission of the Court to question this
22      witness.  Move to strike all the questions and
23      answers.  And object to circulating the exhibits.
24      MR. SCHERER:  Thank you, Counsel.  You've made
25      that objection and it's noted.  I don't think you

17 (Pages 65 to 68)

Page 69

1    need to make it every time. Go ahead.
2         MR. KOPAS: Exhibit 4 is a demonstrative titled
3    Morse Triangle.
4         (Plaintiff's Exhibit No. 4 was marked for
5    identification.)
6    BY MR. SCHERER:
7    Q   Now, take a look at this little graphic we
8    prepared here. I want to see if this accurately
9    portrays the business that you were doing with the Morse
10   family and you've got -- see Ted over there with the
11   fictional deals that you --
12        I'll ask you. You funded fictional deals for
13   Ted Morse and Patti that were Ponzi deals primarily by -
14   started by e-mails, no other documentation?
15   A   99 percent of the deals that I did with Ted
16   were e-mail deals.
17   Q   Right.
18   A   The only time that paper came up was when his
19   father asked for paper. And there was a period of
20   time - the middle or towards the end of one of their
21   audits, I believe Crowe Chizek was doing - they did
22   all the financials as part of the banking requirements.
23   And the auditors seeing all of this money flowing back
24   and forth between Ted and Patti, Morse Operations, Ed
25   and my firm - I suspect, based upon what Ted told me,

Page 70

1    raised a lot of questions.
2         And so, we actually put together -- we created
3    two old deal packets. They were dated fairly close to
4    each other, within weeks of each other to substantiate
5    two of the deals so Crowe Chizek would leave them alone.
6    Q   We'll show you these documents and organize that
7    thought on a global basis your dealings had deals from
8    Ted funded and then you had deals from Morse Operations
9    that were funded that were Ponzi deals, settlements if
10   you will, punitive settlements; correct?
11   A   Yes. There were deals between Ted and my firm,
12   Ted and Patti and my firm, Morse Operations and my firm.
13   Q   And then in addition there was a lawsuit that
14   you used in order to -- called the Jan Jones-Mizner
15   litigation in Palm Beach?
16   A   Yes. If you look through our financials at a
17   period of time, several periods of time actually, where
18   the Ponzi was very close to imploding, we utilized the
19   Jan Jones litigation for the purpose of extracting false
20   bond money out of Ed Morse to fund the Ponzi scheme.
21   Q   And who is the "we"?
22   A   The we at that point in time - it was really me
23   and to a very minimal extent Steve Osper. I don't
24   believe Mr. Rosenfeldt or Mr. Adler or Mr. Lippman had
25   any knowledge of the Jan Jones fraud.

Page 71

1    Q   Do you think Mr. Osper did?
2    A   There is an e-mail from me to Pam Donavesis, Pam
3    is Osper's secretary. The e-mail asks Pam to draft an
4    Order in that case. That e-mail was ultimately reviewed
5    by Mr. Osper. There was no Order, no hearing. Mr. Osper
6    and Pam both knew it. So, to that extent - and if you
7    view the e-mails -- is it my perception that Mr. Osper
8    had knowledge of what was going on? Yes. Did I discuss
9    it with him directly? No.
10   Q   We're going to touch on that in a minute. We're
11   going to get into that in a minute.
12        Let me show you what our next exhibit and it's
13   the first deal.
14   A   Before I forget, on that line, Mr. Osper did
15   know that Ted was assisting us in getting money out of
16   Morse Operations to pay certain things that needed to be
17   paid in the Jan Jones case.
18        Ted was vouching for us with his father, and
19   Osper did know that. And he did know that because I told
20   him.
21   Q   You told Osper that you were -- Tell me what you
22   told him.
23   A   What was going on was, there was a lot of
24   pressure from Carol Morse more than anything, which she
25   was very suspicious, obviously 20/20 rightfully so. She

Page 72

1    was very suspicious of everything. She paid very close
2    attention to everything. And she was putting a lot of
3    pressure on us to get documents and things, to get her
4    details, things that we didn't have that would need to be
5    created.
6         We were telling them at one point in time that
7    we won cases that we didn't win. Steve knew that. That
8    is a fact that is substantiated by e-mail. Mr. Osper
9    knew we were representing to the Morses that cases we
10   lost had ultimately been actually settled by us with Ted
11   Morse's knowledge.
12   Q   Now, I'm going to get to that. I want to kind
13   of take it a step at a time here. This is February 16,
14   which I think is the first deal.
15        MR. KOPAS: Plaintiff's Exhibit 5 is a February
16   16, 2006 e-mail.
17        (Whereupon, Plaintiff's Exhibit No. 5 was marked
18   for identification.)
19        THE DEPONENT: Just so we're clear with this
20   exhibit, where it says this fictional deals funded by
21   Morse Ops, I do not by any stretch of the imagination
22   believe that Ed Morse, Senior knew any idea what was
23   going on at any level.
24   BY MR. SCHERER:
25   Q   Do you know towards the end -- Let me save that

18 (Pages 69 to 72)

Page 73

1   question.
2       A   Sure.
3       Q   I'll examine you on that in a few minutes after
4   we go through some more documents.
5       A   Yes.  I think through Carol, he did get
6   suspicious.  I think they called me Bernie Madoff once.
7       MS. ROTHCHILD:  What is the exhibit that you
8   just handed --
9       MR. KOPAS:  February 16, 2006 e-mail.  Subject,
10  my favorite subject after pussy, smiley face.
11      MS. ROTHCHILD:  Is there a Bates number?
12      MR. KOPAS:   Rothstein S000043.
13  BY MR. SCHERER:
14      Q   I give you this because I believe this to be
15  your first deal.  Deal is on, 400 K, 200 K each, two
16  points, 20 percent, return in 10 weeks guaranteed by
17  secured funds.
18      A   Yes.
19      Q   Let me ask, what was the reference to 200 each?
20  What does each mean?
21      A   At that point in time Ted believed that I was
22  investing along with him.
23      Q   Into this deal, whatever the deal was?
24      A   Yes.
25      Q   We don't find any more paper other than the wire

Page 74

1   into you and the payments back from you to him?
2       A   Right.  And you won't.
3       Q   Do you know how many deals you with did with Ted
4   and Patti?  Does 15 sounds correct?  We're going to look
5   at that in a minute.  Does that sound right?
6       A   It could be.  I really don't have an independent
7   recollection.
8       Q   Same question about Morse Operations, our
9   records show about 17 deals - it shows 17 deals?
10      A   If that's what it shows I'm sure it's correct.
11  I don't have an independent recollection.
12      Q   I'm going to give you another composite
13  exhibit.  And what is the number?
14      MR. KOPAS:  Plaintiff's Exhibit 6 is a composite
15      exhibit of e-mails, Bates numbered Rothstein S000044,
16      through 000081.
17      MR. MULLIN:  Same objection.
18      (Whereupon, Plaintiff's Exhibit No. 6 was marked
19      for identification.)
20  BY MR. SCHERER:
21      Q   I'd like you to take a look at those.  I think
22  those represent the sum and substance of the e-mail
23  initiation of these deals with Mr. Morse.  And again, I
24  don't need you to read each of those because I am going
25  to summarize them in a minute.

Page 75

1       Look them over and see if you don't recognize
2   those or see if you do recognize those.
3       A   Oh, no, I recognize them.
4       Q   All right.  And so, this would be the way that
5   the transactions initially started with Ted and Morse
6   Operations before you started papering them a little
7   differently than an e-mail with a wire in and money paid
8   back?
9       A   Yes.
10      Q   Now, I'm noticing that you used interesting
11  colorful language in your e-mails to your various people
12  you were involved with?
13      A   Yes, I was known to be colorful.
14      Q   Colorful, that's a good word for it.  When you
15  were dealing with innocent investors, did you use the
16  same kind of colorful language or how did you know when
17  to be colorful and when not throughout here?
18      A   Sometimes I didn't know.  Sometimes I just
19  didn't.  I tend to be a little, bombastic.  With Ted I
20  knew I -- look, Ted and I -- we were like brothers.  We
21  shared everything from money to women and everything else
22  in between.
23      There was nothing that I couldn't say to him in
24  the context of our friendship and business dealings.
25  You'll find that my more colorful e-mails were to

Page 76

1   people -- you could pretty much gauge it and tell almost
2   their level of knowledge, the level of whether they cared
3   or didn't care about what was going on based upon the
4   e-mails sent.  If I had someone that was a disbeliever,
5   heavy scrutiny person, the e-mail was more professional.
6       Although at the point you'll see also e-mails
7   even with those people where they were -- if they were
8   pushing back, it wasn't as colorful, but I certainly
9   wasn't above using extreme vulgarity to get my point
10  across about how upset I was if an investor was
11  questioning me.
12      Q   Words like dog and bro and --
13      A   That's --
14      Q   Banker and pimp and userious one and enjoy your
15  ill-gotten bootie was made to people you thought were
16  players more on the inside?
17      A   Yes.
18      Q   I mean, I don't think you would send Mr. Von
19  Allmen a ill-gotten bootie e-mail?
20      A   No.
21      Q   We see throughout this that you sometimes say
22  T.P.O.F.D.  We have a bet in my office about what that
23  means.
24      A   I need money in my commissary, you want to put
25  me in?

Page 77

1    Q   No. I'm going to have a hard enough time.
2        Prince of Darkness.
3    A   You left out the F word, but yes.  It was
4    actually a name given to me when I was at Gunther and
5    Whitaker.  It stuck.
6    Q   I notice in those e-mail deals with Ted Morse
7    and Patti and Morse Operations that they may have started
8    out as like some kind of deals or loans that you were
9    going to make with somebody and then it turned into
10   settlements.
11   A   Yes.
12   Q   Where you actually say I settled the case I have
13   money in-house?
14   A   Yes.
15   Q   That little settlement evolve so at some point
16   you even used two -- actually you used four structured
17   settlement deals or structured deals that morphed into
18   two sets of documents.  Do you remember that?  I'm going
19   to show you that in a minute.  Does that ring a bell?
20   A   I have a vague recollection.  Again, to my
21   recollection, Mr. Scherer, the only time we actually used
22   deal paperwork was when it was required; a lower level of
23   paperwork for Ted to get Ed's approval and a higher level
24   of paperwork for Ted and the folks at Morse to appease
25   their auditors.  Other than that it was just all of this.

Page 78

1    Q   Let me show you a June 26, '06 e-mail.  I would
2    like you to take a look at.
3    A   Is that in this packet or another one?
4    Q   I'm going to bring them over.  You can put that
5    packet aside.  We're going to ask you questions from --
6        MR. KOPAS:  Plaintiff's Exhibit 7 is a 2/26, '06
7    e-mail.  Bates Rothstein S000082?
8    A   Thank you.
9        (Whereupon, Plaintiff's Exhibit No. 7 was marked
10   for identification.)
11   BY MR. SCHERER:
12   Q   See, I kind of have that highlighted so we could
13   more quickly refer to it.  Subject: Mo money?
14   A   Yes.
15   Q   And the terms of the deal were 150 K each, that
16   would be him and then him thinking you had a piece of
17   that also; right?
18   A   Yes.
19   Q   In.  And $175,000 each out in 30 days.  Nice.
20   Fast?
21   A   Um-hmm.
22   Q   Then you got something up here, we can do it
23   with Patti or man law?
24   A   Yeah.
25   Q   However you want?

Page 79

1    A   Um-hmm.
2    Q   See that?
3    A   Yes.
4    Q   And then I want to show you how that deal got
5    paid off and --
6        MR. KOPAS:  Exhibit 8 is August 29, 2006 e-mail,
7    Bates Rothstein S000083 to 84.
8        (Whereupon, Plaintiff's Exhibit No. 8 was marked
9    for identification.)
10   BY MR. SCHERER:
11   Q   Take a look at that and on the second page I
12   have it highlighted there.  It appears to start out at
13   the bottom where you can see Patti sending you an e-mail
14   updating the ledger.  Do you see that?
15   A   Yes.
16   Q   Down at the bottom, on August 28?
17   A   Yes.
18   Q   And she's got various loans and she's got it -
19   on the back page it's got - second page, it has loan
20   number seven.  Do you see that?
21   A   Yes, I do.
22   Q   This has been held since 6/27/06, we still don't
23   know what's happening with it and what's the PI and how
24   long is the loan for.  Can we find this out or get it
25   back.  You see that?

Page 80

1    A   I do.
2    Q   You see your response to her is loan for 12
3    months and then you recast the deal.  You see that?
4    A   Yes.
5    Q   So, you took this 30 day loan that we referred
6    to in Exhibit Number 7 that was supposed to be 175,000
7    out in 30 days and you recast it to make it a year deal
8    with $10,500 a month?
9    A   Yes.
10   Q   See that?
11   A   Um-hmm.
12   Q   I think that adds up to $128,000, so it didn't
13   quite match the terms; you're a year late and a few
14   dollars short.
15   A   And we're sure it's the same deal?
16   Q   Yeah, it's the same deal.
17   A   Okay.  I remember changing more than one deal.
18   I don't remember whether this is that deal.  So, what is
19   your question with regard to this?
20   Q   In terms of what did Ted say when you took your
21   30 day deal that you had on that e-mail and made it a
22   year deal and recast the terms?
23   A   Ted couldn't have cared less.  Patti cared.  Ted
24   was making a fortune with me.  The joke around his family
25   and our friends was that I was his most profitable car

Page 81

1  dealership. He couldn't have cared less.
2      Q   So --
3      A   But what ended up happening - to cut to the
4  chase with this - ultimately Patti is asking me a bunch
5  of questions and it happened several times, more than
6  several times, on some of these deals. She would ask
7  questions, before I ever answered her, I always would
8  pick up the phone and call Ted and say hey, what do you
9  want me to tell Patti? Sometimes he would say tell her
10  whatever you want to tell her, sometimes he would say let
11  me handle it. He would call and scream at her and it
12  would stop and then start again.
13      Q   We've gone over all of the 15 deals and it looks
14  like on some of them you underpaid, some of them you
15  overpaid, but I don't find any inquiry or any question
16  from Ted back to you to say here's what our deal was.
17      A   You can generally tell -- this doesn't go just
18  for the Morse deal, but it goes for all the people
19  involved, one of the indicators that you can utilize is
20  their depth of inquiry and their pitching a fit when a
21  payment doesn't come.
22          If this was a real deal and there was really
23  money in a trust account someplace, holding the money,
24  you would think that the payments would be made on time
25  all the time, not that they would be reshuffled.

Page 82

1      Q   Let me show you what we have as a discrepancy
2  schedule that I would like you to see.
3      A   Discrepancies?
4          MR. KOPAS: Plaintiff's Exhibit 9 is a
5  discrepancy schedule.
6          MS. ROTHCHILD: Bates number?
7          MR. SCHERER: There's no Bates number. It was
8  produced -- it's actually for demonstrative
9  purposes. It wouldn't have a Bates number on it.
10          MS. ROTHCHILD: When was it produced?
11          MR. SCHERER: In those documents that you got
12  this morning.
13          MR. MULLIN: Same objection.
14      (Plaintiff's Exhibit No. 9 was marked for
15  identification.)
16  BY MR. SCHERER:
17      Q   I would like you to look at the schedule and
18  see if this refreshes your recollection. Looks like the
19  eight the 15 deals - you can see the original terms of
20  the deal and the actual payments on eight of the 15
21  didn't match the original terms of the deal?
22      A   That's correct.
23      Q   It looked like six of them were in favor of the
24  Morse and two of them were in your favor on that. I
25  think Mr. Morse netted out about 250,000 more - assuming

Page 83

1  my math is correct, was there any accounting between the
2  two of you as to, he's ahead by 250, or you're ahead by
3  250?
4      A   No.
5      Q   Why not?
6      A   Didn't need it. We were both making a lot of
7  money.
8      Q   There seems to be a switch in '08 from the deals
9  funded by Ted and Patti to the Morse Operations. You
10  started to talk about the switch. Was that in part
11  because of Patti's inquiries or to avoid Patti's
12  inquires?
13      A   It was several fold: It was avoiding Patti's
14  inquiries and also Ted's interest in investing more and
15  more.
16      Q   Needed to get the money out of the company to --
17      A   Instead of using the funds from his and Patti's
18  private account, he wanted to use money from the company
19  to invest at a higher level.
20      Q   Who did the accounting for the first deals that
21  we've just been over; the Ted and Patti deals? Did they
22  do them or was the accounting done --
23      A   Patti did pretty much all of it. We kept track
24  of it in-house. At that time back in 2006 it was
25  actually probably a combination of Debra Villegas an

Page 84

1  Irene Stay, back then Irene Shannon.
2      Q   After the deals you started doing the 17 deals
3  with Morse Operations, I presume their accounting
4  department --
5      A   Dennis McGinnis kept track of that along with a
6  gentleman named Michael Kelly who was, I believe,
7  comptroller or something to that effect.
8      Q   Do you have any belief that they became in on
9  the Ponzi nature - or the illegal nature of your
10  activities during any of this time?
11      A   Mr. McGinnis and Mr. Kelly?
12      Q   Yes.
13      A   I have no reason to believe that.
14      Q   Some point in time they did some back-dating of
15  promissory notes to cover deals that were --
16      A   Yes.
17      Q   -- Morse Operation deals where the e-mail that
18  generated the deal said money in-house, just settled
19  another case?
20      A   Um-hmm.
21      Q   And then a year later you back-date it or
22  somebody back-dated promissory notes and turned the deal
23  in-house to a promissory note. Do you recall that?
24      A   Yes. When they requested documentation for
25  their auditors we created the documents necessary at

Page 85

1  Ted's request. And the request of Mr. McGinnis and/or
2  Mr. Kelly.
3  Q   Mr. McGinnis knew that they were back dating
4  promissory notes that didn't match to cover the deals --
5  A   I can't tell you for certain whether he knew
6  they were back-dated. The only person that I'm certain
7  knew they were back-dated was Ted. We would have had
8  discussions. I can picture the discussion, what do you
9  mean, what the hell are you talking about? I don't have
10  any documents.
11      I need documents. All right. I'll get you
12  documents. It wasn't very complicated from that
13  standpoint.
14  Q   Let me show you an example of the deal that got
15  papered with a Promissory Note. I have an e-mail, June
16  25, '08. I would like you to take a look at it.
17      MR. KOPAS: Plaintiff's Exhibit 10 is going to
18  be a June 25, '08 e-mail, Bates stampted Rothstein
19  S000085. I'm also going to give him Exhibit 11,
20  which is a Promissory Note on that deal, Bates
21  Rothstein S000086.
22      MS. ROTHCHILD: Are these part of the production
23  this morning?
24      MR. KOPAS: Yes.
25      MS. ROTHCHILD: Same objection.

Page 86

1      MR. MULLIN: Join.
2      (Whereupon, Plaintiff's Exhibit Nos. 10 and 11
3  were marked for identification.)
4  BY MR. SCHERER:
5  Q   Do you see that starts out: Money, and I do
6  mean moo?
7  A   Yes.
8  Q   In the end you say hey, bro, very simple deal,
9  fund three million, ROI, 500 K, pay back in 90 days.
10  A   Okay.
11  Q   Secured by funds already in-house?
12  A   Yes.
13  Q   And this was a Morse Operations deal?
14  A   Yes.
15  Q   And then you'll see on the next exhibit, the
16  Promissory Note, it was prepared in May of '09, almost a
17  year later and back-dated. Do you recall that?
18  A   I don't recall the specific Promissory Note, but
19  I do recall back-dating documents for Mr. Morse's use
20  with auditors and his accounting department.
21  Q   In the prior e-mail secured by funds in-house,
22  that's a Ponzi settlement; right?
23  A   Yes, that's a lie.
24  Q   Yeah, I understand it's a lie. But I mean, that
25  was -- those were Ponzi that you would use throughout to

Page 87

1  say I have another settlement?
2  A   That's right. It's a reference to the type of
3  deal it was.
4  Q   So that if there was money already in-house to
5  support the deal, why would they do an unsecured
6  Promissory Note rather than have the funds that were
7  already in-house?
8  A   When they first started to need documentation,
9  Mr. Scherer, there was a discussion between Ted and I -
10  because he didn't even know what type of documentation he
11  needed. He said McGinnis is saying our people at Crowe
12  Chizek, need documents. Okay. Barking up our ass, so to
13  speak. Okay.
14      I said, you got to tell me what the heck you
15  need. You know, I can give you a Promissory Note, I can
16  give you more documents, let's keep it as simple as
17  possible. I guess he spoke to somebody, I don't know
18  whom, I would suspect it would be Mr. McGinnis or
19  Mr. Kelly and they decided a Promissory Note would be
20  sufficient, so I prepared a Promissory Note.
21  Q   Let me show you a schedule -- I mean, a
22  demonstrative schedule that I prepared that's of an
23  e-mail from Morse Operations to you. It's Page 18.
24      MR. KOPAS: Plaintiff's Exhibit 12 is a
25  demonstrative exhibit concerning missing promissory

Page 88

1  notes.
2      MS. ROTHCHILD: Can you identify it?
3      Mr. Scherer, would you identify for us trying to
4  follow along so we can go through this packet?
5      MR. SCHERER: Page 18.
6      MR. KOPAS: Page 18 of the power point
7  provided.
8      MS. ROTHCHILD: Separated out?
9      MR. SCHERER: It's at the end of it.
10      MS. ROTHCHILD: Same objection.
11      (Whereupon, Plaintiff's Exhibit No. 12 was
12  marked for identification.)
13  BY MR. SCHERER:
14  Q   So, do you recall receiving a schedule from
15  Morse Operations in terms of the deals that needed to
16  have promissory notes that look something like this?
17  A   I have a recollection of receiving things that
18  look like this. I don't have an independent recollection
19  of receiving this document.
20  Q   Tell us your recollection of how Morse
21  Operations communicated to you concerning the need for
22  these notes. You said it already but I would like --
23  A   The bulk was Ted calling me. He would call me.
24  Again, Ted and I were best friends. Pick up the phone,
25  our conversations were generally extremely vulgar. I'll

Page 89

1    leave them out.
2         He would tell me, we need documentation. I
3    said, what documentation do you need? I don't know what
4    to give you, I can give you a Promissory Note, I can give
5    you a settlement agreement, I can give you assignments.
6    Basically giving him the variety of documents that we had
7    available in our standard deal packets. We both agreed,
8    let's keep it as simple as possible. He said he would
9    get back to me. This occurred on more than one
10   occasion.
11        I don't know who he spoke to, I can only assume
12   it was someone at Crowe Chizek, more likely Mr. McGinnis
13   or Mr. Kelly or both of them.
14   Q    Did you have communications with McGinnis or
15   Kelly or anybody else either by e-mail or directly
16   concerning the need to paper these transactions?
17   A    I believe I did. I know I had telephonic
18   communications. Dennis McGinnis and I go way back, we
19   were fraternity brothers at the University of Florida. I
20   was extremely comfortable with him.
21        The other thing you have to understand the
22   dynamic of - it's called Ted's management style, when it
23   comes to being abrasive, when he wants something, Ted
24   makes me look like a puppy, so people were very, very
25   reluctant. You can speak to anybody that works for the

Page 90

1    Morse companies can tell you, he's a yeller and a
2    screamer and a curser. It was very simple
3    conversations. I would talk to McGinnis and say, Ted's
4    all over me about this, tell me what the heck you want.
5    And McGinnis might say something like, I know he's been
6    in here screaming like a lunatic. What can you give me?
7    I'll give you a Promissory Note; does that work. Yes.
8    End of conversation.
9         And it's internally - I can't speak for the
10   auditors because I don't know, but internally if the
11   people inside were pushing for something - if Ted said
12   this is what you're getting, make it work, that's the way
13   it would happen.
14   Q    Do you have any recollection of having dialogue
15   with anybody, McGinnis or anybody in Morse Operations
16   about that the deal was a settlement where the funds were
17   in-house and where are the funds that were in-house?
18   A    Where they asked me were the funds in-house?
19   Q    Yes.
20   A    I don't have an independent recollection of it
21   but it certainly wouldn't surprise me if Dennis McGinnis
22   or Mike Kelly asked me that question.
23   Q    The idea of doing a Promissory Note unsecured by
24   the law firm to secure three million dollars that was
25   supposed to be in-house in your trust account, seems to

Page 91

1    me that would be something that an accountant might want
2    to talk to you about.
3    A    I can tell you -- yeah, but they didn't raise it
4    that way. In other words, if you're asking me did
5    Mr. McGinnis or Mr. Kelly or anyone else from Morse for
6    that matter, accepting Carol out on all the Jan Jones
7    stuff -- nobody, no one from Morse Operations ever asked
8    me any in depth conversation - questions, excuse me,
9    never asked me any in depth question about anything that
10   I was doing with Ted.
11        As best as I can could tell, I think the
12   conversations would prove it up, I was off limits.
13   Whatever I was doing was okay by Ted and that was that.
14   Q    Did you have a problem with Bank of America; you
15   and Mr. Caputi --
16   A    Yes.
17   Q    -- have a problem with Bank America that you
18   asked Ted to help you with?
19   A    Yeah, we had a huge problem.
20   Q    It was as a result of some check kiting issue in
21   June of '06?
22   A    Yes, prior to my purchase of Kendall Sports Bar,
23   which was the company that owned Cafe Iguana in Pembroke
24   Pines. Steve Caputi was the manager running the finances
25   for the absentee owners. I believe he was actually a

Page 92

1    five or 10 percent owner, if I'm not mistaken as well.
2    We ran a fairly large check kiting scheme, again, for me
3    to supplement deficiencies in the law firm and out of my
4    own pocket and the pockets of my partners, in and out of
5    what is Kendall Sports Bar, which is Cafe Iguana. It was
6    an extended period of time.
7         At one point in time or several points in time
8    checks got deposited when they shouldn't have got
9    deposited. We miscalculated the float and checks
10   bounced.
11        There were some very, what I'll term -- the best
12   I could tell you would be frightening calls that
13   Mr. Caputi received from the people at Bank of America.
14   When it was relayed to me it was clear to me SAR,
15   Suspicious Activity Report was about to be filed or had
16   been filed and I was going to do everything in my power
17   to stop it.
18        I certainly didn't want the federal government
19   looking at what we were doing. I contacted Ted. I
20   explained the situation in detail to him. He had a very
21   tight relationship with the people at Bank of America all
22   the way up the ladder because the fact that his family
23   they floor planned their cars through Bank of America and
24   had personal money there at one point in time.
25        And he made calls to attempt the stop the SAR

23 (Pages 89 to 92)

Page 93

1  from leaving the bank.
2      Q   How do you know that?  How do you know Ted did
3  that?
4      A   He told me he did.
5      Q   I'm going to show you an e-mail.
6      A   As a matter of fact, I remember him actually
7  telling me he had already contacted someone at the bank
8  and was waiting to hear back.
9      Q   Did the problem go away?
10     A   It never became a problem for us so I assume it
11  went away.
12     Q   What did you tell -- Did you tell him of the
13  importance of the mission to get the bank back off?
14     A   My recollection is that this would be the
15  downfall of my law firm if this occurred.
16     Q   And you related that way to him?
17     A   Probably in more colorful language, but yes.
18         MR. KOPAS:  Plaintiff's Exhibit 13 are the
19  Caputi e-mails, Bates labeled Rothstein S000092,
20  000096.
21         (Plaintiff's Exhibit No. 13 was marked for
22  identification.)
23  BY MR. SCHERER:
24     Q   Let me show you these series of e-mails as a
25  composite.  You don't need to read them all.  I kind of

Page 94

1  over highlighted that first one, but it's an e-mail from
2  you to MOI1 at Ed Morse.  That's Ted --
3      A   That's Ted's personal e-mail, yes.
4      Q   Right.  And you can see on the second one,
5  you're continuing to ask him, and then on the Page 91
6  that ends with 94 where you're talking about a deal on
7  that e-mail.  You can see down at the bottom where he
8  says, I'm on both deals.  And then he said I also talked
9  to BOA, we will know more tomorrow.  Do you see that?
10     A   Yes.
11     Q   And your recollection is in addition to this
12  e-mail you spoke with him after and he said what you said
13  he said?
14     A   Yes.  He told me that he took care of it.
15     Q   Mr. Rothstein, they're telling me that we need a
16  break so we don't want to wear you out.
17         THE DEPONENT:  Okay.
18         MR. SCHERER:  10 minutes.
19         (Thereupon, a short break was taken.)
20  BY MR. SCHERER:
21     Q   We're going to try to hurry this along a little
22  more, Mr. Rothstein.  Hard for me to say that.
23         Let's go.  Next exhibit is Exhibit 14, which is
24  a summary chart that I would like to show you now.
25         MR. KOPAS:  Plaintiff's Exhibit 14 is Page 9 of

Page 95

1  the power point presentation.
2      (Plaintiff's Exhibit No. 14 was marked for
3  identification.)
4  BY MR. SCHERER:
5      Q   I want you to kind of keep that in front of you
6  while we examine - or while I examine you on some more of
7  these facts.  I want to direct your attention to the Jan
8  Jones lawsuit.  And I understand there was a lawsuit
9  filed up in Palm Beach County against a decorator, Jan
10  Jones and a contractor that built a house for Ed and
11  Carol?
12     A   Correct.
13     Q   And look at the schedule there before you, you
14  can see that I've got a schedule of all of the money that
15  was paid, the totals there - the deals, looks like you
16  have the Ted Morse deals, the Morse Operations deals and
17  the Jan Jones deals.
18     A   Okay.
19     Q   I represent that I believe that schedule is
20  pretty accurate, the accounting totaling up to - we don't
21  do the totals on the schedule, it's about - a little shy
22  of a hundred million dollars total.
23     A   That sounds approximately correct.
24     Q   We've talked about the Morse Operation deals and
25  the notes, and we've talked about Ted and Ted's deals.

Page 96

1  And now let's go to Jan Jones.  It looks like that - not
2  looks like -- when was the first time you used the Jan
3  Jones lawsuit -- Well, let me ask you this.  First of
4  all, the Jan Jones lawsuit against the decorator and
5  contractor for building shotty construction; what kind
6  of -- how much is at issue in that lawsuit?
7      A   I don't recollect.
8      Q   It wasn't but a million dollars at issue, plus
9  or minus?
10     A   Yeah, it was probably somewhere between a
11  million plus.  Carol believed it was substantially more
12  but yes, there was - probably on its best day, a few
13  million dollars involved.
14     Q   For them?
15     A   For them.
16     Q   On its worse day, didn't you pay 500,000 to
17  settle it, to get it out from underneath you?
18     A   Yes.
19     Q   Somewhere in that range?
20     A   Somewhere between them paying 500,000 and us
21  getting some money?
22     Q   Yes.
23     A   Range in a million, two million dollars, yes.
24     Q   How did it come about that you - starting in
25  July of '06, started getting money out for these payments

24  (Pages 93 to 96)

1 that you see there as represented as 650,000, 600,000,
2 one million four, et cetera?
3    A   We told Ed and Carol -- when I say we, I told Ed
4 and Carol -- this was me doing this.
5    Q   Okay.
6    A   That there were bonds due.  We need money for
7 the Ponzi scheme obviously.
8    Q   Okay.
9    A   I had no other place to get it.  I went to the
10 place I knew that I could likely get it.  And I explained
11 to them, with a lie obviously, that we needed to post
12 these bonds in order to secure different things.  Certain
13 of these for bonds, certain for expert witnesses, other
14 things, it was one lie after the other.
15    Q   In looking at the -- there weren't any court
16 orders all the way down through the red dotted line there
17 in March of '08, as I understand it?
18    A   No court orders until the pressure from Carol
19 got to the point where we needed to have one.
20    Q   Now, was Ted involved in this knowing that this
21 bond money was not legitimate?
22    A   At a certain point in time it became clear to
23 Ted that there were no real bonds.
24    Q   The fact that there were no real bonds would be
25 supported by the fact that there were no documents in any

1 court file referencing any bonds or seizures of money?
2    A   Right.  By that and by the fact that at the very
3 end there was a phony hearing that allegedly had taken
4 place before Judge Seltzer.
5    Q   We're going to talk about that in a minute.
6        And it appears that there was about eight
7 million dollars worth of these bonds prior to '09.  And
8 then there was -- and that activity really
9 increased.  But I want to direct your attention to the
10 before part of that schedule.
11        What were you telling Ed and Carol or people in
12 Morse -- did you report to Morse Operations also?
13    A   I reported to Ed and to Carol.
14    Q   Not to anybody, McGinnis or anybody at the
15 company where the money was coming from?
16    A   I may have had conversations with them, but I
17 did not report to them.
18    Q   Can you tell us just briefly what you told them
19 that would require them to post eight million dollars in
20 a million dollar lawsuit?
21    A   I don't remember off the top of my head, but
22 here's what you must understand to understand the size of
23 the figures.
24        As far as perpetrating all fraud, Carol was her
25 own worse enemy because she had such venom.  Her attitude

1 was so venomous as pertains to Jan Jones and the people
2 working with him and the other people -- you have to
3 understand, they were building what was going to be their
4 dream, their final big home up in Boca Raton.  It became
5 a disaster.  And the venom level - you could have
6 convinced Carol at that point in time that this lawsuit
7 was worth a billion dollars.  And she --
8        MS. DEUTCH:  Roberta Deutch on behalf of Carol
9 Morse and I represent Ed and Carol Morse.  To these
10 gratuitous comments, move to strike with no
11 foundation.  Move to strike.
12    Q   Okay.  Go ahead, Mr. Rothstein.
13    A   So, I played off of that.  I mean, it was clear
14 to me that Carol believed this was worth a lot of money.
15 When I told her the value of these things and told Ed the
16 value of it, she was actually one of the best salespeople
17 for it because she had Ed convinced that this was worth
18 tens of millions of dollars.
19        MS. DEUTCH:  Move to strike.
20    A   When I asked for the bonds, there was really no
21 question.  The questions were limited, then they sent the
22 money.
23    Q   You asked for the bonds - do you recall what you
24 told them the bonds were securing?
25    A   Some were to secure off-shore money we

1 identified in Jan Jones off-shore, I believe, it was a
2 Cayman account.  Some was to secure a judgment that we
3 had, various things of that nature.  There should be --
4 one thing about this, Mr. Scherer, with regard to Carol
5 and Ed, there should be e-mails.  It's a lot different
6 than my communication with Ted Morse.  Most of it should
7 be memorialized.  The lies I was telling to support this
8 should be memorialized in e-mails.
9    Q   It is.  When did Ted come into the picture in
10 terms of knowing that this was you getting big Ponzi
11 money or getting Ponzi money out of that Jan Jones
12 lawsuit?
13    A   The time that I have -- I'm only going to tell
14 you when I was certain.  I had inklings about it before.
15 The time that I was certain was, this was exploding with
16 Carol.  She was all over me.  I was constantly, for
17 months, complaining to Ted, you need to get her off my
18 back, she's making me crazy, all this crazy shit, she's
19 going to sue me and do all kinds of things.  It's going
20 to blow up everything we have together.  This is a mess.
21        He kept telling me he would handle it, he
22 handled it as best he could for as long as he could.  You
23 must understand, you don't have to take my word for it,
24 speak to anyone in the Morse family or anyone friends
25 with the Morses to say to Carol and Ted had a bad

Page 101

1  relationship, again, one of the understatements of the
2  millennium. He had no love loss for her at all.
3      So, at some point in time it becomes clear to me
4  because I'm telling Ted this is going to blow up. He
5  said, what do we need to do? I said, we have to get
6  something for her to shut her up. And we planned out
7  this hearing that is going to occur.
8      Q   I'm going to get to that. Before we get to that
9  hearing that was going to occur - and I know there's a --
10  you had is a phony Court Order before Judge Seltzer that
11  was Judge Marra that was entered -- I'm going to give you
12  that too in a minute.
13     A   Okay.
14     Q   Before I get there, did you have a
15  conversation -- Let me back up.
16     In April of '09 the New York Fund stopped
17  funding your Ponzi through Banyon. That's the date. It
18  was April and you got no more Monday payments from them.
19  I want you to accept that April 4th was the last one, I
20  think.
21     A   Okay.
22     Q   Okay.
23     A   Um-hmm.
24     Q   Never got anymore, and knew you weren't going to
25  get anymore. Frank Preve e-mailed you and said they're

Page 102

1  history. You were just going to pay them enough to keep
2  them going?
3      A   That sounds about right because it was Aril 13,
4  '09 when I cut them off.
5      Q   Okay. Same period of time.
6      A   Yes.
7      Q   Did you have a conversation with Ted at that
8  point that you needed to get short-term money out to keep
9  the Ponzi going and you were going to ramp up the Jan
10  Jones lawsuit?
11     A   I had several conversations with him about that.
12     Q   Tell us about it.
13     A   What was occurring was Ted could see the
14  pressure that I was under. Again, the man was my best
15  friend. Ted knew based upon my prior conversations with
16  him about everything else we were doing that what was
17  going on was illicit with regard to all the deals that he
18  was doing, that he was doing with me, hence no need for
19  the paperwork.
20     With regards to Jan Jones, the soft point with
21  Ted was that Ted believed all this time that his father's
22  money was ultimately going to be his money anyway. So it
23  was more of a, "Don't worry about it. Do what you've got
24  to do. We'll work it out at the end."
25     Even if you go through all the e-mails, right

Page 103

1  down to the very end Ted sent me an e-mail saying, "I
2  don't care if you did something wrong. We can work it
3  out. Just tell me what's wrong."
4      Q   Let me show you a graphic. At the time of this
5  conversation that you had with Ted -- I'm going to show
6  you a summary chart of how much money Ted had coming and
7  Morse Operations had coming from your Ponzi deals.
8      MR. KOPAS: Exhibit 15, Page 47 from the Power
9      Point.
10     (Whereupon, Plaintiff's Exhibit No. 15 was
11     marked for identification.)
12  BY MR. SCHERER:
13     Q   I represent that I believe this chart is
14  accurate as far as the accounting goes. That he, Morse
15  operations, had $13 million and then some outstanding on
16  your Ponzi deals at that point.
17     Was there a discussion when you talked to Ted
18  that, You've got a lot of money coming if we keep this
19  Ponzi going?
20     A   It wasn't necessarily like that, Mr. Scherer.
21  It was the pressure on me. Okay. I mean, it was an
22  understanding with Ted that he had a lot of money
23  coming. Again, it was not necessarily every day
24  conversation, but certainly whenever the conversation
25  turned to money.

Page 104

1      And I don't mean to be wordy about this, but you
2  need to understand the context to know what Morse knew
3  and didn't know, and it was very simple.
4      Ted knew that he had a lot of money coming. I
5  knew he had a lot of money coming. He did not care where
6  it was coming from, and he made that clear to me by
7  telling me, "Just do whatever you have to do. We'll work
8  it out all out in the end."
9      He used to joke around with me because I used to
10  get visibly upset with him about this. And he would say,
11  "Listen, listen, listen. At the end of this day it's all
12  my money anyway. It's all coming to me. Only a portion
13  of it goes to Carol. The business, most of my father's
14  money is coming to me. So don't worry. We'll get it
15  worked out."
16     He, it was very, very -- he tried to be very,
17  very brotherly and very calming toward me with regard to
18  the moneys and doing what we needed to do in order to
19  make sure everybody got their money back.
20     Q   As far as the bond monies that were tied up, do
21  you recall what you told Ted and ultimately Carol and Ed
22  about what they were going to get from the bond money
23  that was tied up in terms of interest rate?
24     A   It was a ridiculous interest rate. I think we
25  actually made interest payments on it, a $500,000 payment

26 (Pages 101 to 104)

## Page 105

1  and something else.
2      Q    Was there a 15 percent interest rate on the
3  bond? Does that sound right?
4      A    It sounds right.
5      Q    And so what they were going to get out of this
6  lawsuit was there's a phony judgment entered for
7  $23 million?
8      A    Correct.
9      Q    And they had posted up to $57 million in
10 bonds --
11     A    Correct.
12     Q    -- that they were going to get 15 percent on?
13     A    Yes.
14     Q    And so that their anticipation was the 57
15 million bonds being repaid back at 15 percent interest
16 plus a $23 million judgment, 21 of it punitive, $2
17 million of it compensatory, right?
18     A    That's correct.
19     Q    And then all of the Ponzi deals --
20     A    That's correct.
21     Q    -- which ultimately paid out?
22     A    That's correct.
23     Q    After the 57 million was the high watermark of
24 the bonds, you paid a lot of those bond funds back to the
25 Morses, didn't you?

## Page 106

1      A    25 million or so back.
2      Q    29, I believe.
3      A    I don't recollect specifically, but I know it
4  was in the 25 million-plus range.
5      Q    Were you trying it get Ted back his money when
6  the crash occurred?
7      A    Before the crash occurred, yes.
8      Q    Before the crash occurred?
9      A    Yes.
10     Q    At the end of the day if you had been able to
11 carry on this Ponzi scheme a little longer, if my math is
12 correct, Ted and Morse Operations and Ed and Carol would
13 have netted about $38 million from dealing with you, in
14 addition to getting their money back, of course?
15     A    That's correct.
16     Q    Let me show you 49. I've got an e-mail where
17 you're -- where Ed Senior compares you to Bernie Madoff
18 on March 17, '09.
19     A    Yes.
20     Q    Things started to get serious then?
21     A    They were already serious with Carol. But what
22 occurred was I received that e-mail, I believe -- What
23 day of the week is that?
24     Q    It's Tuesday. We're going to get it as soon as
25 my assistant gets on the ball here.

## Page 107

1      A    Okay.
2      Q    We only went over this last night about five
3  times.
4          MR. KOPAS:  Exhibit 16, page 49, from the Power
5  Point.
6          (Whereupon, Plaintiff's Exhibit No. 16 was
7  marked for identification.)
8  BY MR. SCHERER:
9      Q    That's so you can recognize Bernie up there.
10     A    I recognize him.
11     Q    This is a blowup of that e-mail. And you're
12 writing him back. I guess you had a conversation when
13 they accused you of -- How did the accusation of the
14 Madoff come about; do you recall?
15     A    Yes. I was talking to Ted. We were discussing
16 all the funds, what needed to be done. It was a fairly
17 intense conversation. He kept telling me, "You need to
18 do something to calmed Ed down." It was -- it was a
19 recurring theme that had boiled over. It was, "Carol has
20 gotten Ed in a twist. You need to do something to calm
21 him down. He's starting to think you're like Madoff."
22     Q    I notice you say in there, you know, "I'm deeply
23 sorry." I've got that highlighted for you.  "Putting
24 your company in deals that have made you feel so
25 uncomfortable."

## Page 108

1          And then you went on to say something about,
2  down at the bottom there you say -- Let me see if it's in
3  this e-mail.  Somewhere in one of these e-mails you
4  mention to them that you had made them millions of
5  dollars in the settlements, and made some reference that
6  you -- Oh, yeah, in this one.  You're meeting with George
7  about taking them out.
8      A    Yes.
9      Q    Tell us about that.
10     A    I was basically telling them that if they wanted
11 out of everything, that I had someone that would take
12 them out.
13     Q    But, you made reference to the fact that they
14 had made millions in profit on your settlement deals.
15     A    Well, that was something that -- I can tell you
16 this, Ted Morse, I don't know what Ed's feeling was, but
17 Ted did not want out of anything.
18     Q    Okay.
19     A    He was trying to appease his father, and I was
20 attempting to appease his father.
21          If you look at this, this is the way I was
22 operating at that time.  "I'm making you millions of
23 dollars.  Why are you accusing me of something?"
24     Q    Go ahead.  "The next time" -- Why don't you just
25 go ahead and put this e-mail into the record while you've

27  (Pages 105 to 108)

Page 109

1  got it.
2      MR. KOPAS:  Exhibit 17 is the actual e-mail,
3  Bates labeled Rothstein S, 000097.  I'm back on the
4  ball.
5      (Whereupon, Plaintiff's Exhibit No. 17 was
6  marked for identification.)
7  BY MR. SCHERER:
8      Q   This is the actual e-mail, not my graphic there.
9      A   Okay.
10     Q   I couldn't get the picture off.
11     A   Yes.  Understand, first of all, any time I'm --
12  Ed Morse was very much like Ron Picou, who did not have a
13  computer.  So anything I was sending to Ed I would simply
14  send to Dolores Daoust, who was Ed's primary assistant.
15     Q   You drafted a fake order of Judge Marra dated
16  the 25th of March '09.  Do you recall that?
17     A   Yes.
18     Q   And did you do that by yourself or did you have
19  some help in your firm to do that?
20     A   The only thing that may have occurred, and I
21  don't have an independent recollection one way or the
22  other, is running the order by Steve, Steve Osper to make
23  sure it comported with what was going on with the case at
24  the time, but other than that it was all me.
25     Q   The order goes on and on, but it essentially

Page 110

1  says you found ten million dollars in the United States
2  in accounts that you seized, 20 million in the Caymans
3  and that there was a 23 million dollar judgment entered
4  in their favor and ordered that the money was going to --
5  the bond money was going to be paid back to them after a
6  time.
7      A   Yes.
8      Q   And you always had a down the road --
9      A   It had to be down the road because I was hoping
10  that sufficient Ponzi funds came in from other investors
11  to pay them off.
12     Q   By this time Ted knew that this money was going
13  into your illegal business?
14     A   He knew it was being used for illicit activity.
15  Ted and I never had a conversation.  So we're clear,
16  Mr. Scherer, Ted and I never had a conversation that
17  said, This a Ponzi scheme.  I didn't have that
18  conversation with anybody.
19     Q   Nobody used the word Ponzi; right?
20     A   No.
21     Q   There's Ponzi talk throughout your e-mails and
22  your correspondence and --
23     A   There's conversations regarding illicit
24  activity, illegal activity, yes.
25     Q   Now, let me show you an e-mail from Carol that

Page 111

1  kind of got things moving along for you, September the
2  6th.
3      MR. KOPAS:  Exhibit No. 18 is an e-mail from
4  September 6th, and it's actually produced by the
5  Morse as part of their Exhibit 5, pages 150 and 151.
6      (Whereupon, Plaintiff's Exhibit No. 18 was
7  marked for identification.)
8  BY MR. SCHERER:
9      Q   Do you recall this?
10     A   Yes.
11     Q   And it appears that this -- Well, let me ask
12  this:  There was a demand, as you can see there on the
13  e-mail on the 6th to have the following by
14  5:00 p.m. And all Court orders, et cetera, et cetera.
15     A   Yes.
16     Q   You think Carol drafted this?
17     A   No.
18     Q   You think she had a lawyer draft it for her?
19     A   I had a suspicion for many months that Carol had
20  been talking to a lawyer.
21     Q   You don't know who the lawyer was?
22     A   I have no idea.
23     Q   One of the things I wanted to ask you, the Morse
24  Operations, if we were to go run a litigation index of
25  them, that company is in litigation all the time and has

Page 112

1  been for years and years in terms of its Cadillac
2  agencies?
3      A   Sure.  All its car dealerships.  Sure, yeah.
4      Q   Like any other car dealership.
5      A   If you're asking me if they're litigation savvy,
6  the answer is yes.
7      Q   Did it ever occur to you during this time that
8  they might call one of their lawyers in one of their car
9  cases and ask if this sounds legitimate, what you were
10  doing in terms of getting so much money out in terms of
11  bonds?
12     A   Not during the point in time that Ted was
13  telling me that he had everything with Ed under control.
14  Again, you're dealing with people that rule the family
15  with an iron fist.  Obviously that was the case because
16  nobody called anybody though they had access to many
17  lawyers.
18     Q   Would you say that this e-mail on the 6th kind
19  of caused you to get ramped up about doing something to
20  satisfy Carol --
21     A   Yes.
22     Q   -- and her lawyer?
23     A   Yes.  I remember it distinctly.  I was in New
24  York at the time.
25     Q   When you read this did, you read this as though

28  (Pages 109 to 112)

Page 113

1  she's got a lawyer, that only a lawyer would draw
2  something like this?
3      A   I read this as, if I don't do something drastic,
4  yes, I'm going to be in big trouble.
5      Q   Because you know we lawyers don't write like
6  normal people and this looks like lawyer writing?
7      A   Yes.  It doesn't look like anything that Carol
8  had written to me prior.
9      Q   Did you think that in the beginning when you saw
10  this, like, ah-oh, she's got a lawyer?
11     A   Yes.
12     Q   And so you go into damage control on September
13  the 8th.  Do you recall that day?
14     A   I went into damage control when I received
15  this.  I received it when I was in New York.
16     Q   And what happened?
17     A   I attempted to call them.  I couldn't get in
18  touch with them.  I spoke to Ted, told him, big problems,
19  read him the e-mail.  We discussed various options, and
20  we came up with the Court order hearing thing.  I came up
21  with it.  Ted agreed.
22     Q   Now, let me kind of run through this.  I'm going
23  to do it quickly.  But it's important that I get it in
24  the record.
25         So on September 8 -- I don't know what day of

Page 114

1  the week that was.  Tuesday, September the 8th, seemed to
2  be a pretty busy day for you guys.  And Ted came into
3  your office in the morning around 10:00.  Do you recall
4  that?
5      A   I don't recall the time, but I remember him
6  showing up, yes.
7      Q   I'm going to show you an e-mail that will help
8  you there.
9          And did you invite him over so that you guys
10  could do something to answer Carol's demands from a
11  couple of days before?
12     A   We discussed it the night before.  He was going
13  to come over.  We were going to do two things.  We were
14  going to take a trip to the courthouse.  I was going to
15  introduce him to the judge.  I needed to talk to him
16  about some other things.  We went ahead to the bank and
17  get a letter that I was going to put on top of the
18  account statements.
19         It was the standard process that we always used,
20  not Ted and me always used, that the people involved in
21  the Ponzi scheme always used in getting an original
22  letter which we attached with the bank's assistance to a
23  fake bank statement.
24     Q   We're going to show you -- Ted was in your
25  office.  And we're going to show you some stuff off your

Page 115

1  computer to fix various times and the date in terms of
2  when you typed the phony order?
3      A   Sure.
4      Q   But, when Ted came into your office, you went to
5  the Judge Seltzer first, and then you went to the bank?
6      A   I believe that --
7      Q   That's your memory?
8      A   That's my memory.
9      Q   The bank's got a video of you two walking in at
10  about 1:30 or so, which I'm going to show you?
11     A   That would be after I went to see Judge Seltzer.
12     Q   Okay.  And when you went to see Judge Seltzer
13  the purpose -- You took Ted along.  What was the purpose
14  of that?  Why did you go to see Judge Seltzer?  I mean, I
15  know Seltzer was going to enter the order, and I know the
16  order refers to Ted being there and testifying.
17     A   Ted needed to have what I'll call plausible
18  deniability when he spoke to his father.  He was going to
19  have to run with this because we were going to put --
20  there was a specific comment -- excuse me, comment.
21  There was a specific portion of the order that said that
22  Ted testified at length.  And it was based upon his
23  testimony that this order, which was obviously very much
24  in Carol and Ed's favor was based upon in bulk on Ted's
25  testimony.

Page 116

1          Ted and I discussed it.  I said, "We can go over
2  and talk to Barry just in generalities.  I stop by there
3  all the time, and I needed to pick up a book from him.
4  So I used that as my cover with Barry.  He was giving me
5  something to assist him in attempting to get a federal
6  judgeship, his CV and all the pertinent material.
7      Q   And so would it be fair to say that you took Ted
8  along for alibi purposes?
9      A   Alibi purposes sounds about right.  I took him
10  along so that he would have plausible deniability.  He
11  went to the courthouse.  He can identify Judge Seltzer
12  and had in fact talked to him.
13     Q   Hadn't you guys already drafted the rough draft
14  of the Court Order even before you went in there to see
15  Seltzer?
16     A   Yes.
17     Q   Didn't you draft it with Ted sitting in your
18  office there from 10:00 until --
19     A   It started being drafted way before 10:00 I'm
20  sure if you look at the computer.  It was finished after
21  Ted got to the office.
22     Q   Did Ted help you with that order?
23     A   No.
24     Q   Did he suggest any language in that order?
25     A   No.

Page 117

1    Q   Did he see you drafting the order? did you do it
2  in his presence?
3    A   I did it in his presence, but I don't know that
4  he knew what I was doing.
5    Q   So the sequence of events is you go to see
6  Seltzer.  How long was the meeting in Judge Seltzer's
7  office?
8    A   In total maybe 15, 20 minutes.  Not very long.
9    Q   Wasn't Ted in there, you and Ted in there
10  together, and then Ted left, and he left you alone with
11  Judge Seltzer?
12    A   That's correct.
13    Q   And then you left and went to Weston; is that
14  your memory?
15    A   Well, then Judge Seltzer gave me the book that
16  had all his judgeship material in it.  I took the order,
17  placed it inside the book.  Then we went to Weston.
18    Q   And when you went to Weston you put on another
19  one of the shows that you did at the Weston T.D. branch,
20  right?
21    A   Yes.
22    Q   What we call shows --
23    A   Yes.
24    Q   -- and you call them shows.
25        MS. ROTHCHILD:  Object to the form.

Page 118

1        THE WITNESS:  That was when I --
2  BY MR. SCHERER:
3    Q   What did you do when you went to Weston with
4  Ted?
5    A   We gave them the bank statement.  We put on what
6  was commonly known in our firm and commonly known to T.D.
7  Bank as the show.  Both Ms. Caretsky, Ms. Kerstetter,
8  Frank Spinosa and Bill Brock all referred to it as the
9  show.
10    Q   And there was a cover letter with a phony bank
11  balance for the bonds' accounts that's allegedly in your
12  trust account?
13    A   Real cover letter, fake bank statement.
14    Q   It showed 57 million or whatever the bond number
15  was?
16    A   Right.
17    Q   I'm going to show that you in a minute.
18    A   It actually made no sense because we had already
19  paid them some money, but yes.
20    Q   As a matter of fact, you already paid them 10
21  million dollars before that, so that 57 was off by 10
22  million?
23    A   Yes.
24    Q   How could Ted or Morse Operations or Ed and
25  Carol not keep track of a 10 million dollar payment?  I

Page 119

1  mean, how do you explain that?
2    A   You're going to have to ask them.
3    Q   How about Ted, did Ted look at it?  Did he know
4  that there wasn't any money in that account?
5    A   He couldn't have cared less.  I don't know what
6  he was looking at.  We had discussed the night before
7  that we were going to the bank to get this letter to put
8  on top of the bank statement to give to his father.  That
9  was as much as Ted was involved at that particular time.
10    Q   Do you know whether Ted -- Did you ever express
11  to Ted that there really wasn't 57 million in here, that
12  this was a phony statement?
13    A   We never discussed that one way or the other.
14  Throughout this, you'll see it runs the course, just so
15  you understand, that's not a discussion you have.  That's
16  inferred in everything that's going on.  If I had the
17  $57 million in there, I would have given it back to
18  them.  And if I had it and we didn't need to substantiate
19  this for Ed and Carol, I didn't need to drive to the bank
20  to go get this.  I could have pulled it up on the
21  computer in Ed's office.  I didn't need to go to the bank
22  to do this.
23    Q   Right.
24    A   In this day and age of computers, that whole
25  bank thing never made any sense to me, to anybody.

Page 120

1    Q   If you look at the actual shot screen from your
2  computer, it would have shown $100 in that account,
3  right?
4    A   The real one, sure.
5    Q   Sure.
6    A   Yeah.
7    Q   Now, then you and Ted come back to your office?
8    A   Yes.  And then the phone call takes place.
9    Q   Then the phone call.  What phone call is that?
10    A   This is the key moment with Ed and Carol.  We'll
11  call it the Ted show.
12    Q   Okay.
13    A   We contacted Ed.  Ted has Ed on speakerphone.
14  Ted tells his father that we won the hearing, basically
15  reads him portions right off the order.  Ed asks me
16  several questions about it.  And my whole game plan is
17  make Ted look as good as I can in his father's eyes,
18  which I did.  He thanked us and that was the end of the
19  call.  Ted took a copy of the order to deliver to Ed and
20  Carol.
21    Q   Now, in that sequence there after you got back
22  from Court there's an e-mail.  And I'm going to show you
23  where you ask for permission from Ed to have Ted testify
24  in the Court, right?
25    A   Yes.  One of the things that Ted and I discussed

Page 121

1   was the fact that, you know, we left something out. How
2   the hell are you testifying on behalf of your father?
3        So I called Deloris, told her to please get
4   something and I dictated to her. I need an e-mail
5   immediately allowing Ted to testify on behalf of Ed and
6   Morse Operations, that he was -- excuse me -- just on
7   behalf of Ed that he was designated.
8        Q   You did that after you came back from the bank?
9        A   It was more of just the two of us kind of
10  sitting there and me mulling over in my head what could
11  go wrong as far as Carol was concerned. And I guess my
12  brain went to how the hell did Ted testify for Ed.
13       Q   Now, the record I'm going to show you in a
14  minute I believe shows that you asked for permission to
15  testify after you got back from the punitive hearing?
16       A   Right.
17       Q   And then you -- the call on the order, the
18  punitive order that Judge Seltzer entered was made about
19  4:00, although you had had the order drafted hours, a
20  couple of hours before according to your computer. Does
21  that ridge a bell to you?
22       A   It sounds to me, Mr. Scherer, that what actually
23  occurred with regard to the timing of what occurred and
24  what occurred as far as what we were telling Ed and Carol
25  occurred are different. It sounds to me like we told

Page 122

1   them that we got the order, which sitting here thinking
2   about it makes more sense. I don't have specific
3   recollection as to the exact times.
4        Q   Let me see if I can help you.
5        A   Sure.
6        Q   Give me a minute here. We're going to give you
7   a composite here that are these blowups that we have of
8   the actual documents. Let me see if I can't put it all
9   together to speed this up.
10       MR. KOPAS: Exhibit 19, composite exhibit. It's
11  Page 65 from the Power Point, Page 69 from the Power
12  Point. It's also a T.D. Bank's Statement, Rothstein
13  S105, 106. It is Ed's authorizing Ted to testify,
14  e-mail Rothstein 93. It's the fake Court order,
15  Rothstein 107 and 108. It's also a series of Ted
16  testified e-mails, Rothstein 902, 904, 905, 906 and
17  907. That's Exhibit 19.
18       (Whereupon, Plaintiff's Composite Exhibit No. 19
19  was marked for identification.)
20  BY MR. SCHERER:
21       Q   Mr. Rothstein, let me show you Composite
22  Exhibit 19, and I'd like you to look at that. For some
23  reason I can't find your metadata from your computer
24  which I have that shows when you actually typed all that
25  stuff.

Page 123

1        A   Okay.
2        Q   But I'll get it in the record maybe before this
3   deposition it is over in 10 days.
4        MS. ROTHCHILD: Can we just have an objection to
5   that exhibit, please?
6        THE WITNESS: Okay.
7        MR. SCHERER: Sure.
8        MS. CARETSKY: Thank you.
9   BY MR. SCHERER:
10       Q   What have you got there? I kind of pulled my
11  things apart. What's that first thing?
12       A   Ted goes to Rothstein's office, 10:00 a.m.
13       Q   Okay. That's an e-mail from one of your
14  assistants that shows that Ted was there?
15       A   Yes. That's my main secretary letting me show
16  he's there.
17       Q   He came in to see you?
18       A   Correct.
19       Q   That's consistent with your memory?
20       A   That's correct, yes.
21       Q   All right. And then what do you have next?
22       A   12:45 we go to T.D. Bank.
23       Q   Now, but we know that between the 10:00 and
24  12-whatever-that-is, 12:45, you went to Judge Seltzer;
25  correct?

Page 124

1        A   That's my recollection that that's when we
2   headed over to Judge Seltzer.
3        Q   Then you see the snapshot of the surveillance
4   video with you and Ted walking in to get the $57 million
5   balance, right?
6        THE WITNESS: Yes.
7        MS. ROTHCHILD: Objection to form.
8        MR. SCHERER: What's wrong with the form?
9        MS. ROTHCHILD: In addition to leading, it's
10  assuming facts not in evidence.
11       MR. SCHERER: I'm sorry?
12       MR. CRAIG: Lack of predicate.
13       MS. ROTHCHILD: Lack of predicate. Thank you.
14  BY MR. SCHERER:
15       Q   What is that exhibit that you see there as part
16  of the composite exhibit? Would you describe that for
17  us, please.
18       A   Yes. It's the inside of the main T.D. branch
19  out in Weston where I did business. That's Mr. Ted Morse
20  and I walking into the bank.
21       Q   Okay. And your purpose of going to the bank was
22  to do what?
23       A   I needed the original letter from either
24  Ms. Caretsky or Ms. Kerstetter. I don't remember who.
25  Well, it says right here, Ms. Caretsky, to place on top

Page 125

1    of the phony bank statement that we created.
2        Q    Did you bring the phony bank statement?  Do you
3    have a recollection of how that phony bank statement got
4    there?  You can't tell from there, but I --
5        A    Yeah.  Go ahead.  What were you going to say?
6        Q    Let me ask you this:  Do you have a recollection
7    as to how that statement got there?
8        A    Well, one of two things happened, or one of
9    several things.  Either Bill Brock brought it to
10   Ms. Caretsky, as was the normal process.  That's Bokfor
11   (phonetic),.  He goes by Brock.
12       Q    Right.
13       A    As was our normal process when we were doing
14   this.  Or I brought it with me and put it with the
15   letter, one or the other.
16       Q    All right.  And then what do you have there?
17   Then you have a copy of Ms. Caretsky's letter with
18   attached phony bank balance, right?  Is that what you've
19   got there in front of you?
20       A    I've got the original letter with the statement
21   we created.
22       Q    Correct.  And that statement is, how much is in
23   that statement, 57 million?
24       A    $57,982,110
25       Q    And you represent -- and I recall your testimony

Page 126

1    that you had paid that down by some amount of money?
2        A    10 million and change.
3        Q    All right.  And then what's your next document
4    there?
5        A    This is the authorization letter that I dictated
6    to Deloris for Ed to have Ted testify on his behalf.
7        Q    That was, what is the time of that?
8        A    It says 2:25 p.m.  So one of two things, just to
9    make sure my testimony is clear, one of two things
10   occurred.  Either we told Ed and Carol that the hearing
11   was occurring later in the day or we did this after the
12   fact, one or the other.
13       Q    Okay.  And then you have an e-mail transmitting
14   the -- well, then you have Judge Seltzer's phony Court
15   Order, right?
16       A    That's correct.
17       Q    You photo-shopped his signature onto that?
18       A    The signatures were all done by Ms. Villegas.  I
19   don't know whether she photo-shopped it or how she -- it
20   looks like a cut and past job to me.
21       Q    That's how I use photo-shopped, meaning it was
22   his actual signature that --
23       A    His actual signature placed on a phony order.
24       Q    Right.  Okay.  Then what do you have?  You have
25   a transmittal of the phony order to the Morses?

Page 127

1        A    This is the order.  It's sent to Deloris so that
2    Ed got it.  It's sent to Cammissy so Carol got it.  And
3    it's sent to Ted Morse at moi1 so he had an additional
4    copy on his compute.
5        Q    So as I recall that order said that the
6    $59 million that you were holding in trust would be
7    returned in, I don't know, a month or something like
8    that, five weeks.
9        A    In so many days, yes.
10       Q    So many days?
11       A    Sure.
12       Q    And --
13       A    In between this, just so you've got your order
14   correct --
15       Q    Right.
16       A    -- in between this is sometime between arriving
17   back from the bank and the time we're sending this order
18   over to Ed and Carol is the telephone call where Ted's
19   talking about testifying the other things.
20            And the unique thing to remember, Mr. Scherer,
21   during this entire thing is that during the course of
22   sitting with Judge Seltzer, Ted didn't say five words.
23   He sat there basically quiet the entire time, and Judge
24   Seltzer and I basically talked mostly about skiing and
25   his upcoming wedding.

Page 128

1        Q    Then after you sent that e-mail attaching the
2    order in the e-mail, don't you invite Ed and Carol to
3    talk to Ted because he was there?
4        A    Yes.
5        Q    And Ted --
6        A    Actually there was some more pressure right
7    after that coming from Carol.  I believe she either-- I
8    either spoke to her or got a snooty e-mail from her.
9        Q    Would that snooty e-mail say the next day you
10   did all this and took care of the IRS all at the same
11   time?
12       A    Amazing.
13       Q    Amazing --
14       A    Yes.
15       Q    -- or marvelous or something like that?
16       A    Yes.
17            MR. KOPAS:  Exhibit 20, it's on Page 82 from the
18   Power Point, the so-called snooty e-mail.
19            (Whereupon, Plaintiff's Exhibit No. 20 was
20   marked for identification.)
21   BY MR. SCHERER:
22       Q    She says to you -- This is the next day, right?
23   Yeah.  Scott, you handled the courts and the IRS in less
24   than eight hours.  Is that a miracle or what?
25       A    Yes.

32 (Pages 125 to 128)

Page 129

1    Q    Please e-mail me the updated Jan Jones
2  settlement money, update on the Jan Jones settlement
3  money, correct?
4    A    Yes.
5    Q    And then thereafter I know there's e-mails, I
6  don't know if I provided them to you in that composite,
7  back and forth between you and the Morses about Ted's
8  testimony that day and using Ted to testify again if
9  necessary?
10   A    Yes.  We went through the whole thing about Ted
11  making it -- it's in the September 9th e-mail to -- well,
12  it was sent to three people, to Carol Morse, to Ed Morse
13  via Dolores Daoust, and to Ted Morse all at their various
14  e-mail addresses.  And it specifically talks about the
15  fact that Ted made a very effective witness.  I'm trying
16  to get back into Court.  And of course if you want to
17  know what went on during the hearing and all the
18  testimony and questions that were asked, ask Ted, he was
19  there, he testified.
20   Q    After that point you owed them on the bonds
21  $49 million and --
22   A    Correct.
23   Q    -- you got back another -- you paid them another
24  20 million or so after that point, as I understand it.
25  Does that sound about right to you?  Let me ask it --

Page 130

1  That's a bad question.  Let me ask it better.
2         You were trying to get them back all of that
3  bond money as fast as you could from the Ponzi scheme,
4  right?
5    A    Yes.
6    Q    And if you got back all their money except for
7  20 million, that means that you got back -- you got the
8  Morses money back on those bonds between that fake Court
9  Order of Judge Seltzer and the time of the actual crash
10  on Halloween '09?
11   A    Correct.
12   Q    If we were to look at that Seltzer fake order,
13  Judge Seltzer fake order, it orders the repayment back in
14  four weeks with one post dated check?
15   A    That's correct.
16   Q    But, you made a series of payments that was not
17  one post dated check, and you never did pay the whole
18  thing back?
19   A    That's correct.
20   Q    Was there ever any discussion -- I can't find
21  anymore fake orders that allowed you to make partial
22  payments rather than the one payment.
23   A    There are not any.
24   Q    And was there ever any dialogue from the Morses
25  about, Where is the orders that allow us to get our money

Page 131

1  back, you know modifying that order?
2    A    Only between Ted and I.
3    Q    Not between Carol and -- What happened as far as
4  Carol and Ed?  Did they stop bugging you?
5    A    No.  That's the reason Ted and I he those
6  conversations.  What occurred was, I told Ted, Listen,
7  whatever I got I'm going to be sending them.  Okay.
8  Because the more pressure I take off Carol, the less
9  she'll bother Ed, the less she'll bother me.
10        And that's when it was decided.  It was never
11  discussed that we thought we needed additional fake
12  orders to do that.  I was just going to try to put money
13  in their hands as quickly as possible.
14   Q    I can't find anymore e-mail correspondence or
15  correspondence with them to you during this time that you
16  were paying them back right before the crash complaining
17  about, Why am I not getting a lump sum payment?  I don't
18  think.  I'm not sure if there's any --
19   A    I don't recall one way or the other whether
20  there was or not.  I just had it in my head we were going
21  to get them the money back as much as possible as quickly
22  as possible.
23   Q    Did you ever discuss with Ted whether Ed and
24  Carol took you up on your invitation to talk to Ted, he
25  was there, he testified brilliantly?  Did Ted ever come

Page 132

1  and say, Mom and dad talked to me, or, My dad and my
2  step-mom talked to me?
3    A    Ted said, you have to understand, it was an
4  ongoing thing with Ed.  Ted rarely talked to Carol.  It
5  was an ongoing thing with Ed about this because of all
6  the pressure Carol was putting on Ed.  So yes.
7    Q    And my question is that, When you invited them
8  to talk to Ted, he was there, do you know whether they
9  did that or not?
10   A    Carol did not.  Ed did.
11   Q    Ed did talk to him, and Ted told his dad that he
12  was there at the hearing and testified?
13   A    He told them that once in front of me and
14  multiple times subsequent to that.
15   Q    Okay.  Thank you.  We're going to change topics
16  now a little bit.
17   A    Okay.
18   Q    They wouldn't let the paralegals in here.  You
19  can only have lawyers, so I'm having to use lawyers as
20  paralegals.  They're not as good.
21        Mr. Rothstein, when did you start banking at
22  Gibraltar bank, do you recall?
23   A    I have no independent recollection.
24   Q    Do you have any reason why you chose Gibraltar?
25   A    I was actually solicited by them to come to the

33 (Pages 129 to 132)

Page 281

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT IN AND
FOR BROWARD COUNTY, FLORIDA
CASE NO: 09-062943 07

RAZORBACK FUNDING, LLC, et al,

    Plaintiffs,

vs.

SCOTT W. ROTHSTEIN, et al,

    Defendants.
_____/

DAY 2 - AFTERNOON SESSION

DEPOSITION OF SCOTT W. ROTHSTEIN

DATE TAKEN:   Tuesday, December 13, 2011
TIME:         12:30 p.m. - 5:00 p.m.
PLACE:        99 N.E. Fourth Street, Miami, FL

Taken on Behalf of Razorback

Examination of the witness taken before:

Terri Wright
United Reporting, Inc.
1218 Southeast Third Avenue
Fort Lauderdale, Florida 33316
(954)525-2221

Page 282

1       IN THE CIRCUIT COURT OF THE
        17TH JUDICIAL CIRCUIT IN AND
2       FOR BROWARD COUNTY, FLORIDA
        CASE NO: 09-062943 07
3
4   EDWARD J. MORSE, CAROL A. MORSE,
    and MORSE OPERATIONS, INC.,
5
        Plaintiffs,
6
    vs.
7
    SCOTT W. ROTHSTEIN, et al,
8
        Defendants.
9   _____/
10          UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF FLORIDA
11          FORT LAUDERDALE DIVISION
12
    AMY ADAMS, ET AL, PLAINTIFF VS. SCOTT ROTHSTEIN, ET AL.
13  CASE NO.: 0:11-CV-61688-JIC/LSS
14
    Case No: 10-03767 RBR   STETTIN VS. GIBRALTAR PRIVATE
15          BANK & TRUST CO.
16  Case No: 10-03802-RBR  STETTIN VS. CENTURION STRUCTURED
17          GROWTH LLC, ET AL.
18  Case No: 11-02288-RBR  STETTIN VS. FIDELITY CHARITABLE
19          GIFT FUND
20  Case No: 11-02368-RBR  STETTIN VS. TD BANK, N.A.
21
22  Case No: 11-02473-RBR  STETTIN VS. REGENT CAPITAL
            PARTNERS, LLC ET AL
23
24  Case No: 11-02604-RBR  STETTIN VS. MAPLE LEAF DRILLING
            PARTNERS, ET AL
25  Case No: 11-02605-RBR  STETTIN VS. DON KING PRODUCTIONS,

Page 283

1   APPEARANCES FOR RAZORBACK:
2       WILLIAM R. SCHERER, ESQUIRE
        REID COCALIS, ESQUIRE
3       IVAN KOPAS, ESQUIRE
        CONRAD & SCHERER, LLP
4
5       ADAM MOSKOWITZ, ESQUIRE
        KOZYAK, TROPIN & THROCKMORTON, P.A.
6
7               ***********
8       MARC S. NURIK, ESQUIRE
        Appearing on behalf of SCOTT ROTHSTEIN.
9
10      CHARLES L. LICHTMAN, ESQUIRE
        BERGER SINGERMAN
11      Appearing on behalf of the Chapter 11 Trustee,
        Herbert Stettin.
12
13      HARVEY SERBLOWSKY, ESQUIRE
        Appearing on behalf of Platinum & Centurion Funds.
14
15      SUSAN E. TRENCH, ESQUIRE
        GOLDSTEIN, TANEN & TRENCH, P.A.
16      Appearing on behalf of Platinum and Centurion.
17
        MICHAEL GOLDBERG, ESQUIRE
18      AKERMAN SENTERFITT
        Appearing on behalf of Official Committee of
19      Unsecured Creditors.
20
        THERESA M.B. VAN VLIET, ESQUIRE
21      JOHN H. GENOVESE, ESQUIRE
        Appearing on behalf of the Trustee.
22
23      CARAN L. ROTHCHILD, ESQUIRE
        GREENBERG TRAURIG
24      Appearing on behalf of TD Bank, N.A.
25

Page 284

1       MARY BARZEE FLORES, ESQUIRE
        MATTHEW DATES, ESQUIRE
2       STEARNS WEAVER
        Appearing on behalf of Gibraltar Bank.
3
4       MICHAEL SCHLESINGER, ESQUIRE
        SCHLESINGER & COTZEN
5       Appearing on behalf of Frank Spinosa.
6
7       CHRISTOPHER G. BERGA, ESQUIRE
        LYDECKER DIAZ, LLC
8       Appearing on behalf of Szfranski.
9       RAMON A. RASCO, ESQUIRE
        PODHURST ORSECK
10      Appearing on behalf of Frank Preve.
11
12      TUCKER CRAIG, ESQUIRE
        BILLING, COCHRAN, LYLES, MAURO & RAMSEY, P.A.
13      Appearing on behalf of Rosanne Caretsky.
14      DAVID C. CIMO, ESQUIRE
        GENOVESE JOBLOVE & BATTISTA
15      Appearing on behalf of the Trustee.
16
        ALEX HOFRICHTER, ESQUIRE
17      LAW OFFICES OF ALEX HOFRICHTER, P.A.
        Appearing on behalf of Federal Insurance Company.
18
19      JOHN MULLIN, ESQUIRE
        GEORGE WALKER, ESQUIRE
20      TRIPP SCOTT
        Appearing on behalf of Morses.
21
22      JESUS SUAREZ, ESQUIRE
        Appearing on behalf of the Trustee.
23
24      SCOTT SCHMOOKLER, ESQUIRE
        Appearing on behalf of RLI Insurance, Columbia
25      Insurance and Zurich Insurance.

1 (Pages 281 to 284)

Page 285

1   CASEY CUSICK, ESQUIRE
    Appearing on behalf of Emess Capital, LLC.
2
    JAMES A. BLACK, JR., ESQUIRE
3   Appearing on behalf of St. Paul Fire & Marine.
4   BART HOUSTON, ESQUIRE
    Appearing on behalf of Levinson, Pearson &
5   Associates, Roger Stone and Watch U-Want, Inc.
6
    LAWRENCE LAVECCHIO, ESQUIRE
7   Appearing on behalf of the U.S. government.
8
    JACK SIEGAL, ESQUIRE
9   Appearing on behalf of Fepict, MS Group.
10
    ROBERTA M. DEUTSCH, ESQUIRE
11  THE LAW OFFICE OF ROBERTA M. DEUTSCH
    Appearing on behalf of Carol Morse.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 286

1
2                   I N D E X
3
4         EXAMINATION INDEX
5                                        PAGE
    SCOTT W. ROTHSTEIN
6
    CONTINUED DIRECT BY MR. SCHERER        287
7   DIRECT BY MR. MR. LICHTMAN             411
8
9
10         EXHIBIT INDEX
11                                        PAGE
    EXHIBITS
12
        Exhibit No. 46.          325
13      Exhibit No. 47.          337
        Exhibit No. 48           350
14      Exhibit No. 49.          358
        Exhibit No. 50.          366
15      Exhibit No. 51.          372
        Exhibit No. 52.          375
16      Exhibit No. 53.          377
        Exhibit No. 54.          381
17      Exhibit No. 55.          385
        Exhibit No. 56.          387
18      Exhibit No. 57.          392
        Exhibit No. 58.          393
19      Exhibit No. 59.          394
        Exhibit No. 60.          398
20      Exhibit No. 61.          400
        Exhibit No. 62.          406
21      Exhibit No. 63.          408
22
23
24
25

Page 287

1           CONTINUED DIRECT EXAMINATION
2   BY MR. SCHERER:
3       Q   Good afternoon, Mr. Rothstein.
4       A   Good afternoon.
5       Q   You know you're still under oath, right?
6       A   I do, sir.
7       Q   Okay.  I know that one of the charities that you
8   supported with other people's money as you mentioned was
9   the Boys and Girls Club of Fort Lauderdale.
10      A   That's correct.
11      Q   And you were pretty active there at auctions and
12  things like that?
13      A   Yes.
14      Q   And do you know who was on the board of
15  directors kind of running that thing, that couple of
16  fellows that were involved in this Ponzi as investors?
17          MR. SCHLESINGER:  Object to form; lack of
18      foundation.
19          MR. SCHERER:  I'm just laying a foundation,
20      Counsel.  I'll do that.
21  BY MR. SCHERER:
22      Q   Any of the board involved in this Ponzi scheme
23  at all?
24      A   I believe that they were.  I was actually on the
25  board with them.  Ted Morse was on the board, Doug

Page 288

1   Von Allmen sat on the board, Linda Von Allmen sat on the
2   board.  If I saw a list of the Board I could tell you who
3   was and who wasn't.
4       Q   Did Ted know that Mr. Von Allmen was investing
5   in the Ponzi?
6       A   Yes.
7       Q   Now, did Mr. Von Allmen know that Ted was
8   investing in the Ponzi?
9       A   I don't actually know.  I believe that he did
10  based upon conversations that we all had, but I'm not
11  certain.
12      Q   Do you have any memory of any conversations
13  where they were together and talked about it?
14      A   Actually, yes.  There was a Boys & Girls Club
15  function that we were at.  And I can't remember -- I
16  don't remember which function it was, but Ted was bidding
17  for something and Doug and I were kind of just standing
18  off to the side watching.
19          I think there may actually be a picture from
20  this event of us kind of standing there watching Ted.  It
21  may be in all the photos that we have.  And Ted was going
22  crazy, as he and I tended to do when we were bidding.
23  And Doug made a comment to me about how much he was
24  bidding on this particular item.  And my response was,
25  well, he's making a lot of money with us on the

2 (Pages 285 to 288)

Page 313

1  up.
2      How often did you get the paperwork wrong?  And
3  that is, that the terms didn't quite match the money
4  coming in and the payments going out and that sort of
5  thing.  What I would call the math of everything.
6      A   There were frequent errors attributable to the
7  vast amount of paperwork that I had Ms. Villegas
8  attempting to put together.  She frequently got the
9  numbers wrong and paperwork was sent with wrong numbers
10  on it, with wrong names on it, with improper case numbers
11  and the like over to Mr. Preve.
12      Q   Did you ever get word that Mr. Preve would be
13  forwarding that defective paperwork on to Platinum and
14  Centurion or the funds.  Let me call it that way.
15      A   Two different scenarios arose.  Sometimes, and
16  this should be in all of your e-mails, sometimes
17  Mr. Preve would catch the error and send it to me,
18  telling me this needed to be corrected, that needed to be
19  corrected.  Once he got comfortable with Deborah Villegas
20  he would send it directly to her and copy me and tell her
21  to fix it.
22      Q   Okay.
23      A   On occasions, more than several, he would
24  actually send the paperwork.  He did not catch the error
25  and it went over to Platinum and Centurion and Level 3,

Page 314

1  et cetera.  They sent it back for correction to Frank,
2  and then sent it to me.  Deb would correct it and it would
3  go back.
4      Q   How would you correct it?
5      A   We just changed the pages out.  Sometimes we
6  made changes and did fraudulent initials on it.  But we
7  changed whatever they needed to change.
8      Q   You put fraudulent initials on it as though you
9  went back to the punitive Defendant or Plaintiffs and had
10  them initial the corrections?
11      A   Sure, if you think that was going on because it
12  happened instantaneously.  There's no way I could really
13  possibly pull the Defendant and the Plaintiff in there
14  unless they were sitting in my drawer.  I'm being
15  facetious, of course.
16      Q   I understand.  In terms of some appreciation of
17  the fact that money wasn't in hand from a Defendant and
18  the money wasn't paid out to a Plaintiff in a lump sum,
19  if this happened after the fact, what would that
20  demonstrate?
21      A   Can you restate the question?
22      Q   Yeah.  Lousy question.
23      A   I didn't say it was lousy.  I just need you to
24  restate it.
25      Q   It was.  It was a lousy question.  I'll rephrase

Page 315

1  it.
2      If the deal was a legitimate purchase of a
3  settlement stream of payments and it had already happened
4  and the money was in hand at trust at the bank, the
5  Plaintiff had already gotten his or her, and it's usually
6  her money, and then the deal had to be completely
7  corrected, of course that would undermine the entire
8  Ponzi scheme, at least as to that investment; correct?
9      A   Yes.  There were frequent conversations, in
10  answer to your question, there were frequent
11  conversations between Mr. Preve and I, Debra and I, from
12  time to time about the fact that it was almost like a
13  barometer as to whether we could tell what level of due
14  diligence we were going to get from people, what level of
15  scrutiny we were going to get when mistakes occurred.
16  Because things were occurring that could not reasonably
17  occur in any legitimate investment scenario such as these
18  type of corrections.
19      You would think that a Defendant maybe one time
20  could perhaps miss the fact that the amount they're
21  settling for is off by hundreds of thousands of dollars,
22  which you would not think that that would happen with
23  multiple Defendants, multiple defense counsel on a
24  regular basis, which it did.
25      Q   That would tell you and Mr. Preve what, when

Page 316

1  that happened repeatedly without the investors catching
2  it?
3      A   What it told us was we could rest a little bit
4  easier with regard to the scrutiny that we would be
5  getting from the other side.
6      There are clear indicators, skipping my
7  testimony, there are clear indicators in the documents
8  when you go through them, I believe, that indicate people
9  who were in the know, meaning knew that there was some
10  type of fraud going on, and people who did not, and you
11  could tell by their level of due diligence, I believe.
12  But more than that, you could tell by what they let pass.
13      Q   If there were mistakes made and investors would
14  come back to you for an explanation, and then you offered
15  an explanation that they accepted, you would put those
16  investors in one category as opposed to investors that
17  never asked?
18      A   Of course.  There's a difference between an
19  investor who is asking the proper questions and takes my
20  explanation and an investor who asks no questions; sure.
21      Q   Let me refer back to Morse a little bit while
22  we're in the middle of Platinum and Centurion, but there
23  were two deals to Morse Operations for payment of 700,000
24  with a return of 300 on top of the seven, so a million
25  back.

United Reporting, Inc.
(954) 525- 2221

Page 317

1    A   Yes, sir.
2    Q   And do you recall that?  And then immediately
3  thereafter you would e-mail and say, I hit this again.  I
4  got another seven and three.  Are you in?  And the e-mail
5  back, yeah, we're in, and the money would be wired to
6  you.  Do you recall that scenario that you did four times
7  with Morse Operations?
8    A   I don't know how many times I did it, but I
9  recall several scenarios where we did that.
10   Q   Let me see that if you recall that on the first
11 one that you did two million deals based on the e-mails
12 which I didn't ask you about this morning, but I could
13 get them out if I had to, when you returned the paperwork
14 you did one $2 million deal --
15   A   Okay.
16   Q   -- rather than two, $1 million deals.
17   A   That rings a bell.
18   Q   And then you repeated it again sometime later, a
19 short time later with the Morse Operations where you did
20 two $1 million deals based on e-mails back and forth, and
21 the paperwork was a $2 million deal.
22   A   Sure.  I understand that.
23   Q   Those were the only two Ponzi settled papered
24 deals that you ever did with the Morse family, Morse
25 Operations, Ted and --

Page 318

1    A   They were the only deals where we actually
2  provided them with full settlement packets.
3    Q   Those two?
4    A   Right.  Well, nobody did.
5    Q   That put me off track.
6    A   Did you want to ask me another question?
7    Q   I've forgotten where we were.
8    A   We were talking about the Morse, the only two
9  packets that we did.
10   Q   Yeah.  Only two packets.  And then do you recall
11 whether or not those two papered deals became promissory
12 notes a year later?
13   A   I don't recall one way or the other, but I do
14 remember that whenever Ted got inquires from his auditors
15 or from his father for that matter requiring that he
16 wanted to see some paperwork, generally it was the
17 auditors, that we provided whatever he needed.  So if he
18 needed a deal packet, we gave him the deal packet.  Later
19 if he needed a Promissory Note, we'd give him that.
20   Q   Your testimony yesterday was that when you got
21 that threatening e-mail from Carol Morse that you
22 suspected was written by a lawyer because it didn't use
23 normal English, it had lawyer speak in it; you recall
24 that e-mail?
25     MS. DEUTSCH:  Objection to form.

Page 319

1     THE WITNESS:  I do.
2  BY MR. SCHERER:
3    Q   What do you recall that e-mail where Carol
4  threatened you to look like?
5      MS. DEUTSCH:  Object to the form.
6      MR. SCHERER:  What's the matter with it?
7      MS. DEUTSCH:  Use of the term threatened.  Can
8  you rephrase?
9      MR. SCHERER:  Well, I think that was his
10 testimony.
11 BY MR. SCHERER:
12   Q   Do you recall how you phrased your testimony
13 yesterday about that e-mail from Carol that precipitated
14 the Judge Seltzer meeting?
15   A   Prior to --
16     MR. DEUTSCH:  Objection to form.
17     THE WITNESS:  Prior to receiving, actually prior
18 to the Judge Seltzer meeting, I received an e-mail
19 from Carol Morse that we discussed yesterday that --
20 I mean, it doesn't take a rocket scientist to read it
21 and understand that she is very close to figuring out
22 what we're doing.  It was clear to me that it was
23 written by someone other than her, at least in part.
24 And it did at the end of the e-mail threaten me.  It
25 said, either you get me this stuff or I will take

Page 320

1  alternative means.  It said, if you have acted
2  ethically this shouldn't be a problem.
3  BY MR. SCHERER:
4    Q   I think you testified yesterday that you had the
5  impression when you received that that it was written by
6  a lawyer or she had a lawyer help her write that.  Do you
7  recall that testimony?
8    A   I do.
9    Q   Now, from that point on, did you believe that
10 Carol Morse had a lawyer that was advising her from that
11 point to the -- that being September through the crash of
12 the Ponzi?
13   A   Yes.
14   Q   Do you remember whether you and Ted talked about
15 that at all?
16   A   We did extensively.  We talked about Carol
17 extensively frequently.
18   Q   Do you have a recollection of discussing with
19 Ted that Carol may have her own counsel involved?
20     MR. MULLIN:  John Mullin.  I'm going to restate
21 the objections I made yesterday.  All of the
22 questioning about Carol Morse and Ed Morse related
23 not to the Razorback 2,100 page complaint for which
24 Mr. Scherer got permission to take this depo, but to
25 a separate action that to date we've not been served

10  (Pages 317 to 320)

Page 321

1   with.
2       So, I think that this violates protocol order
3   and we object to this entire line of questioning and
4   move to strike.
5       MR. SCHERER:  You did that yesterday.  I think
6   this is a continuing deposition, as I understand it.
7       MR. MULLIN:  I wanted to make sure you knew it
8   was a continuing deposition.  I thought you were done
9   with that topic.
10      MR. SCHERER:  Sorry, Mr. Mullin, what did you
11  say last?  I got interrupted.
12      MR. MULLIN:  I said I wanted to make sure you
13  knew it was a continuing objection since I thought
14  you were done with that topic.
15      MR. SCHERER:  Okay.  Thank you very much.
16      MR. MULLIN:  You're welcome.
17      MR. SCHERER:  Madam Reporter, can you read back
18  my question?
19      (The pending question was read back by the court
20  reporter.)
21  BY MR. SCHERER:
22      Q   And the answer is?
23      A   Here's the way it would work with Ted.  Any time
24  that Carol was bothering me, making inquires that were
25  problematic for me, create problems for his dad, for Ed,

Page 322

1   driving him crazy, Ted and I would speak about it.  I
2   frequently said to Ted on receipt of all the various
3   e-mails I got from Carol that he needed to figure out, by
4   talking to his dad, what the heck was going on, that
5   she's making ridiculous inquires, that she's not letting
6   me do what I need to do.
7       If she's going to create a real problem between
8   me, him, and Ed, a real problem for us, if she continues,
9   we don't need this kind of headache.
10      He would agree with me.  He would generally talk
11  to Ed.  And when this first occurred he came back to me
12  and said, she's got her - I believe it's either her
13  sister or sister-in-law, I don't remember whether it was
14  sister or sister-in-law that she was speaking to, and
15  that when she's up in Maine this is all she has to do, so
16  she's focused on it.  But basically just try to appease
17  her as best as I could.
18      As I told you yesterday, Ted had a very poor
19  relationship with her.  I wouldn't even qualify it as a
20  relationship.
21      It then escalated with this e-mail.  I called
22  Ted and I remember it being a very heated conversation on
23  my side basically saying what is the F is going on, this
24  is isn't coming from the sister-in-law or whatever it
25  was, or some lay person she's talking to this, is coming

Page 323

1   from a lawyer, which means I have a level of scrutiny on
2   me and I can't get past.  This is a real problem and you
3   need to do something about it.  Don't worry, I'll talk to
4   Ed.
5       Q   And did you attempt to accelerate the payments
6   that you owed of this bond money and the investments that
7   they had made because of this lawyer scrutiny?
8       A   Yes.
9       Q   Now, you used the word real problem and we don't
10  need this kind of problem; is that Ponzi speak again?
11      A   Yes.  That is, we don't need people looking at
12  what I'm doing or not doing.  You have to understand, Ted
13  is very pragmatic.  He is result-oriented; with regard to
14  the investments, is he making money, the answer - if it's
15  yes, fine, everything is good with him.  Okay.  Doesn't
16  really care how, just wants to make sure that everything
17  is going according to the way he wants it to go.
18      With regard to his father, he simply wanted his
19  father happy, and whatever steps we needed to take to
20  make his father happy, that's what needed to be done.
21      Q   While we're on that subject, do you have any
22  recollection of Mr. Ted Morse making some affectionate
23  reference to you and your business in relation to a
24  Cadillac store or Cadillac dealership?
25      A   Yes.  It was frequently the joke around our

Page 324

1   friends, it was actually also repeated to another friend
2   of ours, mutual friends, the Meldow, Margaret and Michael
3   Meldow, that time by Patti.  The statement was always
4   that one, we were their most profitable car dealership,
5   meaning R.R.A. slash Scott was our most profitable car
6   dealership.  They used to say that all the time in
7   public.
8       I later came to find out pre-explosion of the
9   Ponzi, pre the crash, that Patti had actually - during a
10  conversation with Margaret Meldow, had actually told her
11  if it wasn't for the investments and all the things that
12  I was doing for them financially that they wouldn't have
13  been able to sustain the growth of the dealerships nor do
14  all the things they were able to do for the family just
15  as buying homes and the like for the children.
16      MR. MULLIN:  Objection, move to strike as non
17  responsive and hearsay.
18      Q   Do you have a memory of any construction that
19  was going on at the Cadillac - one of the Morse Cadillac
20  agencies during this period of time on Federal Highway
21  there?
22      A   Yes, sure.
23      Q   What do you recall about this?
24      A   Ted telling me that it was the investment money
25  that was basically assisting the family in all of the car

11 (Pages 321 to 324)

Page 325

1  dealership expansion - they were doing an expansion, a
2  large expansion at the Bayview dealership on Federal
3  Highway. They were in the process of building a brand
4  new Toyota dealership in Delray and they were doing
5  expansions of the dealerships up on the west coast of
6  Florida, if I'm not mistaken, or the Tampa area.
7       Ted and I -- and this was discussed amongst our
8  group of friends, I used to joke around with Ted and say,
9  you are the only car dealer -- this was during the
10 automotive downturn, I used to say every time we saw Mike
11 Jackson from AutoNation and he would say hello to us and
12 I would joke around with Ted and say, he's pissed at you,
13 he's pissed. Everyone else is having problems and you
14 keep expanding. You're the only car dealership family
15 that continues to expand during a major automotive
16 contraction, he would say, that's because I have a very,
17 very fine performing car dealership that doesn't require
18 a floor plan, and that was me.
19    Q   Let me show you an e-mail on December the 12,
20 2008.
21       MR. KOPAS: Plaintiff's 46, Bates labeled
22 Rothstein S 117 to 118.
23       (Whereupon, Plaintiff's Exhibit No. 46 was
24 marked for identification.)
25 BY MR. SCHERER:

Page 326

1    Q   This is from Mr. Preve to you. And I have
2  highlighted down at the bottom there for you - it says in
3  this e-mail: Also need to discuss the three million
4  dollar -- 3m, which I presume is million dollar licensing
5  fee, paren, Jack, closed paren, and the 11 million
6  pending transaction. When you available. Question
7  mark.
8       Do you recall what that was all about?
9    A   Which part of it?
10   Q   Well, the three million dollar licensing fee and
11 the 11 million dollar pending transaction?
12   A   Yes.
13   Q   The date is 12/12/08. Excuse me, I can't read.
14 It's December 1, '08.
15   A   Yes, I do.
16   Q   Take them one at a time. The licensing fee,
17 what licensing fee was involved with Jack? First of all,
18 who is Jack?
19   A   Jack Simony.
20   Q   What is the licensing fee that was involved with
21 Jack?
22   A   There's no such thing.
23   Q   Okay. Did you have a discussion with either
24 Jack or Frank or both about the three million dollar
25 licensing fee?

Page 327

1    A   It was a methodology created by Mr. Preve and
2  Mr. Simony to get additional funds into Mr. Simony's
3  personal hands.
4    Q   Do you know whether they were to be to
5  Mr. Simony or ultimately go to Murray Huberfeld?
6    A   I don't have a clue. I just knew in order to
7  keep Jack on board we needed to get him money.
8    Q   This licensing fee, was there any kind of
9  legitimate reason to grant a three million dollar
10 licensing fee, to your knowledge?
11   A   To my knowledge, no.
12   Q   Now, are you aware that there was testimony from
13 David Ring in this case to the affect that Jack Simony
14 had tried to rent the 1-800 retired judge website for a
15 three million dollar fee?
16   A   No, sir. I don't know anything about that
17 testimony nor do I know anything about that agreement.
18   Q   Do you have any knowledge about Banyon, Preve,
19 or you trying to buy or rent a 1-800 retired judges
20 number?
21   A   We had discussed it, but I was really not
22 interested. You understand there's no real business
23 going on. I have no real reason to buy an 800 number.
24   Q   Are you aware of e-mail traffic between Preve
25 and Mr. Simony concerning that this would provide some

Page 328

1  form of cover or some such Ponzi words like that?
2    A   I haven't seen that, no.
3    Q   Okay. You are not aware of Mr. Simony's
4  testimony that this three million dollar 1-800 ex-judge
5  deal was a way to try to get three million dollars to
6  Murray?
7       MS. TRENCH: Object to the form.
8    A   My answer to the question is no, I was not aware
9  of it. I knew that the licensing fee thing that is in
10 here is not real because we weren't trying to license
11 anything.
12      What they were doing behind the scenes, all I
13 knew is that Frank wanted me to get money as much as
14 possible to Jack as quickly as possible. The way they
15 were going to do that, that was between them.
16   Q   Are you aware that Mr. Simony testified that the
17 folks that owned 1-800 ex-judge accused him of trying to
18 involve them in a scam and that Mr. Simony agreed that he
19 was indeed trying to scam them with respect to this three
20 million dollar payment back to Mr. Huberfeld?
21      MS. TRENCH: Object to the form.
22   A   I was unaware of that.
23      MS. TRENCH: I didn't hear the answer.
24      THE DEPONENT: I said I was unaware of that.
25      MS. TRENCH: Thank you.

12 (Pages 325 to 328)

Page 947

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT IN AND
FOR BROWARD COUNTY, FLORIDA
CASE NO: 09-062943 07

RAZORBACK FUNDING, LLC, et al,

    Plaintiffs,

vs.

SCOTT W. ROTHSTEIN, et al,

    Defendants.
_____/

DAY 4 - AFTERNOON SESSION

DEPOSITION OF SCOTT W. ROTHSTEIN

DATE TAKEN:  Thursday, December 15, 2011
TIME:      1:00 p.m. - 5:00 p.m.
PLACE:     99 N.E. Fourth Street, Miami, FL

Examination of the witness taken before:

Terri Wright
United Reporting, Inc.
1218 Southeast Third Avenue
Fort Lauderdale, Florida 33316
(954)525-2221

---

Page 948

```
 1              IN THE CIRCUIT COURT OF THE
                17TH JUDICIAL CIRCUIT IN AND
 2              FOR BROWARD COUNTY, FLORIDA
                CASE NO:
 3
 4   EDWARD J. MORSE, CAROL A. MORSE,
     and MORSE OPERATIONS, INC.,
 5
          Plaintiffs,
 6
     vs.
 7
     SCOTT W. ROTHSTEIN, et al,
 8
          Defendants.
 9   _____/
                  CASE NO:  10-24110 CACE (19)
10
              UNITED STATES DISTRICT COURT
11            SOUTHERN DISTRICT OF FLORIDA
                 FORT LAUDERDALE DIVISION
12
13   AMY ADAMS, ET AL, PLAINTIFF VS. SCOTT ROTHSTEIN, ET AL.
     CASE NO: 0:11-cv-61688-JIC/LSS
14
15   Case No: 10-03767 RBR  STETTIN VS. GIBRALTAR PRIVATE
                               BANK & TRUST CO.
16
17   Case No: 10-03802-RBR  STETTIN VS. CENTURION STRUCTURED
                               GROWTH LLC, ET AL.
18
19   Case No: 11-02288-RBR  STETTIN VS. FIDELITY CHARITABLE
                               GIFT FUND
20
21   Case No: 11-02368-RBR  STETTIN VS. TD BANK, N.A.
22
     Case No: 11-02473-RBR  STETTIN VS. REGENT CAPITAL
23                             PARTNERS, LLC ET AL
24   Case No: 11-02604-RBR  STETTIN VS. MAPLE LEAF DRILLING
                               PARTNERS, ET AL
25
```

---

Page 949

```
 1   APPEARANCES FOR RAZORBACK:
 2     WILLIAM R. SCHERER, ESQUIRE
       ERIC RAYMAN, ESQUIRE
 3     IVAN KOPAS, ESQUIRE
       CONRAD & SCHERER, LLP
 4
 5              ************
 6     MARC S. NURIK, ESQUIRE
       Appearing on behalf of SCOTT ROTHSTEIN.
 7
 8     CHARLES L. LICHTMAN, ESQUIRE
       BERGER SINGERMAN
 9     Appearing on behalf of the Chapter 11 Trustee,
       Herbert Stettin.
10
11     HARVEY WERBLOWSKY, ESQUIRE
       Appearing on behalf of Platinum & Centurion Funds.
12
13     MICHAEL GOLDBERG, ESQUIRE
       AKERMAN SENTERFITT
14     Appearing on behalf of Official Committee of
       Unsecured Creditors.
15
16     THERESA M.B. VAN VLIET, ESQUIRE
       JOHN H. GENOVESE, ESQUIRE
17     Appearing on behalf of the Trustee.
18
19     HOLLY SKOLNICK, ESQUIRE
       GREENBERG TRAURIG
       Appearing on behalf of TD Bank, N.A.
20
21     MARY BARZEE FLORES, ESQUIRE
       MATTHEW DATES, ESQUIRE
22     STEARNS WEAVER
       Appearing on behalf of Gibraltar Bank.
23
24     MICHAEL COTZEN, ESQUIRE
       SCHLESINGER & COTZEN
25     Appearing on behalf of Frank Spinosa.
```

---

Page 950

```
 1   CHRISTOPHER G. BERGA, ESQUIRE
 2     LYDECKER DIAZ, LLC
       Appearing on behalf of Szfranski.
 3
 4   RAMON A. RASCO, ESQUIRE
       PODHURST ORSECK
 5     Appearing on behalf of Frank Preve.
 6
 7   TUCKER CRAIG, ESQUIRE
       BILLING, COCHRAN, LYLES, MAURO & RAMSEY, P.A.
 8     Appearing on behalf of Rosanne Caretsky.
 9   DAVID C. CIMO, ESQUIRE
       GENOVESE JOBLOVE & BATTISTA
10     Appearing on behalf of the Trustee.
11
12   ALEX HOFRICHTER, ESQUIRE
       LAW OFFICES OF ALEX HOFRICHTER, P.A.
       Appearing on behalf of Federal Insurance Company.
13
14   JOHN MULLIN, ESQUIRE
       GEORGE WALKER, ESQUIRE
15     TRIPP SCOTT
       Appearing on behalf of Morses.
16
17   ROBERTA DEUTSCH, ESQUIRE
       LAW OFFICES OF ROBERTA DEUTSCH
18     Appearing on behalf of Carol Morse, Ted Morse and
       Morse Operations.
19
20   JESUS SUAREZ, ESQUIRE
       Appearing on behalf of the Trustee.
21
22   SCOTT SCHMOOKLER, ESQUIRE
       Appearing on behalf of RLI Insurance, Columbia
23     Insurance and Zurich Insurance.
24
25   CASEY CUSICK, ESQUIRE
       Appearing on behalf of Emess Capital, LLC.
```

1 (Pages 947 to 950)

Page 951

1  JAMES A. BLACK, JR., ESQUIRE
   Appearing on behalf of St. Paul Fire & Marine.
2
3

4  BART HOUSTON, ESQUIRE
   Appearing on behalf of Levinson, Pearson &
   Associates, Roger Stone and Watch U-Want, Inc.
5

6  LAWRENCE LAVECCHIO, ESQUIRE
   Appearing on behalf of the U.S. Government.
7

8  JACK SIEGAL, ESQUIRE
   Appearing on behalf of Fepict, MS Group.
9

10 DONNA EVANS, ESQUIRE
   GOLDSTEIN, TANEN & TRENCH, P.A.
11 Appearing on behalf of Platinum and Centurion.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 952

1              I N D E X
2         EXAMINATION INDEX
3                              PAGE
   SCOTT W. ROTHSTEIN
4

5  DIRECT BY MR. MULLIN        953
   FURTHER DIRECT BY MS. DEUTSCH   1079
6
7
8         EXHIBIT INDEX
9                              PAGE
   MORSES'
10
   150  MOI-002029, E-mail dated 3/14/2006.    966
11 151  MOI-008844, E-mail dated 4/22/2009.    976
   152  MOI-008973, E-mail dated 6/29/2009.    979
12 153  E-mail dated 9/29/2009.        981
   154  E-mail dated 9/29/2009.        986
13 155  E-mail dated 9/29/2009.        990
   156  MOI-008586, E-mail dated 6/01/2006.   1007
14 157  MOI-008587, E-mail dated 6/05/2006.   1008
   158  MOI-008643, E-mail dated 3/12/2008.   1011
15 159  MOI-008647, E-mail dated 3/12/2008.   1013
   160  MOI-008656, E-mail dated 3/17/2008.   1016
16 161  MOI-009134, Order on Plaintiff's Ore Tenus  1035
       Motion.
17 162  MOI-009128, E-mail dated 10/09/2009.  1050
   163  MOI-008738, Stipulated Confidentiality  1065
18     Order.
   164  MOI-009151, E-mail dated 10/12/2009.  1077
19 165  E-mail dated 9/06/2009.       1091
   166  E-mail dated 9/09/2009.       1098
20 167  E-mail dated 9/30/2009.       1101
21
22
23
24
25

Page 953

1      MR. LICHTMAN:  For the record, it should be
2  noted that there have been some instances where
3  there was humor in the courtroom.  And I think we
4  should so acknowledge that in some of the banter
5  among the lawyers, it's actually been humorous as
6  opposed to any type of a acerbic comment or
7  anything along those lines.
8      MR. SCHERER:  I agree with that.  Of course,
9  I've been engaging in it.  I think it breaks the
10 ice.  If anybody objects to it let us know and
11 we'll quit it.
12     MR. MULLIN:  No objection here.  We understand
13 it.
14     MR. LICHTMAN:  Let the humor continue.
15     (A discussion was had off the record.)
16         DIRECT EXAMINATION
17 BY MR. MULLIN:
18   Q   Good afternoon.  You understand you're still
19 under oath; correct?
20   A   I do, sir.
21   Q   My name is John Mullin and I don't think we've
22 ever met before.  I'm an attorney at Tripp Scott.  I
23 represent Ed and Carol Morse as well as Morse
24 Operations.
25   A   Good to see you, sir.

Page 954

1    Q   Thank you.  Mr. Rothstein, I don't want to go
2  over too much of your testimony we've already covered.
3  I'm going to try not to do that as best as I can.  I
4  want to explore a couple of areas with you.
5      Your background a little bit.  I think you
6  talked Monday and testified that you're a 1988 graduate
7  of Nova Law School; is that correct?
8    A   Correct.
9    Q   Prior to losing your law license what was your
10 primary practice area or specialty?
11   A   Primarily for the bulk of the time it was
12 various types of litigation.  I professed to have a
13 specialty in labor and employment law.  I spent a fairly
14 significant part of my practice attempting to emphasize
15 my practice in that direction.
16   Q   Did you in fact have a speciality in labor and
17 employment law or was that just an aura that you
18 attempted to portray?
19   A   I don't know that I ever had a true specialty,
20 but that was certainly the direction I was trying to go.
21   Q   Now, the investment scheme, quote, unquote,
22 Ponzi started sometime around 2006, I believe you
23 already testified?
24   A   Yes, five, six.
25   Q   Could you tell the jury at what point you

2 (Pages 951 to 954)

Page 951

```
 1   JAMES A. BLACK, JR., ESQUIRE
     Appearing on behalf of St. Paul Fire & Marine.
 2
 3
     BART HOUSTON, ESQUIRE
 4   Appearing on behalf of Levinson, Pearson &
     Associates, Roger Stone and Watch U-Want, Inc.
 5
 6   LAWRENCE LAVECCHIO, ESQUIRE
     Appearing on behalf of the U.S. Government.
 7
 8   JACK SIEGAL, ESQUIRE
     Appearing on behalf of Fepict, MS Group.
 9
10   DONNA EVANS, ESQUIRE
     GOLDSTEIN, TANEN & TRENCH, P.A.
11   Appearing on behalf of Platinum and Centurion.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 952

```
 1              I N D E X
 2         EXAMINATION INDEX
 3                          PAGE
     SCOTT W. ROTHSTEIN
 4
     DIRECT BY MR. MULLIN        953
 5   FURTHER DIRECT BY MS. DEUTSCH    1079
 6
 7
 8         EXHIBIT INDEX
 9                          PAGE
     MORSES'
10
     150 MOI-002029, E-mail dated 3/14/2006.    966
11   151 MOI-008844, E-mail dated 4/22/2009.    976
     152 MOI-008973, E-mail dated 6/29/2009.    979
12   153 E-mail dated 9/29/2009.      981
     154 E-mail dated 9/29/2009.      986
13   155 E-mail dated 9/29/2009.      990
     156 MOI-008586, E-mail dated 6/01/2006.    1007
14   157 MOI-008587, E-mail dated 6/05/2006.    1008
     158 MOI-008643, E-mail dated 3/12/2008.    1011
15   159 MOI-008647, E-mail dated 3/12/2008.    1013
     160 MOI-008656, E-mail dated 3/17/2008.    1016
16   161 MOI-009134, Order on Plaintiff's Ore Tenus 1035
         Motion.
17   162 MOI-009128, E-mail dated 10/09/2009.   1050
     163 MOI-008738, Stipulated Confidentiality  1065
18       Order.
     164 MOI-009151, E-mail dated 10/12/2009.   1077
19   165 E-mail dated 9/06/2009.      1091
     166 E-mail dated 9/09/2009.      1098
20   167 E-mail dated 9/30/2009.      1101
21
22
23
24
25
```

Page 953

```
 1        MR. LICHTMAN:  For the record, it should be
 2   noted that there have been some instances where
 3   there was humor in the courtroom.  And I think we
 4   should so acknowledge that in some of the banter
 5   among the lawyers, it's actually been humorous as
 6   opposed to any type of a acerbic comment or
 7   anything along those lines.
 8        MR. SCHERER:  I agree with that.  Of course,
 9   I've been engaging in it.  I think it breaks the
10   ice.  If anybody objects to it let us know and
11   we'll quit it.
12        MR. MULLIN:  No objection here.  We understand
13   it.
14        MR. LICHTMAN:  Let the humor continue.
15        (A discussion was had off the record.)
16             DIRECT EXAMINATION
17   BY MR. MULLIN:
18   Q    Good afternoon.  You understand you're still
19   under oath; correct?
20   A    I do, sir.
21   Q    My name is John Mullin and I don't think we've
22   ever met before.  I'm an attorney at Tripp Scott.  I
23   represent Ed and Carol Morse as well as Morse
24   Operations.
25   A    Good to see you, sir.
```

Page 954

```
 1   Q    Thank you.  Mr. Rothstein, I don't want to go
 2   over too much of your testimony we've already covered.
 3   I'm going to try not to do that as best as I can.  I
 4   want to explore a couple of areas with you.
 5        Your background a little bit.  I think you
 6   talked Monday and testified that you're a 1988 graduate
 7   of Nova Law School; is that correct?
 8   A    Correct.
 9   Q    Prior to losing your law license what was your
10   primary practice area or specialty?
11   A    Primarily for the bulk of the time it was
12   various types of litigation.  I professed to have a
13   specialty in labor and employment law.  I spent a fairly
14   significant part of my practice attempting to emphasize
15   my practice in that direction.
16   Q    Did you in fact have a speciality in labor and
17   employment law or was that just an aura that you
18   attempted to portray?
19   A    I don't know that I ever had a true specialty,
20   but that was certainly the direction I was trying to go.
21   Q    Now, the investment scheme, quote, unquote,
22   Ponzi started sometime around 2006, I believe you
23   already testified?
24   A    Yes, five, six.
25   Q    Could you tell the jury at what point you
```

United Reporting, Inc.
(954) 525- 2221

Page 955

1    stopped actually practicing law and going to court
2    representing clients, if you ever did stop, prior to
3    2009?
4        A    I never stopped completely.
5        Q    Could you give us an idea of the level of
6    practice of law, how many hours a day typically in 2006
7    and 2007 you actually spent practicing law?
8        A    It varied.  I can't do it by percentage, it
9    wouldn't be accurate.
10       Q    And I believe you testified that you were rated
11   by Martindale Hubbell; correct?
12       A    I was.
13       Q    I understand the rating system, I think most of
14   the people in this room do, but it's possible the jury
15   doesn't.  Could you spend a few minutes and explain the
16   rating system and what that designation entails?
17       A    I actually don't recall what it entails.  I
18   remember being AV rated but I don't remember how they
19   arrive at it.
20       Q    Do you recall that the AV was actually two
21   separate ratings, one for legal ability and one for
22   professionalism and integrity?
23       A    I do recall that.
24       Q    And the A represented the highest level of
25   legal ability; is that correct?

Page 956

1        A    I recall that now, yes.
2        Q    And in order to get any rating, AV, BV or CV,
3    you have to actually have the V rating, which is the
4    highest rating of professionalism and integrity; is that
5    correct?
6        A    I believe that's correct.
7        Q    Do you have an understanding as to how one goes
8    about getting rated, for example, it's done by your
9    peers; is that correct?
10       A    My recollection is that it is done by your
11   peers.  I don't remember whether you get to submit names
12   or they just go out and do it -- I thought there was
13   some kind of submission process with them where you gave
14   them a group of names and then they pick some of them.
15   I really don't recall.
16       Q    And so the Martindale Hubbell company or the
17   parent company that owns them actually contacts
18   attorneys who are already rated in South Florida and
19   asks for their opinions or submissions about you; is
20   that correct?
21       A    Yes.
22       Q    And to your understanding that was done and you
23   got the highest rating?
24       A    To my understanding, yes.
25       Q    Do you have a recollection as to what year you

Page 957

1    received your AV designation?
2        A    I don't have the slightest clue.
3        Q    At some point you know you were given the
4    highest designation for legal ability as well as
5    professionalism and integrity?
6        A    Yes.
7        Q    In addition to fooling some clients about that,
8    you fooled some very high prominent members of the
9    Florida Bar in South Florida; correct?
10       A    For part of the time, yes, and for part of the
11   time, no.  Overall, yes.  I fooled a lot of people
12   professional and otherwise.
13       Q    Including some very bright attorneys?
14       A    I did.
15       Q    Now, your work history, I believe you testified
16   that you were at some prior firms before R.R.A. was
17   formed; correct?
18       A    I was.
19       Q    Can you briefly just go over the roster or the
20   litany of some of the law firms at which you worked
21   after law school?
22       A    During law school and right after I was at
23   Gunther and Whitaker, then it was at Kaplan and Cusick
24   which became Kaplan, Cusick and Rothstein, then it
25   became Kaplan, Cusick, Rothstein and Salomon, then it

Page 958

1    became Cusick, Rothstein and Salomon, then it became
2    Cusick and Rothstein, then it became Scott W. Rothstein,
3    P.A., then it became Scott W. Rothstein, P.A. and
4    Associates, I believe, then it became Rothstein
5    Rosenfeldt, Rothstein, Rosenfeldt, Dolan and Pancier;
6    Rothstein, Rosenfeldt, Adler.  I'm pretty sure that I'm
7    close to having that exactly right.
8        Q    I appreciate that.
9        A    Oh, wait.  I left out Phillips, Eisinger, Koss,
10   Rothstein and Rosenfeldt in the middle of all the other
11   ones.  And that would have been between -- at the time
12   it goes to Scott W. Rothstein, P.A., it then goes to
13   Phillips, Eisinger, Koss, Rothstein and Rosenfeldt, then
14   it goes to Rothstein and Rosenfeldt.  Then Rothstein,
15   Rosenfeldt, Dolan and Pancier, then Rothstein,
16   Rosenfeldt, and Adler.
17       Q    By the time you formed Rothstein, Rosenfeldt
18   and Adler, we'll call it R.R.A. throughout the
19   deposition.  Were you one of only two shareholders at
20   that firm?
21       A    I was.
22       Q    So Mr. Adler, although his name was on the door
23   as a named partner, was not a shareholder; correct?
24       A    He was not an equity shareholder, correct.
25       Q    Were there any other equity shareholders other

3 (Pages 955 to 958)

Page 959

1 than yourself and Mr. Rosenfeldt?
2    A   No, sir.
3    Q   What did it mean to be a partner at R.R.A.?
4    A   It was a form of recognition, you had a certain
5 additional level of perks over and above the associate
6 level but not quite as many as shareholder.  It was just
7 a way to recognize skill level, longevity, loyalty.
8    Q   For example, was Mr. Cusick a partner at
9 R.R.A.?
10    A   He was either a partner or a shareholder.
11 Generally when we brought someone in from the outside
12 who had their own firm or was in -- and had a name in
13 another firm and also had been practicing for several
14 decades, we tried to either give him a partner
15 designation or a shareholder designation.  So he would
16 have been one or the other.
17        And then at one point in time Of Counsel and at
18 one point in time, as you probably know during the
19 middle of the scam, we made it like he wasn't even part
20 of the firm at all because he was writing fake letters
21 for us.
22    Q   We'll get to that.
23        But if he had the shareholder designation he
24 wasn't an actual shareholder; correct?
25    A   The only actual shareholders in existence were

Page 960

1 myself and Mr. Rosenfeldt.
2    Q   Do you have a recollection as to what other
3 members of the firm or employees of the firm had the
4 designation of shareholder, whether they were or not?
5    A   I could take a wing at it but, no, I don't
6 remember the difference who was shareholders, who were
7 partners.
8    Q   I don't want you to do that.
9        How long did you practice with Mr. Cusick
10 before forming R.R.A.?
11    A   More than a handful of years.  I'd be guessing
12 to tell the specific number of years because it happened
13 for a period of time then it was no more and then he
14 came to R.R.A.  I don't know.  I had remained friends
15 with him pretty much the entire time.
16    Q   Did you have a friendship relationship with
17 Mr. Cusick outside the office?
18    A   At various points in time.  I think we had a
19 falling out a few times, but for the most part we
20 remained friends at least as far as I was concerned.
21    Q   Did he have some sort of a sports management
22 agency with his son?
23    A   He did.
24    Q   Did you have any interest in that?
25    A   I did not.

Page 961

1    Q   Was Mr. Osber a partner or shareholder at
2 R.R.A.?
3    A   He was at the very least a partner, I don't
4 know if we ever gave him the shareholder designation,
5 but I remember him being a partner.
6    Q   And what about Mr. Stracher?
7    A   Mr. Stracher was a shareholder.
8    Q   Even though he didn't actually have shares he
9 was known as a shareholder?
10    A   Mr. Stracher wanted his name on the door.  He
11 wanted it to be Rothstein, Rosenfeldt, Stracher &
12 Adler.  So, yes, he was a shareholder.
13    Q   I believe you testified on Monday that
14 Mr. Stracher was an attorney for Morse Operations and
15 him joining your firm was one of the ways in which you
16 started doing work for the Morses?
17    A   That's correct.
18    Q   Do you recall when it was Mr. Stracher joined
19 your firm?
20    A   I do not.
21    Q   Did you have any kind of a friendship,
22 relationship with Ted Morse before Mr. Stracher joined
23 your firm?
24    A   I did.
25    Q   You did or did not, sorry?

Page 962

1    A   I did.
2    Q   You did?
3    A   Did, yes.
4    Q   When did you meet Ted Morse?
5    A   I don't remember the year.
6    Q   Would it be fair to say he was one of your
7 closest friends before this whole thing imploded?
8    A   Before this thing imploded?
9    Q   Yes.
10    A   He was my best friend.
11    Q   He introduced you to your wife, correct?  Did
12 he introduce you to Kim?
13    A   No, you have him confused with his son and his
14 son didn't even introduce me, that's a very long story.
15 But, no, neither of them introduced me to her, but his
16 son, Teddy the Third, was instrumental in Kim and I
17 speaking to each other which eventually led to us
18 getting together.
19    Q   Was Ted Morse best man at your wedding?
20    A   Yes.
21    Q   Was he one of the first people you brought in
22 as an investor to your investment scheme?
23    A   I believe he was one of the first.  It was
24 around the time that we were doing a very simplified
25 deal so, yeah, around '06, something like that.

United Reporting, Inc.
(954) 525- 2221

Page 963

1  Q  And you testified on Monday I believe that
2  there were certain friends of yours or members of your
3  firm that wanted to invest and wanted to get in and you
4  shielded them from it and said you wouldn't want to get
5  them involved; do you remember that?
6  A  Certain people, yes.
7  Q  Can you give me an example of some of those
8  people that wanted to invest and you said I don't want
9  you to get involved?
10  A  Grant Smith attempted to get involved.  The
11  Ponzi scheme was well underway and I was fairly certain
12  it was going to explode and I didn't want him anywhere
13  near it.  I also didn't want his wife involved in it
14  because of who her father was.
15  Q  For the jury's benefit, who is his wife's
16  father?
17  A  You know all of a sudden his name just flew out
18  of my head.
19  Q  Mike Egan?
20  A  Mike Egan.  There it is.  Thank you.
21  Q  So Mr. Grant Smith was never an investor in any
22  of your transactions?
23  A  No, sir.
24  Q  Why is it that you didn't shield your best
25  friend and best man at your wedding Ted Morse from the

Page 964

1  investments?
2  A  Because I knew I would be able to control the
3  payouts to him and barring the explosion I would be able
4  to make sure he got every penny back.
5  Q  But you also allowed his family to be fleeced
6  in the amount of $10 million in the Jan Jones matter?
7  A  I allowed them to be fleeced?
8  Q  Let me rephrase the question.  Isn't it true
9  that you testified earlier that --
10  A  By the way, I didn't just say I allowed them to
11  be fleeced, I was questioning it.
12  Q  You were repeating my question.
13  A  I was.
14  Q  I'm going to strike that and start a different
15  question.
16  A  Okay.
17  Q  Given your friendship with Ted Morse and the
18  fact that he was best man at your wedding, how did you
19  choose Ed and Carol Morse as the victims to extract the
20  bond monies when you needed it to keep your Ponzi
21  afloat?
22  A  They had a substantial amount of money, I was
23  extremely greedy, and ultimately I focused on them.
24  Q  Did you have any other sources of revenue
25  available to you at that time?

Page 965

1  A  At that moment, no.  At that moment I was
2  desperate.
3  Q  Now, would you agree with me that the first
4  several transactions that you pitched to Ted Morse you
5  pitched it to him as a joint investment with you
6  investing one half and him or him and Patti investing
7  the other half; correct?
8  A  Yes.  In the beginning of my dealing with Ted
9  on these deals I lied to him about me investing,
10  correct.
11  Q  Why did you feel it was important to lie to Ted
12  who we've established was your best friend?
13  A  Because Ted -- I knew Ted very well and in
14  order to get Ted to invest, I needed him to believe that
15  I had stayed in the game.
16  Q  So you lied to him in a series of e-mails in
17  which you pitched the particulars of various deals to
18  him?
19  A  Yes.  If you follow the track of the e-mails it
20  starts out with him trying to sell the deals to him and
21  eventually just goes into a normal flow of deals.
22  Q  Did Mr. Morse ask you questions or ask to see
23  further documentation about your investment in these
24  deals or did he take your word for it that you were
25  telling him the truth?

Page 966

1       MR. SCHERER:  Objection, form.  Which
2  Mr. Morse?
3  Q  Ted Morse, sorry.
4  A  He took my word for it.
5  Q  I'm going to show you, Mr. Rothstein, a
6  composite exhibit which we're going to mark as 150 and
7  it's a handful of e-mails relating to possible deals
8  between yourself and Ted Morse that were in our packet
9  that we circulated last week.
10       MR. WALKER:  Bates labeled MOI 002029, second
11  page 002030, third page 002031, fourth page 002033,
12  fifth page 002040, sixth page 002041, and the final
13  page is 002047.
14       THE WITNESS:  Thank you.
15       (Whereupon, Morses' Exhibit No. 150 was marked
16  for identification.)
17  A  Okay.  I reviewed them.
18  Q  Do you recognize those e-mails, Mr. Rothstein?
19  A  I do.
20  Q  Are those true copies of e-mail exchanges
21  between yourself and Ted Morse?
22  A  They appear to be.
23  Q  At moi1@edmorse.com, that's Ted Morse's e-mail
24  address?
25  A  Correct.

5 (Pages 963 to 966)

Page 967

1      Q   What is the date range of these investment
2   e-mails, from March 2006 to May 2006; correct?
3      A   That's correct.
4      Q   In each one of these e-mails are you pitching
5   investment opportunities to Ted Morse?
6      A   In a manner of speaking, yes.
7      Q   In each one of them you're suggesting to him
8   that you're going in 50/50 or that these are common
9   deals; correct?
10      A   That's correct.
11      Q   At that time did you have an attorney/client
12   relationship with Ted or with Morse Operations?
13      A   I don't remember whether I did or not at that
14   point in time.
15          Do you recall the date that I handled his first
16   case when Les Stracher joined our firm?
17      Q   I'm going to show you documents relating to
18   some of the Jan Jones and Builder Services matters which
19   I think started in 2006.
20      A   Let me answer it this way for you.  I think I
21   can clarify it for you.
22      Q   Sure.
23      A   I think from the time that Ted and I became
24   best friends, sometime in that time period even before
25   maybe my firm started representing him, they had a

Page 968

1   significant number of legal issues in that family that
2   Ted would confide in me about.  So if nothing else I was
3   certainly acting as his confidant.  I don't know if I
4   would say I was always his lawyer but I was certainly
5   acting as his confidant.
6      Q   You would agree with me there was an
7   attorney/client or a confidential relationship between
8   yourself and Ted Morse as early as March of '06?
9      A   For the legal things we were doing, yes.
10      Q   He trusted you and you undertook to assist him
11   like a fiduciary relationship; correct?
12      A   I believe it was stronger than a fiduciary
13   because we were best friends.  We trusted each other
14   with our lives, I believe.
15      Q   Now, why did you feel the need to add
16   extraneous details in some of these e-mails, for
17   example, let's turn to the next to last page of this
18   package, the one that has 2041 as the Bates label.  And
19   at the top it says: Hey, Bro, sitting in a depo bored
20   out of my mind and lo and behold what hits my screen.
21      A   Yes.
22      Q   You weren't sitting in a depo when you sent
23   that e-mail to him, were you?
24      A   I was not.
25      Q   You were sitting at your desk?

Page 969

1      A   Let me see if that is sent - I can't tell if
2   that is from my Blackberry or from my actual computer.
3   I could have been sitting anywhere, I could have been
4   sitting in a bar.
5      Q   And I guess it doesn't matter but why did you
6   feel the need to say in an e-mail to Ted Morse, I'm
7   sitting in a depo, bored out of my mind when you would
8   get one of these pitches to make to him?
9      A   Because you have to know Ted, okay.  And when
10   he's working, I'm working.  He's much more - but I don't
11   know - I don't know how to explain it, but there was a
12   method to my madness at that time.  This is at the time
13   before he understands that what we're doing is illegal.
14      Q   Do these kind of details air -- lend an air of
15   believability or authenticity to your stories if you're
16   saying that you're getting chewed out by a judge or
17   sitting in a deposition?
18      A   Here's the thing, okay.  You have to understand
19   Ted's and my relationship.  Ted knew me very well, he
20   knew that I tended towards exaggeration.  There would be
21   times when I would say things like - I know you're
22   smiling and tending towards exaggeration is an
23   understatement given the magnitude that we now know what
24   I did.
25          But understand, there were dozens of times when

Page 970

1   I wrote something like that to Ted and then we would be
2   sitting down in front of Bova or sitting at Jackson's
3   smoking a cigar, I'd be having a cocktail and he'd have
4   a soda, Pellegrino with lime.  And he would say to me,
5   and I'm going to use the language he would use, please
6   pardon my language, he would say to me, what the fuck
7   are you telling me you were in a depo for when you
8   weren't really in a depo?  You think I give a shit?
9          I said, you know me, that's just me, Ted.
10   Those are the types of conversations we had.  I, mean
11   Ted literally from the time we became best friends he
12   caught me in those crazy little lies all the time.
13      Q   But you kept giving them to him, didn't you?
14      A   I'm not trying to justify my personality, I'm
15   just telling you in order to understand the context of
16   all of this you need to understand Ted's and my
17   relationship.  Ted and I had our relationship and we
18   loved each other despite our foibles.
19      Q   Now, the fourth page of the packet, Page 2033:
20   Just wrapped up meeting with Russell's client.  You
21   obviously didn't meet with Russell's client about that
22   deal, did you?
23      A   No, sir.
24      Q   That was another misstatement on one of these
25   e-mails?

6 (Pages 967 to 970)

Page 971

1    A   That's correct.
2    Q   And in fact really everything about these
3  e-mails is false; is that correct?
4    A   Except for the amount of money he was making.
5    Q   Now, you said Mr. Stracher came over and he had
6  been counsel for MOI for awhile.  Do you recall the type
7  of cases that Les had handled for the Morse family?
8    A   It was mostly automotive, but it was my
9  understanding he also handled personal matters.  It was
10  a very, very sore point between Les and I when Ted
11  started asking me to handle personal things for him.
12    Q   So, he had, for example, warranty claims or
13  Magnuson & Moss type actions that a car dealership might
14  be involved with?
15    A   I never did automotive law so anything
16  automotive related, Mr. Stracher did.
17    Q   And when he joined your firm and brought that
18  client over, at some point in time you became the chief
19  point person for the Morses including Ed and Carol; is
20  that right?
21    A   I have to correct you.  He did not bring Morse
22  with him.  What was going on at the time was Ted was
23  about ready to fire Les.  We had a meeting at Jackson's
24  450 and Ted said to Les, basically because Les was
25  toying around with the idea of joining our firm,

Page 972

1  couldn't make the decision, Ted basically said at the
2  end, Listen, either you join his firm or you're going to
3  lose the client.  You go there you get to keep the
4  client.  You go you don't go there, don't get to keep the client.
5    Q   He chose to join the firm?
6    A   He did.
7    Q   After he chose to join the firm did he continue
8  representing the client in various matters separate and
9  apart from your representation of Ted?
10    A   Yes.
11    Q   And at some point did you begin to handle a
12  series of litigation matters arising from Ed and Carol
13  Morse's house in Boca?
14    A   I did.
15    Q   And I have some documents I'll show you, but
16  out of memory can you recite for us the various cases in
17  which you were counsel of record or your firm was
18  counsel of record?
19    A   Real cases you're talking about?
20    Q   Yes.
21    A   Jan Jones was the one that sticks out in my
22  mind the most.  I'm sorry?
23    Q   I was going to just ask you a follow-up
24  question.  Continue with your answer, sorry.
25    A   I recall something with Albanese and his

Page 973

1  company.
2    Q   He's a contractor for them?
3    A   Contractor, yes.
4    Q   Okay.
5    A   Contractor, yes, John Albanese.  Somebody
6  Albanese.  Leonard Albanese, excuse me, and his company
7  and some other contractors.  There was stuff going on
8  with their Maine house.  You want me to cover that
9  also?
10    Q   Yes.
11    A   There were some real issues with the Maine
12  house that we were handling both that were in litigation
13  and not in litigation.  I don't remember which ones
14  actually got filed and which ones didn't.
15    Q   Did you bring an action against Mr. Marsh and
16  the Digby Bridges architecture firm?
17    A   We may have eventually, but I believe that was
18  being handled by Mr. Stracher and Mr. Osber.  I'm not
19  sure, but I recall having no real direct involvement
20  other than as a liaison with the Morses.
21    Q   And what about something called the Builders
22  Services case.  Do you remember that?
23    A   I'm sorry?
24    Q   Builders Services?
25    A   Vague recollection.

Page 974

1    Q   Did you personally supervise or have any role
2  in that case?
3    A   I don't even know which case that is.
4    Q   What about one called Mizner Lakes?
5    A   That sounds familiar to me.
6    Q   Now, in these cases in which Mr. Osber was
7  involved, was he reporting to you or was he keeping you
8  updated on the progress of the cases?
9    A   When I needed updates, yes.
10    Q   How independent was Mr. Osber?  Was he just
11  kind of charged with running with these cases on his own
12  or was he given specific instructions from you on what
13  to do?
14    A   He wasn't given specific instructions, he was
15  told to litigate the cases.  He got a lot of
16  interference unfortunately from Mr. Stracher, but he was
17  told to run with the cases and report to me as
18  necessary.
19    Q   At any point was he told to delay the cases and
20  keep them going since you needed them to extract money
21  from the Morses?
22    A   I never told him that, no.
23    Q   Did you ever tell him that a settlement
24  agreement had been reached with the Morses that they
25  knew nothing about?

7 (Pages 971 to 974)

Page 975

1   A   Yes.
2   Q   I believe you testified on Monday that at some
3   point you believed Mr. Osber must have known that you
4   were not giving the true story to the Morses; can you
5   elaborate on that?
6   A   Yes.  There was a time when I requested Pam
7   Domineses, who was Mr. Osber's legal assistant and right
8   hand at the law firm, to do an order for me, the fake
9   Seltzer Order.
10   Q   That would have been September, 2009?
11   A   I think that was the order.  It was one of the
12   major fake orders that we did.  And that was one of the
13   things that led me to believe that Osber knew that that
14   order existed.  But more than that, there were
15   conversations with Mr. Osber where I was letting him
16   know not about the bonds or things like that but about
17   the fake settlements.
18       For example, there were documents that needed
19   to be signed.  You'll see a lot of e-mails from
20   Mr. Osber to me asking me when are we going to be able
21   to get the Morses' signature on this.
22   Q   On the --
23   A   On the real settlement agreements.  And I would
24   tell him, Listen, they don't know that we're paying this
25   money.  Ted knows, Ted's helping us get the funds to do

Page 976

1   this you just have to stall it out a little bit longer.
2       So, maybe that's what you were referring to
3   earlier with your delay question, but there were
4   conversations like that where I was explaining to him
5   what was going on between me and the Morses and me and
6   Ted and what we needed to do with regard to making sure
7   that the Morses, Ed and Carol, stayed in the dark with
8   regard to what was actually going on.
9   Q   And you reiterated, I believe on Monday if not
10   on Tuesday, that Ed and Carol were completely in the
11   dark as to what was really go on on the Jan Jones case;
12   correct?
13   A   Yes.
14       MR. WALKER:  Marking Exhibit 151, Bates labeled
15   008844, 008845, 00846, and then all the way through
16   MOI 008848.
17       (Whereupon, Morses' Exhibit No. 151 was marked
18   for identification.)
19       THE DEPONENT:  Okay.
20   BY MR. MULLIN:
21   Q   Have you had a chance to look at this,
22   Mr. Rothstein?
23   A   I have.
24   Q   Does this appear to be a true and correct copy
25   of the settlement agreement that was signed in the

Page 977

1   Mizner Lakes case together with an e-mail to you from
2   Mr. Morse.
3   A   The way you just asked that question, no,
4   because it's a fake settlement agreement.
5   Q   Well, I appreciate that.
6   A   It's not in the case.
7   Q   I'm going to get to that.  But let's go with
8   the first page, is this an e-mail to you from Ed Morse.
9   A   It's actually -- it's from Ed but it's actually
10   an e-mail to me from Dolores Daoust.
11   Q   And Dolores was Ed's assistant; correct?
12   A   Yes.
13   Q   And Ed Morse is 88 years old, he doesn't send
14   out e-mails on his own, he has his assistant send them;
15   correct?
16   A   Ed never had a computer, didn't even have one
17   in his office.
18   Q   Whenever we see one of these e-mails to or from
19   Ed, it's really to and from his assistant Dolores; is
20   that right?
21   A   Yes.
22   Q   This is an e-mail from Ed slash Dolores and
23   copied with this is a settlement agreement and release
24   and I think you testified this is a fake settlement
25   agreement; correct?

Page 978

1   A   It's actually, if you look at the real
2   settlement agreement and this, it's actually taking the
3   real one and reversing it to make it look like the
4   Morses' one.
5   Q   And again, when Mr. Morse, Ed Morse and Carol
6   Morse were communicating with you, they didn't know the
7   true facts of that; did they?
8   A   No, no.  I simply wanted them to get their
9   money and be done with the case.
10   Q   So you led them to believe that they had won
11   the Mizner Lakes case and sent them a dummy settlement
12   agreement to further back that up?
13   A   I did.
14   Q   And that is an e-mail from Mr. Morse talking
15   about the provisions of the settlement agreement and the
16   obligations of the parties?
17   A   Yeah, we're talking about punch list issues
18   which was always an issue that came up, yes.
19   Q   Okay.  Did you likewise give Ed and Carol Morse
20   false information as to the other cases you were
21   handling for them?
22   A   Throughout the course of the litigation there
23   were times when they received accurate information about
24   the things we were trying to help them with and there
25   were also times when they received inaccurate

8 (Pages 975 to 978)

Page 979

1  information, false information.
2      Q    And the inaccurate information was coming from
3  you and it was deliberately false, correct?
4      A    Yes.
5      Q    At one point did you send him a draft Marsh
6  complaint that you intended to file on behalf of Ed and
7  Carol Morse against Digby Bridges, Marsh and Associates?
8      A    I'd have to see it to let you know.  I really
9  don't recall whether I sent it or drafted it.  Even if
10  someone else in the firm drafted it, it's likely that I
11  would have ultimately forwarded it, but I would have to
12  see it.
13      Q    We're going to show you a composite exhibit and
14  the complaint is attached so you can see it.
15          MR. WALKER:  I'm marking that as Morse Exhibit
16      152, Bates labeled MOI 008973 through MOI 008982.
17          (Whereupon, Morses' Exhibit No. 152 was marked
18      for identification.)
19          THE DEPONENT:  Okay.
20  BY MR. MULLIN:
21      Q    Does that refresh your recollection, sir, that
22  you actually sent a draft complaint about Mark Marsh and
23  the Digby Bridges Marsh firm to the Morses?
24      A    Yes.
25      Q    And do you have a recollection of preparing

Page 980

1  that complaint or having Mr. Osber prepare that
2  complaint?
3      A    My recollection is that Mr. Osber prepared it.
4      Q    Do you have a recollection as to whether that
5  lawsuit was actually filed?
6      A    I don't know.  I believe Mr. Osber did the
7  legwork and then it went to Mr. Stracher for follow-up
8  and then it came to me and I don't know whether it was
9  actually filed or not, I don't recall.
10      Q    You don't recall Ed taking any significant
11  steps to move the case forward whether it was filed or
12  not; do you?
13      A    I don't remember one way or the other because
14  Ted really wanted to speak to Mark Marsh on Ed's behalf
15  and try to just get him to resolve it with him because
16  they had had such a long-standing relationship.  So
17  there was a lot of things going on at that time that
18  would have dictated whether or not it got filed.
19      Q    You don't have any personal knowledge of any
20  discussions Ted had with Mr. Marsh?
21      A    I was present during one of them, it wasn't
22  really a discussion it was more like Ted was screaming
23  and Mark was kind of sitting there trying to figure out
24  what was going on.
25      Q    Was he an architect?

Page 981

1      A    He was.
2      A    Still is, I imagine.
3      A    I have no idea one way or the other.
4      Q    Now, did there come a point in time where you
5  sent information to Carol Morse about a wire transfer on
6  the HVAC matter?
7      A    You have to show me the e-mail.  I don't have
8  an independent recollection of it.  I'm certain if
9  you're telling me there is, there is, but I need to see
10  it.
11      Q    Next I'm going to show you, I think it's a four
12  page exhibit and it looks like it's a wire transfer
13  information from the Koppel and Bates trust account.
14          MR. WALKER:  Marking 153.  There is no Bates
15      label.  It's from S. Rothstein at rra-law.com to
16      cammissy@aol. Dated 9/292009 at 6:07 p.m.
17      A    Thank you.
18          (Whereupon, Morses' Exhibit No. 153 was
19      marked for identification.)
20          THE DEPONENT:  Okay.
21  BY MR. MULLIN:
22      Q    Does looking at these documents, Mr. Rothstein,
23  refresh your memory that there was a wire transfer of
24  315,000 relating to the HVAC as you put in the e-mail to
25  Carol there?

Page 982

1      A    There was a sending of a wire document to
2  Carol, and my recollection is that there was no actual
3  wire received by us.
4      Q    What was that e-mail concerning a possible wire
5  that was sent to Carol in late September of 2009
6  designed to do?
7      A    We were attempting to resolve a claim for them
8  for an extended period of time with their HVAC people in
9  Maine.  They put in an HVAC system that was a disaster
10  and we were trying to get the system fixed, both
11  Mr. Osber and I.
12          And ultimately I decided to simply send them a
13  bunch of money to shut the case down because we were
14  never going to be able to achieve the result that they
15  wished and it was much easier for me to simply make them
16  happy and send them the money.  So we created this
17  fiction with the assistance of the Koppel and Bates law
18  firm.
19      Q    I was going to ask you about that.  Koppel and
20  Bates Law Firm is one of the law firms you've identified
21  as participating in these meet and greets to give
22  investors the impression that you had a burgeoning law
23  practice; correct?
24      A    That's correct.  They also participated in this
25  fraud.

9 (Pages 979 to 982)

Page 983

1    Q   And what was the role of the Koppel and Bates
2  Law Firm in this fraud, did they actually move money in
3  and out of their trust account to make it looks like it
4  was coming from an outside firm?
5    A   No.  What they did was -- my recollection is
6  that they are the ones that prepared on their
7  letterhead, pursuant to my instructions, a false
8  settlement letter.
9    Q   Did $315,000 actually come back to the debit
10  column of the Morses as opposed to 57 or some million
11  credit column?
12    A   Ultimately I did send them that money, yes.
13    Q   There was no, in fact, settlement on the HVAC
14  system in the Maine case; is that right?
15    A   That is correct.
16    Q   Do you know if Mr. Osber took any steps to
17  further the Maine case with regards to the HVAC system
18  up there?
19    A   My recollection is that Mr. Osber was trying to
20  do a very good job on this actually.  It was just that
21  you have to differentiate between what was achievable
22  and what was within Carol Morse's psyche as to what she
23  wanted.
24        Not trying to justify what we did, I'm just
25  telling you that certain results were not achievable and

Page 984

1  so I made the decision, not Mr. Osber, I made the
2  decision to simply send them money and be done with it.
3        At the end of the day, of course, Mr. Osber
4  knew that we sent them the money.
5    Q   Did Mr. Osber know at this point in late
6  September that there really was no settlement and that
7  this was a dummy or did he believe that there actually
8  was a legitimate settlement at that time?
9    A   No, he knew that was no settlement.
10    Q   So at least as of late September, 2009,
11  Mr. Osber knew there was a fraud being perpetrated upon
12  the Morses?
13    A   You have to understand what Mr. Osber was being
14  told, which was what in fact was going on.  I discussed
15  it with Ted Morse.  I told Ted, I'm getting your parents
16  out of this - or your dad.  I never said your parents
17  because he hated Carol.
18    Q   I don't want to cut you off, but I asked about
19  what you and Mr. Osber --
20        MR. NURIK:  I think he needs to explain.
21        THE WITNESS:  I'm telling you what we
22  discussed.  I don't want to give you the impression
23  that Mr. Osber was part of that fraud.  Mr. Osber
24  knew we were paying them money.  I'm just telling
25  you what he actually knew.

Page 985

1        He knew that Ted and I had a conversation and I
2  told Ted, I'm getting rid of this for your father.
3  I have plenty of money, I'm sending him whatever he
4  thinks the case is worth, sending him a settlement
5  letter that Doug Bates drafted for me and I'm
6  getting rid of this case.
7        That's what I discussed with Ted and that is
8  what I told Osber we were doing, that Ted wants his
9  father out of this just like I do.  We're sending
10  him the money.
11  BY MR. MULLIN:
12    Q   But, I guess my initial question was Mr. Osber
13  knew at the time that money was being sent to the
14  Morses but it wasn't in respect to a legitimate
15  settlement?
16    A   That's correct.
17    Q   Did you also wire some funds to the Morses with
18  respect to a Marvin Window settlement?
19    A   Yes, I believe we did.
20    Q   Was that around the same period of time?
21    A   I don't recall the time-frame.  If you have a
22  document you could show me I'm sure it will refresh my
23  recollection.
24    Q   We'll show you one, that's fine.
25        MR. WALKER:  We're marking Plaintiff's Morse

Page 986

1  Exhibit 154, an e-mail dated 9/29/2009 at 5:21 p.m.
2  from S Rothstein at rra-- law.com to
3  Cammissy@aol.com.  No Bates label.
4        THE WITNESS:  Thank you, sir.
5        (Whereupon, Morses' Exhibit No. 154 was marked
6  for identification.)
7        THE DEPONENT:  Okay, my memory is refreshed.
8  BY MR. MULLIN:
9    Q   So, did you in fact have a $310,000 payment
10  with respect to another imaginary settlement on the
11  Marvin Windows matter?
12    A   You've got to clarify for me, did I have a
13  $300,000 payment?  I'm not sure you mean to me or to the
14  Morses.
15    Q   Well, describe what this exhibit entails.
16    A   Sure.  Same thing happens.  We've got that
17  Marvin Windows thing and in order to understand what's
18  going on, I will give you a one sentence explanation.
19        Carol thought she was seeing things in the
20  windows, scratches and images that they could not
21  remove.
22        We initially contacted Marvin Windows about a
23  dozen times trying to get them to replace all the
24  windows, just trying to fix something.  Carol initially
25  said I just want these three or four windows replaced.

10  (Pages 983 to 986)

Page 987

1    Eventually she told me and Ed and Ted she
2  wanted every window in the house replaced. Again, I
3  went to Ted and said, I'm never going to be able to
4  accomplish this. I've got plenty of money, I'm sending
5  them the money. I'll get someone to write a letter.
6    I got Howard Kusnick to write a fake settlement
7  letter to the Morses on the Marvin Windows case
8  pretending he was Counsel for them. I prepared the fake
9  wire documents so it looked like we received the money
10  in and I sent the wire out to the Morses to get this
11  case done with, yes.
12    Q  I'm going to show you the fake letter in a
13  minute. I just wanted to show you the wire transfer
14  first.
15    A  Do you understand the transaction now?
16    Q  I do.
17    A  Okay.
18    Q  The wire transfer info that we just marked as
19  the most recent exhibit shows Kusnick and Associates'
20  trust account. Was there such a thing as the Kusnick
21  and Associates trust account in September of 2009?
22    A  To my knowledge, no. He may have kept his
23  trust account, but that wasn't it.
24    Q  How did you create dummy documents, is this
25  Photo Shop where you have incoming wire info showing a

Page 988

1  wire coming to your trust account at 310,000 from
2  Kusnick and Associates' trust account, just like the
3  prior exhibit was from the Koppel and Bates trust
4  account.
5    How did you do that?
6    A  My recollection is that my IT staff, Mr. Bill
7  Corte and Mr. Curtis Renie set it up for me so I could
8  create phony wire documents as part of the Ponzi scheme.
9    Q  So these last two exhibits represent fake
10  e-mails concerning, you know, wires or wire transfer
11  information that didn't exist, that was created by your
12  IT team?
13    A  No, no, real e-mails, fake wires.
14    Q  That's what I meant, fake wires and real
15  e-mails. And then you did send the money to back them
16  up?
17    A  I sent the money to the Morses, sure.
18    Q  Now, explain to me the process by which you
19  obtained the fake letter from Mr. Kusnick?
20    A  I went down to Howard's office because he was
21  really working for us, even if he was Of Counsel, he was
22  still working - he was on our payroll at that point in
23  time. I went into him and I said Howard, I need you to
24  do a letter for me to the Morses. I have to pretend to
25  have settled this case. I discussed it with Ted already

Page 989

1  and I told him what we're doing, get his dad out of
2  this. I said this is what the letter needs to say. I
3  may have actually drafted the letter.
4    I probably actually drafted the letter, sent it
5  to him to put on his letterhead. He would then send it
6  over to Sandra Falance (phonetic), who was his
7  assistant. She put it on a letterhead. And actually I
8  think we may have even created the letterhead for him.
9  He had her do it, signed it and we sent it out.
10    Q  Did Mr. Kusnick express any doubt or concern or
11  questioned why he was going to send out a dummy
12  settlement letter in which you agreed to pay your
13  exorbitant price of 310,000 for the windows?
14    A  No.
15    Q  Was he a willing participate?
16    A  Yes.
17    Q  Did you pay anything to Mr. Kusnick for his
18  cooperation?
19    A  At that time, I don't remember whether I did.
20  I probably gave him a few grand cash. That's normally
21  what I would do.
22    Q  He wasn't living the rock star lifestyle with
23  you?
24    A  Not as much. He wasn't doing bad, I was paying
25  him - overpaying him and he was certainly entitled to go

Page 990

1  to games and things with us. So, yeah, he was living a
2  modified rock star lifestyle. He certainly was not
3  doing bad.
4    Q  Okay. I'm going to show you a composite
5  exhibit, which is a letter and I think there's also a
6  couple of e-mails that you had sent to your staff about
7  Mr. Kusnick's role in that the firm, which I want to ask
8  you about.
9    A  Okay.
10    MR. WALKER: That is composite exhibit Morse
11  Exhibit 155. First page is an un-Bates labeled
12  e-mail from S Rothstein at rra-law.com and
13  cammissy@aol.com on 9/29/2009, 4:51 p.m. Second
14  page is Bates labeled MOI 003909, forth page MOI
15  003910 and the final part of the exhibit is a
16  two-page news story that contains an e-mail excerpt
17  that Rothstein sent out to the firm allegedly.
18    (Whereupon, Morses' Exhibit No. 155 was marked
19  for identification.)
20  BY MR. MULLIN:
21    Q  Have you had a chance to look at that exhibit,
22  Mr. Rothstein?
23    A  I have.
24    Q  That letter, the June 18th letter that is pages
25  two and three of this exhibit, is that the letter you're

11 (Pages 987 to 990)

Page 991

1 referring to?
2 　A　It is.
3 　Q　And in fact you shared that letter via e-mail
4 with Carol Morse; correct?
5 　A　I did.
6 　Q　What was the purpose of sending Carol Morse --
7 I mean, strike that.
8 　　　You already testified that you wanted to get
9 them off your back and pay the $310,000 to the Morses,
10 but what was the purpose of actually sending this
11 letter?
12 　A　To add credibility to the fake settlement.
13 　Q　Did you also want to inflate yourself in your
14 negotiation prowess in the eyes of the client to make it
15 looks like you were a super star on their behalf?
16 　A　Sure.
17 　Q　Anything about this letter true?
18 　　　MR. NURIK:　Read it in its entirety.
19 　　　THE WITNESS:　I am.
20 　　　MR. MULLIN:　Let me read --
21 　　　MR. NURIK:　Let him finish.
22 　　　THE WITNESS:　One second.
23 　　　MR. MULLIN:　Sorry, I thought you were done
24 already.
25 　　　THE WITNESS:　There is nothing that I can see

Page 992

1 in here that is accurate other than my name and the
2 address of my law firm and the name of our client
3 and - well, the name of my clients.　That's it.
4 BY MR. MULLIN:
5 　Q　So, in the second paragraph you said:　I
6 believe that we have reached a settlement on this
7 matter, though I will not call it amicable.　My client
8 will pay your client the sum of $310,000 and no cents in
9 full settlement of all their nonsensical claims.
10 　　　You're basically writing this as an angry
11 opposing lawyer who has to capitulate to Mr. Rothstein's
12 outlandish demands?
13 　A　It's two-fold.　Yes, it's having to capitulate
14 to my outrageous demands and it's also a little shot at
15 Carol on the fact that she wanted every window in the
16 house replaced because she was seeing things in them;
17 that's the fact.
18 　Q　The address, is that Mr. Kusnick's home address
19 where is says Kusnick and Associates or do you recall
20 where that address came from?
21 　A　What I ended up doing was, Howard had
22 created -- had Sandy create some letterhead and it was
23 terrible looking, so I had either Deb or one of my
24 assistants create some quick fake letterhead, and then
25 we just threw Howard's home address on it.

Page 993

1 　Q　And with respect to the last two pages of the
2 exhibit, we didn't get copies of all of your e-mails but
3 this was publicized on Mr. Norman's web page back in
4 December of 2009 and there were excerpts from e-mails.
5 　　　Did you actually send out those e-mails to the
6 entire staff of your firm in October of 2009?
7 　A　Give me one second, I want to read it.
8 　Q　Sure.
9 　A　Especially since it appears on something Bob
10 wrote.
11 　　　Yes.
12 　Q　Now, the first --
13 　A　That e-mail that was in bold print, I did send
14 to all staff.
15 　Q　There is a second e-mail on Page 2 that's a
16 little bit shorter, did you --
17 　A　Yes, I sent both of those.
18 　Q　Okay.　Let's turn to the first one momentarily
19 here.　It's in all caps, did you typically send out your
20 e-mails in all caps?
21 　A　No, but I was frantic.
22 　Q　And you said:　Important - Howard Kusnick,
23 effective immediately:　If anyone calls for Howard
24 Kusnick or anybody asks about him - and I mean anyone -
25 he is not an employee of our firm.　You are simply to

Page 994

1 tell the caller or the person inquiring that he is not
2 employed by R.R.A. and can be reached at a phone
3 number.　Howard is aware of this and understands.　While
4 he may be in our office from time to time in the future,
5 he is not an employee of R.R.A.　Thanks for your
6 attention to this matter, et cetera.
7 　　　First of all, what was Howard's reaction,
8 Mr. Kusnick's reaction when he saw this e-mail?
9 　A　Nothing.
10 　Q　Did he know about it in advance and discuss it
11 with you?
12 　A　Yes.
13 　Q　Why were you frantic to have your law firm
14 disassociate itself with Mr. Kusnick when that letter
15 was written four months earlier?
16 　A　What was happening was around this time we had
17 had Kenneth Padowitz, who was Of Counsel to our firm, do
18 a couple of fraudulent letters for us, fraudulent legal
19 opinion letter that he did, things of that nature, and
20 there were questions being asked by hedge funds, by
21 other people, why are people at the same address as you
22 doing things.
23 　　　And then I was downstairs one evening in front
24 of Bova just right around this time that Ted - and he
25 said, my dad, somebody's asking questions about the

12　(Pages 991 to 994)

Page 995

1  place letters are being written from. I didn't remember
2  exactly what he was talking about. But I remember being
3  frantic about making sure that no one thought that that
4  I was doing this internally from the law office.
5       There were several things going on all at the
6  same time and I wanted to make sure that if Carol called
7  as well, that she knew that Howard was not working for
8  our firm.
9       Q   I'm sorry to interrupt you.
10      A   Okay.
11      Q   Were there other letters that Mr. Kusnick had
12  signed, dummy letters in addition to the one we
13  previously identified here?
14      A   I think he did more than one fraudulent letter
15  for me. I just -- I'm not sure they were all related to
16  Morse, I think some were related to other things related
17  in the Ponzi scheme.
18      Q   To your knowledge, the one we've already
19  identified is the only one he did to Morse; correct?
20      A   To my knowledge, yes.
21      Q   You said Howard had no reaction to this letter
22  because he knew about it. What was the reaction of
23  other people in the staff at R.R.A. who knew that
24  Mr. Kusnick was an employee of the firm and had worked
25  there for years?

Page 996

1       A   Some people asked me if everything was all
2  right with Howard. I told them don't worry about it,
3  it's just something I needed to do. It wasn't overly
4  dramatic. I probably got a couple e-mails from people
5  being concerned about Howard, they knew we were friends
6  as well.
7       But it was the way we did business in a lot of
8  ways, so people were used to seeing crazy e-mails from
9  me, so I don't think anyone went oh, my God, I think
10  they probably said, here's another crazy e-mail from
11  Scott.
12      Q   I don't want to beat a dead horse, but these
13  e-mails were false; correct? He was an employee or at
14  least an Of Counsel at the firm at that time?
15      A   He had some employer/employee relationship to
16  us. I don't remember ever whether he was actually -- we
17  may have had an Of Counsel relationship with him, but
18  he was on our payroll at some level.
19      Q   He was on your malpractice insurance premium
20  policy as well?
21      A   I'm pretty sure he was, yeah.
22      Q   Was that letter also designed to fool any
23  people that were auditing R.R.A. such as the Clifford
24  Chance firm or Morgan Lewis firm or any of the other
25  firms identified took part in some of due diligence?

Page 997

1       A   This letter?
2       Q   Yes.
3       A   I don't think so. I don't think so. I don't
4  think I ever showed that to -- I don't know why they
5  would want to see something about a construction
6  litigation case.
7       Q   Now, did Mr. Kusnick assist you in any way in
8  the coverup of the Jan Jones case and the fake bonds?
9       A   You'd have to go through the documents and
10  see. I don't recall, he may have. He may not have.
11  Howard was a good soldier, so if I went to him and asked
12  him to do it, he would have. But I don't recall which
13  other things he got involved in.
14      I seem to have a vague recollection of him
15  doing some sort of an opinion letter for me, but I could
16  be mistaken.
17      Q   With respect to the Jan Jones case, and I'm
18  going to get into a bunch of the documents and show them
19  to you. But sitting here today before you look at the
20  documents do you have any recollection of what employees
21  at the firm helped you perpetrate that fraud upon the
22  Morses?
23      A   The Jan Jones fraud?
24      Q   For example, who helped create the phony Court
25  orders?

Page 998

1       A   Give me one second. I just want to try to get
2  them all lined up.
3       It would have been me, Debra Villegas, Adelita
4  Cabello, Pam Domineses, Scott Goldstein - Stu Rosenfeldt
5  may have helped me with some little stuff with Ed and
6  Carol, but I don't have a specific recollection. There
7  may be more. I have to think about it. Right now I've
8  got me, Deb, Adelita, Pam, Scott Goldstein, I guess Steve
9  Osber to some extent. You have to get into questioning
10  on that specifically because he didn't know what was
11  going on with the bonds and stuff.
12      Q   What did Mr. Goldstein do?
13      A   He pretended to be Judge Kenneth Marra.
14      Q   In a telephone call?
15      A   In a dozen telephone calls.
16      Q   What did Adelita do?
17      A   She helped draft false documents.
18      Q   That case was filed initially in Palm Beach
19  Circuit Court; is that correct?
20      A   The real case?
21      Q   Yes.
22      A   In Palm Beach Circuit Court, that sounds
23  correct.
24      Q   At some point did you falsely claim to the Morse
25  family that the case was removed to federal court because

13 (Pages 995 to 998)

Page 999

1  of your status as a member of the JNC?
2      A    That sounds accurate.  There are a lot of things
3  I told the Morses to move that case around.  At some
4  point in time somehow I magically got it into federal
5  court.
6      Q    We're going to get into the documents.  But
7  would you agree with me that virtually everything you
8  told the Morses about that case is false?
9          MR. SCHERER:  Objection to the form.
10         Can you identify the Morses since we've got four
11     of them?
12         MR. MULLIN:  I'm sorry.  Ed and Carol Morse.
13  BY MR. MULLIN:
14     Q    They were the client if that case, right?  They
15  were named plaintiffs?
16     A    Yes.
17     Q    The Jan Jones case was a case that was designed
18  to sue somebody who helped with design services and the
19  construction of their house in Boca Raton, correct?
20     A    Yes.
21     Q    So, it was Ed and Carol that were the plaintiffs
22  in that case?
23     A    Yes.
24     Q    And would it be accurate to state that virtually
25  everything you told Ed and Carol Morse about the Jan

Page 1000

1  Jones case from 2006 to 2009 was materially false?
2      A    Yes.
3      Q    Now, we've talked about you told them that you
4  somehow got the case transferred to federal court,
5  correct?
6      A    Yes.
7      Q    I don't want to put words in your mouth.  Do you
8  remember what lie you told them about why it got turned
9  into federal Court?
10     A    No, sir.
11     Q    Did it have to do with your status on the JNC?
12     A    It might have, but I don't recall specifically
13  as I sit here today.
14     Q    At some point did you tell the Morses that you
15  needed expenditures of money for investigative services
16  and people to find assets of Jan Jones?
17     A    I did.
18     Q    What else did you tell Ed and Carol Morse that
19  was materially false that you recall before looking at
20  the documents?
21     A    I told them about getting the case into federal
22  court.  I lied to them about who the judges were, I lied
23  to them about having to put up bond money, about finding
24  assets, about investigative stuff we figured out.
25     Q    The case started out --

Page 1001

1      A    Really if you showed me the file and all the
2  e-mails that go with it I'd be able to pinpoint it for
3  you better.  Now I'm kind of just shooting in the dark.
4      Q    Well, I just want to get your recollection.  We
5  don't have your entire file, but we have a series of
6  e-mails turned over to us.
7      A    Do you want me to see those and I'll help you
8  with this?
9      Q    Yes, absolutely, but I want to just get into
10  conceptually, the case was worth, you said, a handful of
11  million dollars?  I think the other day you said it was
12  somewhere one and maybe three or 4 million?
13     A    If everything Carol told me could have been
14  proved as true, the case probably had a value - and given
15  the fact that Jan had actually perpetrated at least some
16  level of fraud on the Morses, yeah, I thought that
17  reasonably if it was a collectible entity I could have
18  gotten in excess of a million dollars out of them if
19  everything was true because they had spent at least that
20  much money.
21     Q    Didn't you indicate to the Morses that Jan Jones
22  had been caught hiding money in the Cayman Islands, and
23  as a result a punitive damage award was entered?
24     A    I recall that.
25     Q    Do you recall the punitive damage award was

Page 1002

1  something in the neighborhood of ten to $11 million?
2      A    I recall something like that.
3      Q    Now, you do have some kind of a background as a
4  litigator.  Is a punitive damage award of ten to $11
5  million completely unheard of in a case that's worth one
6  or $2 million?
7      A    Yes.
8      Q    Do you think the Morses would have known
9  automatically that a punitive damage award of $10 million
10  was grossly excessive?
11     A    Ed and Carol?
12     Q    Yes.
13     A    I don't think that Ed would have known that.  I
14  think that, and it was always a fear of mine, that Carol
15  was going to contact a lawyer or have Ed call one of his
16  lawyers, I think from your firm actually, and ask if this
17  was reasonable or not.
18     Q    But the fact is they trusted you as their
19  lawyers in 2006 and 2007 and 2008; isn't that right?
20     A    That's not really a correct statement.  Ed
21  trusted me.  I never really got the impression that Carol
22  ever really trusted me because she hated Ted, and Ted and
23  I were joined at the hip.
24     Q    But you were in a position of trust because you
25  were their lawyer at that time, correct?

14 (Pages 999 to 1002)

Page 1003

1    A    If you're using that word formally, that a
2  lawyer is in a position of trust to his or her clients,
3  that answer is correct.
4        If you're using it for its real meaning, I was
5  in a position of trust with Edward Morse. I do not
6  believe I was ever in a position of trust with Carol
7  Morse. I don't believe she ever trusted me. But I was
8  her fiduciary as her lawyer.
9    Q    I guess that's where I'm going. You were a
10  member of the Florida Bar once, correct?
11    A    Yes.
12    Q    And you understood that you owed a duty of
13  candor and loyalty and trust to Carol whether she trusted
14  you or not?
15    A    Yes.
16    Q    And so at all material times until October 2009
17  you did have a relationship of confidence and trust in a
18  fiduciary relationship with both Ed and Carol Morse,
19  correct?
20    A    I guess we're going to toss around on these
21  words; but, yes, from an ethical Florida Bar standpoint.
22    Q    Sure.
23    A    And I don't mean to fight over words with you.
24  I just want you to understand and I want to make sure I'm
25  being clear with you. From an ethical standpoint I had

Page 1004

1  an obligation to be in a position of trust with her.
2  But, again, I do not believe she ever trusted me, nor do
3  I believe she ever trusted Ted.
4    Q    But if a client gets an e-mail from their
5  attorney and their attorney tells them, I just got you an
6  $11 million award, and sends a fake court order to back
7  it up, why would a client not believe it?
8    A    Carol?
9    Q    Why would any client not believe it?
10        ALL PRESENT: Objection to form.
11        THE WITNESS: Carol is not any client. You're
12  talking about a completely different level of client
13  here. And you don't have to take my word for it
14  because people don't like to take my word for
15  anything these days. I can't really blame them.
16        But you could ask of any number of lawyers,
17  Mr. Stracher, who is a very, very ethical lawyer,
18  about Carol Morse, and if you're able to pick him up
19  off the floor after he finishes laughing, then --
20        MS. DEUTSCH: Move to strike as gratuitous.
21        THE WITNESS: It's really unfortunately the
22  truth. Carol was extremely difficult. Les Stracher
23  used to come in my office on a regular basis
24  complaining about having to deal with her on
25  anything.

Page 1005

BY MR. MULLIN:
1
2    Q    I don't believe I asked you that. I think I
3  asked you about, would a client believe a transmittal
4  from their own attorney that enclosed signed court orders
5  from people like Judge Kenneth Marra or Susan Black from
6  the 11th Circuit Court of Appeals?
7        And you're telling me that because of Carol's
8  relationship with Ted she wouldn't believe her own
9  attorney when she got judgments like that?
10    A    I believe that on some level she was forced to
11  believe me because of the whole familial thing and my
12  relationship with the Morses. But I always had the
13  feeling that she did not believe me, and I discussed that
14  at length with Ted. I don't want to say something that I
15  don't truly believe existed.
16    Q    Did you ever advise the Morses, and I mean Ed
17  and Carol Morse, that there was a strict confidentiality
18  order entered with respect to the Jan Jones case?
19    A    That's exactly it. I did that because I didn't
20  trust that Carol Morse trusted me.
21    Q    So you did that to basically intimidate the two
22  of them into not raising any questions about your
23  outlandish judgments, correct?
24    A    That's correct.
25    Q    So supposedly whether she believed it or not,

Page 1006

1  Mr. and Mrs. Morse were both faced with the prospect of
2  economic ruin under that confidentiality order if they
3  shared the contents of the prior orders with anybody
4  else?
5    A    Yes.
6    Q    Let's start going through the documents then
7  from the Jan Jones case.
8        Do you know why you picked Judge Marra, by the
9  way, as one of the judges to use a fake order for?
10    A    I don't.
11    Q    How about Judge Seltzer or Susan Black, do you
12  have any reason for having picked those respective
13  jurists?
14    A    Judge Black I believe we picked because I think
15  we had a reasonable facsimile of her signature. I don't
16  know that for certain. And Judge Seltzer because I had
17  access to him because of my relationship with him. And I
18  had the feeling that I might need to utilize that access
19  at some point in time. That's why I included him.
20    Q    I'm going to show you a document, Mr. Rothstein,
21  that looks like an e-mail from yourself to both Carol
22  Morse and I think Ed Morse.
23    A    Okay.
24        MR. WALKER: I'm marking this Exhibit 156. It's
25  an e-mail from Scott Rothstein to moi2@edmorse.com,

15  (Pages 1003 to 1006)

Page 1007

1  cammissy@aol.com, moi1@edmorse.com. It's dated June
2  1, 2006, at 5:17 p.m.
3       (Whereupon, Morse's Exhibit No. 156 was marked
4  for identification.)
5       THE WITNESS: Okay.
6  BY MR. MULLIN:
7     Q   Do you recall sending that e-mail to my clients,
8  Mr. Rothstein?
9     A   I do.
10    Q   And just for the record, it says in the second
11 sentence, just wanted to let you know that I was
12 successful in having the Attorney General's Economic
13 Crimes Unit pick up review of the Jones matter.
14    A   Correct.
15    Q   This is significant for us. It will enable us
16 to get info subpoenaed that we would not otherwise be
17 entitled to.
18       Did you ever, in fact, get the Attorney
19 General's Economic Crime Unit to look into the Jan Jones
20 case?
21    A   No, sir.
22    Q   Why was it that you were telling this to the
23 Morses as early as 2006? Did you know as far back as
24 2006 that you were going to have to use this case as a
25 vehicle to get money from them?

Page 1008

1     A   I don't recall what was going on at the time
2  that made me do that. There was something going on
3  probably relative to inaction on the case that would want
4  me to do that.
5       Carol had repeatedly told me that she wanted to
6  see Jan Jones in jail. So that looks like this would be
7  around that time, but I'd be guessing any further than
8  that.
9     Q   But, you would agree with me this entire e-mail
10 is false and was just designed to get your clients' hopes
11 up about criminal prosecution of Mr. Jones?
12    A   The material portions of the e-mail are false,
13 yes.
14    Q   Well, I've already asked you why you sent it.
15 That's fine.
16       The Bates label I think is MOI-8586.
17       Next I'm going to show you a one-page memo from
18 the desk of Ed Morse. It looks like it's back to you in
19 response to that same e-mail.
20    A   Okay.
21       MR. WALKER: I'll mark it 157, Bates label
22 MOI-008587.
23       (Whereupon, Morse's Exhibit No. 157 was marked
24 for identification.)
25       THE WITNESS: Okay.

Page 1009

1  BY MR. MULLIN:
2     Q   Do you recall receiving that e-mail?
3     A   I do.
4     Q   Is this a true and correct copy of an e-mail
5  that you got from Ed Morse through his assistant Dolores?
6     A   I have no reason to doubt its authenticity.
7     Q   It shows that basically Mr. Morse believed what
8  you told him about the AG's office and was offering to
9  help if any further information was needed to clear it
10 up, correct?
11    A   Yes.
12    Q   So it shows that they were buying whatever you
13 were selling?
14    A   Yes.
15    Q   Was Mr. Morse a fairly hands-on client with
16 respect to this lawsuit?
17    A   I'm sorry. Repeat the question.
18    Q   I asked if Mr. Morse, and I mean Ed Morse, was a
19 hands-on client with respect to this lawsuit?
20    A   Not really. Not really. He much like Ted was
21 trying to stay out of Carol's way.
22    Q   Did you periodically update him through e-mails
23 and phone calls?
24    A   Sure.
25    Q   Were most of your communications with him in

Page 1010

1  writing or did you call him as well?
2     A   I spoke to him on the phone rather frequently.
3     Q   And just so that we're clear, when you did speak
4  to him on the phone you were giving him false information
5  consistent with the e-mails, right?
6     A   False information...
7     Q   About the true status of the case, what Court it
8  was in, what judge it was before, et cetera?
9     A   Yes. Actually now that I think about it there's
10 actually something very unique about this telephone
11 call. But, yes, I was providing false information.
12    Q   What was unique about the telephone call?
13    A   Ted Morse was on every one of those calls with
14 us.
15    Q   Okay.
16    A   That was Ed's way of doing business. Whenever I
17 called, because Ed was afraid he wouldn't remember
18 something, and Ted was basically riding shotgun in the
19 entire case trying to help us keep Carol at bay, keeping
20 Ed informed. If you notice, I was copying Ted on
21 everything.
22       What would happen is I would call, generally
23 speak to Dolores. She'd say, I'll get Ed. And I would
24 wait for Ed. And he would put on the speaker phone, and
25 I would, if not 100 percent of the time, 99.9 percent of

16 (Pages 1007 to 1010)

Page 1011

1 the time Ted Morse was always on the phone when I was on
2 the phone with Ed.
3     Q    Well, they both work in the same building,
4 correct?  They both worked at Morse Operations, Ed and
5 Ted Morse?
6     A    Yes.
7     Q    So if you were calling Ed Morse, Ted's father,
8 and he was down the hall, is there anything unusual or
9 unexpected about Dolores saying, Ted, why don't you come
10 in and listen to this as well?
11     A    No.  I meant that it was unique regarding Ted's
12 knowledge of what was going on.
13     Q    At some point did you advise the Morses that you
14 filed a motion to release bond money?
15     A    Are you talking about a Judge Seltzer order?
16     Q    No.  I mean earlier in 2008.
17     A    I'm sure that I did.  I'm sure that I did.  If
18 you show me a copy it would be a lot easier than me
19 guessing.
20     MR. WALKER:  I'm marking this Exhibit 158.  It's
21 an e-mail from Scott Rothstein to Dolores Daoust,
22 cammissy@aol, moi-1@edmorse.com, 3/12/2008
23 MOI-008643.
24     (Whereupon, Mores's Exhibit No. 158 was marked
25 for identification.)

Page 1012

1     THE WITNESS:  Okay.
2 BY MR. MULLIN:
3     Q    What is the Bates number on that?  I just want
4 to look on while I'm asking questions.
5     A    MOI-008643.
6     Q    It says:  The court reviewed the motion I filed
7 last week to release the money you put up on the first
8 deposit on Jones.  Judicial assistant just advised me
9 that the judge granted the motion in part.  I'm
10 authorized to release 50 percent of the first deposit in
11 20 days.  They gave 20 days so Jones can lawfully object
12 if he wishes and so objection can be heard by Court.  Any
13 objection Jones makes will you futile.  Judge ruled on my
14 motion without a hearing.  No chance for Jones.  Love ya,
15 Me TPFOD.
16     A    Yes.
17     Q    Obviously there was no motion filed, and so this
18 entire e-mail is false; is that right?
19     A    It is all false.
20     Q    And it was designed to trick Mr. Morse and his
21 wife into thinking that you were getting successful Court
22 orders to return some of their money?
23     MR. KOPAS:  Object to the form.
24     THE WITNESS:  Yes.
25 BY MR. MULLIN:

Page 1013

1     Q    What was the purpose of this e-mail?
2     A    It was designed to make the Morses think that I
3 was successful, and the timing of the returns were for
4 the purpose of coordinating with my ability to pull other
5 funds out of the Ponzi scheme so that I could actually
6 pay them.
7     MR. MULLIN:  Okay.  I show you another e-mail
8 from the same day six minutes later on March 12,
9 2008, at 3:50 p.m., Bates numbers 8647 and 8648.
10     MR. WALKER:  Exhibit 159.
11     (Whereupon, Trustee's Exhibit No. 159 was marked
12 for identification.)
13     THE WITNESS:  Okay.
14 BY MR. MULLIN:
15     Q    Do you recall sending that e-mail to my clients?
16     A    The one in the middle of the first page?
17     Q    Well, I was actually going to ask you first
18 about the top one on the first page.  It says, "Lawyers
19 in the courtroom."
20     A    I remember this, yes.
21     Q    You do.  Okay.  Who was Andy Masseo?
22     A    Andy Masseo was a police sergeant with the
23 Plantation Police Department that I had a relationship
24 with.
25     Q    So he assisted your firm as an investigator or

Page 1014

1 for security reasons?
2     A    He did a variety of things for us.  He did
3 nothing for us with regard to this case.
4     Q    So his use in this e-mail is fraudulent or
5 false, that he really was not sitting with the bank
6 managers ready to serve a writ or anything?
7     A    No.  Andy Masseo had nothing to do with the
8 Morse case.
9     Q    What is the import of this paragraph?  What are
10 you telling the Morses in this e-mail?
11     A    I'm trying to make them think I've located money
12 and I'm trying to get it for them.
13     Q    And you're about to seize their bank accounts.
14 And did you say something like, The Albanese partner is
15 supposedly on his way to the bank as well.  The branch
16 closes in 12 minutes, so he'll never get there on time.
17 We got him.
18     A    Yes.
19     Q    So you were telling the Morses great news, you
20 were about to seize the bank assets of one of the
21 defendants they were suing, correct?
22     A    Correct.
23     Q    In fact, all of the information on here is
24 false?
25     A    Yes.

17 (Pages 1011 to 1014)

Page 1015

1    Q    And then lower down in the same page, Hey
2   Queenie -- Who is queenie?  Is that Dolores or is that
3   Carol?
4    A    No.  I used to call Dolores queenie.
5    Q    Okay.  So, Hey, Queenie.  Just heard from Andy
6   Masseo.  We have account with nearly 3,900,000.
7    A    Um-hmm.
8    Q    So this is a follow-up telling them that that's
9   the amount that you're about ready to levy?
10   A    No.
11   Q    What was this?
12   A    It's not a follow-up.  It's the earlier e-mail.
13   Q    This is the account that you supposedly found
14  that you were supposed to attach in the later e-mail,
15  correct?
16   A    Yes.
17   Q    Obviously there was no account at Gibraltar Bank
18  having 3.9 that you were going to seize?
19   A    No account, no judge.
20   Q    At least in the interest of speed, let me go
21  through some of these other e-mails.
22       MR. NURIK:  John, can we take a five minute
23   break?  He needs to stand up and stretch and maybe
24   some bathroom break right now.
25       (Thereupon, a short break was taken.)

Page 1016

1   BY MR. MULLIN:
2    Q    I'm going to show you a composite exhibit of
3   several one-page e-mails from Mr. Morse to yourself.  And
4   we'll mark it as composite so we can go through this
5   quickly?
6        MR. WALKER:  Bates labeled MOI008656, 8686,
7    8690, 8695, 8697, 8772, 8703, 8704, 8705, 8724, and
8    8725 and it's Exhibit 160.
9        (Whereupon, Morses' Exhibit No. 160 was marked
10   for identification.)
11  BY MR. MULLIN:
12   Q    Now, we could do it these one at a time so you
13  don't have to memorize 12 pages.
14   A    Okay.
15   Q    These all purport to be e-mails from Ed Morse,
16  which we've established are probably coming from Dolores
17  to yourself relating to these lawsuits that were pending?
18   A    Okay.
19   Q    First one is a very short one that says:
20  Perhaps you should put a tracer on the check from Jan
21  Jones, which you said was sent to us last Thursday.
22  Nothing showed up yet.  Cordially, Ed.
23       Do you recall that e-mail?
24   A    I do.
25   Q    So, that's Mr. Morse keeping a fairly tight

Page 1017

1   reign on what's happening with the case and following up
2   on a check that was due the week before; correct?
3        MR. SCHERER:  Objection to form.
4    Q    Why don't you characterize it -- What is this?
5    A    It's Ed looking for a check.
6    Q    And it's not a check that was due six months
7   ago, it was a check that was due the prior week; right?
8    A    If that's the time frame.
9    Q    He says in the letter, which you said was sent
10  to us last Thursday; is that right?
11   A    Yep.
12   Q    Now, let's turn to the next one it's dated July
13  14, 2008.  I'm going to publish it:  Scott, please advise
14  us as soon as you can if the judge reviewed the Mizner
15  property and the results of his visit.  I would also like
16  to review the property with you and your construction
17  expert as soon as possible so we can determine when the
18  household -- excuse me - when the house could be put up
19  for sale and how ownership can be achieved by us.
20   A    Okay.
21   Q    Do you recall that e-mail?
22   A    I do.
23   Q    This is Mr. Morse playing a fairly detailed and
24  hands-on role in this litigation, is it not?
25   A    No, sir.

Page 1018

1    Q    What is it then?
2    A    I actually remember this because I remember the
3   visit.  Carol was making Ed crazy about wanting to go out
4   and look at the house.  As a matter of fact, we went and
5   looked at that house probably a dozen times.  And on more
6   than half a dozen of them I would speak to Ed and Ted and
7   Ed would tell me, I'm not going there, go with Carol.  I
8   used to beg Ed to please come out there and not leave me
9   alone there with her because I was afraid I'll be there
10  the entire day.  This is more of the Carol appeasing --
11   Q    He may have been appeasing his wife but in the
12  actual paragraph he is saying he would like to review the
13  property with you and your construction expert; is that
14  not true?
15   A    That's what he's saying but I'm telling you in
16  conversations that I had with Ed and Ted.  That's not the
17  case.  He hated that house.  He did not want to go there.
18   Q    Let's go to the second paragraph:  We still have
19  not received any written confirmation of the funds frozen
20  by us in the Jan Jones and Albanese cases.  We want to
21  know all we could about how much of their money was being
22  held up.  Is he meaning what he said there or --
23   A    Yes.
24   Q    -- did he have a secret meaning with that
25  paragraph?

18 (Pages 1015 to 1018)

Page 1019

1    ALL PRESENT:  Object to the form.
2    A   Don't misunderstand me, I'm not saying there's a
3  secret meaning, it's just that I knew these people
4  intimately.  I'm telling you what was going on so you can
5  be completely educated as to what was going on at the
6  time so you can evaluate the evidence.
7    The second sentence is accurate, he was looking
8  for his money.
9    Q   He's fairly hands-on about asking for his money?
10   A   He is asking for it, yes.
11   Q   Now, let's look to the next one, July 24, 2008,
12 an e-mail starts out by saying:  Scott, we hope your
13 forensic accountant can get the information we need to
14 bury Jan Jones and bring this to a conclusion.
15   Now those sound like Ed Morse's words and not
16 Dolores' words; correct?
17   A   I think that most of the time these were Ed's
18 words.  I think what used to happen - and I can only tell
19 you from being there and watching Ed dictate to Dolores,
20 he used to actually tell her what to write.
21   Q   He would dictate?
22   A   Sometimes he would dictate and sometimes he'd
23 say send a letter, find out what's going on with the
24 stuff.  And she had also been his assistant for a long
25 time.  She knew how he spoke.

Page 1020

1    Q   At the end of this e-mail he says:  I'm getting
2  older by the minute and also getting more irritated.
3  Help.  Cordially, Ed.
4    A   Yes.
5    Q   Does that sound like Mr. Morse?
6    A   Yes.
7    Q   Next, July 28, 2008, this is four days later.
8  Scott, thank you for the information on Jan Jones.  I
9  guess there's little we can do until you get all the
10 information you need from your forensic accountant on
11 their files regarding our contract.  Do you recall
12 getting that e-mail?
13   A   I do.
14   Q   There was no forensic accountant working on this
15 case; was there?
16   A   No.
17   Q   So, Mr. Morse is being led astray by your prior
18 e-mails into believing that there's a forensic accountant
19 working on this on behalf of the R.R.A. firm?
20   A   That's correct.
21   Q   When you got this e-mail did you call him up or
22 correct him and say no, there's really nobody working on
23 your case?
24   A   No, I did not.
25   Q   Let's go to August 20, which is about three

Page 1021

1  weeks later.  Scott, I am repeating some unanswered
2  questions which were in an e-mail in August.
3    First question:  Do you have any idea when we
4  will be able to evaluate the forensic accountant's review
5  of the Jan Jones billings?  We hope that they will not be
6  able to use another computer or subterfuge to hide their
7  misdeeds.
8    Next:  I am still waiting an opportunity to get
9  into the Mizner house and see the work which has been
10 completed and remains to be done so we could take action
11 against Albanese.
12   Again, is this an e-mail you got from Mr. Morse
13 in August of 2008?
14   A   Yes.
15   Q   He's asking very detailed questions on strategy
16 and progress; is that right?
17   MR. SCHERER:  Objection, form.
18   A   It's the way Ed would approach me, there's
19 nothing confusing about this.  He's asking me what's
20 going on in the case.
21   Q   And in the last full paragraph it says:  Now
22 that you have a verdict against Jan Jones from the
23 Appellate Court what is the next step?  There has been
24 considerable conversation about the Attorney General's
25 Office, but apparently no action has been taken.  We have

Page 1022

1  in place nearly 7.9 million dollars in escrow, all but
2  1.25 million is against Jan Jones.
3    Do you see that paragraph?
4    A   I do.
5    Q   At this point Mr. Morse, according to this
6  e-mail, believes you have already won a verdict in the
7  appellate court against Jan Jones?
8    A   Correct.
9    Q   Because you told it to him?
10   A   Correct.
11   Q   That was false; correct?
12   A   Correct.
13   Q   He also believes that the Attorneys General's
14 Office is dragging their feet where we've already
15 established they had no knowledge of this matter; right?
16   A   Correct.
17   Q   Next is November 3, 2008.  Dear Scott, please
18 let us know if you are getting the cooperation you need
19 from Mark Marsh in order to expedite the foreclosure at
20 the Mizner Lake property.
21   Did you get that e-mail?
22   A   I did.
23   Q   Do you have any recollection of there being a
24 foreclosure at the Mizner Lake property?
25   A   There was all kinds of strange stuff going on.

19  (Pages 1019 to 1022)

Page 1023

1  Actually I think that Albanese himself was trying to
2  foreclose on the property. There was something weird
3  going on there. At the same time we were trying -- this
4  is what was really going on in the case, the first
5  paragraph. Mark Marsh was supposed to come out to the
6  property to help us with information on architectural
7  issues and stuff. He was repeatedly supposed to meet
8  Mr. Osber and I out there, he kept postponing and
9  changing stuff.
10       That first sentence has nothing to do with the
11  fraud. That's stuff that's really going on in the case.
12  Q   In fact, Mr. And Mrs. Morse actually were
13  foreclosed out of their house and locked out of
14  their house until they had to come in and post a bond?
15  A   I believe that is correct, yes.
16  Q   Now, this doesn't seem like an aloof Plaintiff
17  who's just sending you checks and wires whenever you ask
18  for them without keeping track of the case. Isn't it
19  true that throughout this period of time Mr. Morse is
20  engaged in trying to find out everything he can about the
21  case?
22       MR. SCHERER: Object to the form.
23  A   You just took one scenario and attached it to a
24  simpler one that are not related. The money side of this
25  is completely different than the what's going on side as

Page 1024

1  far as Mr. Morse's attentiveness to the details. You
2  tried to hook it all in together and make it one
3  sentence.
4  Q   Let me make break it down into two sentences.
5  Generally when you contacted Mr. Morse --
6  A   Yes.
7  Q   -- or you contacted the people at Morse
8  Operations whether it be Mike Kelly or Dennis McGinnis,
9  when you asked for money because you as their attorney
10  said it was necessary, they provided it to you; is that
11  right?
12  A   That's not the way it worked.
13  Q   How did it work?
14  A   I would call Ted Morse and tell Ted Morse that
15  we needed money. Ted would let Ed know what was going
16  on, based on the way I told Ted to address it with Ed.
17  Then I would make the request to Ed, sometimes I didn't
18  even have to make the request to Ed as I recall,
19  sometimes Ted made the request and told him the money
20  needed to be sent.
21       Frequently, I would then call Ed at which time
22  Ted and Ed would get on the phone or I would write to Ed,
23  tell me him we needed the bond. There were very
24  infrequently any questions other than a brief
25  explanation.

Page 1025

1       When we got into -- finishing your question,
2  when we got into the house details, if it was something
3  he was particularly concerned about he was on top of it.
4  If it was something that Carol was aggravating him about,
5  he was on top it reluctantly. Other issues like the
6  things on the window in the main house, that stuff drove
7  him crazy, he didn't want to be involved in it.
8  Q   Whether he asked questions or not about the
9  bonds, isn't it true that every time he sent you money or
10  MOI sent you money for this case for a bond, for an
11  expert witness fee, for an imaginary consulting cost that
12  you sent them, he did it because you as his attorney told
13  him it needed to be paid; right?
14  A   You want to know what I think?
15  Q   No. I want to know the answer to the question.
16  Did you in writing or via telephone advise Ed Morse and
17  Carol Morse or Morse Operations that those funds were
18  needed for the benefit of the Jan Jones case?
19  A   I did.
20  Q   And in fact --
21  A   That's a completely different question. I did.
22  Q   Every time you so advised them, whether it be in
23  writing or informally or by telephone, they funded it;
24  correct?
25  A   You're leaving a part out, but yes.

Page 1026

1       MR. SCHERER: Object to form. Move to strike
2  the answer.
3  Q   Let's go to the next document in the exhibit,
4  12/3, 2008. Dear Scott: We know you are overwhelmed
5  because you have not been able to get back to us on
6  questions we had about the Jan Jones settlement, which we
7  understand is 1.25 million, with a question about the
8  furniture.
9  A   Sorry. Hang on a second. I have an e-mail
10  before that, 11/5/08.
11  Q   Yeah, I skipped that one, it was short. But the
12  11/5/08 is saying: I've not yet heard if you were
13  getting total cooperation from Mark Marsh and Les Stevens
14  on the Albanese matter. And have we made any further
15  progress on the Jan Jones settlement? You got that
16  e-mail on November 5 of 2008?
17  A   I did.
18  Q   We've talked about Mark Marsh. Who was Les
19  Stevens?
20  A   Les Stevens was one of Mr. Morse's other
21  attorneys, he used to be partners with Les Stracher,
22  Stracher and Stevens.
23  Q   Was he in any way co-counsel or acting with
24  Mr. Osber or Mr. Stracher in the Mark Marsh case?
25  A   I don't remember his exact involvement, but

20  (Pages 1023 to 1026)

Page 1027

1  there were things that Les Stevens -- Yes, I do
2  remember. Les Stevens did the closing on the Mizner
3  house and he made a mess of it. There were some real
4  issues with what had been done. He didn't follow the
5  Morses' instructions as to the way they wanted themselves
6  protected. I needed to get information from Mr. Stevens
7  and he wasn't getting it to us. That was a real part of
8  the case.
9      Q   He was a real estate attorney or is a real
10  estate attorney?
11     A   I don't know what kind of attorney he was but he
12  did the real estate closing.
13     Q   And then he's asking again, have we made any
14  progress on the Jan Jones settlement.
15         At this point in time in November of 2008, were
16  you telling the Morses that the Jan Jones case was
17  settling?
18     A   Based upon this questioning he's asking me, it
19  appears I was. I don't have an independent
20  recollection. You would have to show me documents so
21  I could figure it out.
22     Q   If you don't recall the settlement without
23  documents, you don't recall the terms of that possible
24  settlement?
25     A   Yeah, I don't, not off the top of my head.

Page 1028

1      Q   All right. Going back to the next page that I
2  started to read before, December 6, 2008. Do you recall
3  reading that e-mail?
4      A   Give me a second to read it real quick.
5      Q   Sure.
6      A   Okay.
7      Q   Did you get that e-mail?
8      A   I did.
9      Q   He's asking you about several different cases;
10  right? Asking about Mizner Lakes, he's asking about
11  possible settlement with Jan Jones, he's asking detailed
12  and pointed questions in December of 2008?
13     A   Yes, he's asking very specific questions about
14  what's going on with certain issues, some of which are
15  fraudulent and some of which are not.
16     Q   And when they're fraudulent, again, he had no
17  knowledge they were fraudulent, but in fact that was
18  details about his cases being hidden from him; correct?
19     A   Correct.
20     Q   Go onto the next one on January 15, 2009. He
21  expresses his hope you're feeling better and rid of the
22  flu. And then it looks like in the middle main paragraph
23  he says: We are still confused about the judge's order
24  to release two and a half million dollars and the ruling
25  that he came forth with about five days to show cause, as

Page 1029

1  you seem pleased with that.
2          So, it's fair to state he had gotten one of your
3  court orders and was confused about it?
4      A   He either had gotten the order or we had
5  discussed it, one or the other. But, yes, he was aware
6  of it.
7      Q   And do you recall discussing it with him in
8  response to this e-mail?
9      A   I don't recall one way or the other.
10     Q   Now, at some point did you have to ramp up the
11  amount of money you were getting from the Morses to cover
12  your Ponzi operation?
13     A   I did.
14     Q   And do you recall February 2009 as being a point
15  in time where you got two payments of over nine million
16  dollars a piece?
17     A   If that's what the records show, that's what
18  occurred. I don't have an independent recollection of
19  it. I remember there being a point in time when the
20  Ponzi scheme was about to explode and I turned to the
21  Morses to facilitate me getting funds to keep the Ponzi
22  going, yes.
23     Q   And let's look at the next e-mail, which is
24  dated March 10, 2009, maybe that will shed some light on
25  it.

Page 1030

1      A   Okay.
2      Q   Do you recall telling the Morses that you needed
3  to put up triple bonds - in other words, three times the
4  amount of the judgment or three times the amount sought
5  as a bond amount?
6      A   I do.
7          MR. SCHERER: Object, Counsel. Morse?
8          MR. MULLIN: Ed Morse.
9          MR. SCHERER: Thank you.
10     A   I do.
11     Q   And since there was an objection, could you tell
12  me what you remember about discussing the treble amounts
13  for the bonds with Mr. Ed Morse and his wife?
14     A   All I remember is that we were desperate for
15  cash and I was trying to figure out a way to get the
16  money from Mr. Morse and the treble damages thing came
17  into my head.
18     Q   There are certain bonds, for example,
19  pre-judgment writs of garnishment or attachment in which
20  it's not uncommon to have to put up treble the amount of
21  the amount sought as a bond amount; is that correct?
22         MR. SCHERER: Objection, form.
23     A   I don't recall one way or the other. That
24  sounds familiar to me, but I haven't practiced law in a
25  couple years. I don't remember.

21 (Pages 1027 to 1030)

Page 1031

1    Q   Did it sound plausible enough to be believable
2    by a layman?
3         MR. SCHERER: Objection to form.
4    A   Yes.
5    Q   That's why you came up with the story, you
6    didn't pick three out of the hat, I assume, when you told
7    that lie to the Morses; did you?
8    A   No, I didn't pick it out of the hat. That's why
9    I utilized it.
10   Q   Reading this e-mail of March 10, it says:
11   Thank you for your reassuring phone call this morning.
12   Hopefully we can get before the federal court judge early
13   next week and finish up the Jan Jones saga. We are
14   confident that he will be able to put up a high amount of
15   bond money required to appeal. We think this would
16   trigger our access to the District Court adjudication of
17   the matter where we would get the one million two hundred
18   thousand plus three million punitive damages of the
19   frozen funds as soon as possible.
20        Does that refresh your recollection on what
21   exactly you were telling the Morses regarding what was
22   going on at that time?
23   A   It does to some extent, yes.
24   Q   And then he says later on in that same
25   paragraph: It would also free up 9,250,000 of new bond

Page 1032

1    money put up on February 10 of this year.
2    A   Okay.
3    Q   We could go through the actual wire transfers
4    but you are aware that in February 10 or sometime around
5    then he did put up $9,250,000?
6    A   Yes, sir.
7    Q   In fact, there were two bonds or two payments,
8    roughly a week apart, 9,250,000 each; is that right?
9    A   I believe that's correct, sir, yes.
10   Q   At that time you were still banking with
11   Gibraltar?
12   A   This is '09, I was banking with both Gibraltar
13   and T.D.
14   Q   When you were asking for bond money or other
15   payments related to this lawsuit from my clients, isn't
16   it true that you were giving wire transfer instructions
17   into an IOLTA trust account that your firm maintained?
18   A   Correct.
19   Q   And it was IOLTA trust accounts that went to
20   Gibraltar for a period of time and some point it switched
21   to T.D. Bank?
22   A   Depended where we needed the money for the Ponzi
23   scheme, yes, sir.
24   Q   And so, did you ever tell Ed and Carol Morse
25   that the money was actually not maintained in a

Page 1033

1    segregated trust account?
2    A   I don't recall one way or the other. I do
3    recall, for some reason, at some point in time opening up
4    a - either opening a segregated account for them at T.D.
5    or utilizing one of the already existing accounts and
6    simply them telling it was a segregated account for them,
7    one or the other.
8    Q   Like the account number, the 4923 account -- the
9    0923 account?
10   A   No, 0923 was a non segregated account, because
11   of the sheer velocity of the activity. I may have told
12   them that was a segregated account. I don't recall that
13   being the number.
14   Q   Whether it was an individual account devoted
15   solely to them or your firm's main IOLTA trust account,
16   you would agree with me that when the moneys were
17   requested of the Morses you were telling them it was
18   going into trust accounts; correct?
19   A   Yes.
20   Q   You never told Ed and Carol Morse that in fact
21   the monies had been pulled out of the trust account to
22   cover your Ponzi and that there was $100 remaining in the
23   accounts?
24   A   No, sir.
25   Q   So, at all material times that they continued to

Page 1034

1    fund the money you were telling them the money was secure
2    in your trust account?
3    A   Correct.
4    Q   Whether it be Gibraltar or T.D.?
5    A   Talking about Ed and Carol?
6    Q   Yes, sir.
7    A   Yes, sir.
8    Q   Did there come a point in time where
9    correspondence and e-mails wasn't enough, you felt like
10   you needed to actually provide phony court orders to the
11   Morses to keep the funds coming?
12   A   I did.
13   Q   Do you recall which was the first court order
14   that you had forged and sent to the Morses?
15   A   I do not.
16   Q   Was it the Judge Marra Order?
17   A   If you show me all the forged orders we can put
18   them in order and I will be able to tell you with a
19   hundred percent accuracy.
20   Q   We're going to show you a composite exhibit,
21   which I believe it the fake Judge Marra Court Order, the
22   global release of all claims settlement agreement, the
23   Motion to Seize and Release Funds, and then the United
24   States Court of Appeals for the 11th Circuit decision
25   from Judge Susan Black. And finally, the order on the

22 (Pages 1031 to 1034)

Page 1035

1  Plaintiff's emergency ore tenus motion to release funds
2  that was supposedly signed by Judge Seltzer. We've got
3  this as a composite exhibit and then go over it one at a
4  time.
5       MR. WALKER: Exhibit 161.
6       A   Okay.
7       (Whereupon, Morses' Exhibit No. 161 was marked
8   for identification.)
9  BY MR. MULLIN:
10      Q   Do you remember --
11      A   Which one do you want to talk about first?
12      Q   Well, I guess we'll go in order. The first
13  document listed here is the - and the Bates number starts
14  with 9134. This is the fake Judge Marra Order; correct?
15      A   Yes, sir.
16      Q   Did you have any role in preparing this or do
17  you know who prepared it?
18      A   Without seeing the e-mail traffic before and
19  after it and during it I can't tell you for certain. But
20  reading it, it looks like I prepared the bulk of it. I
21  may have prepared all of it.
22      Q   Do you have any independent recollection of
23  doing so?
24      A   You know, I have an independent recollection of
25  preparing a lot of this language and then I'd have to

Page 1036

1  send it to one of the secretaries for, you know, for
2  formatting. So, I don't know if there's -- you have to
3  look at the e-mail traffic and see if I sent it to
4  someone else to take a look at the wording. I don't have
5  an independent recollection. The bulk of this language
6  looks like me.
7       Q   It looks like it's just detailed enough to sound
8  like it's something the Court would write; is that
9  correct?
10      MR. SCHERER: Objection to form.
11      A   Yes. That's the way I designed it.
12      Q   By now, 2009, you had been practicing for what,
13  21 years?
14      A   Yes.
15      Q   Now, the second paragraph of the order -- First
16  of all, I think I've talked about it, but you had already
17  indicated to the Morses that the case had been
18  transferred to federal court; correct?
19      A   Yes.
20      Q   You had been telling them they were in front of
21  a federal judge, whether it be Judge Marra or another
22  judge, they probably didn't know who that was; right?
23      A   Yes.
24      Q   You're saying -- and even in the case number,
25  you put case number under seal at the caption and

Page 1037

1  heading?
2       A   Yes.
3       Q   Is that to make sure that any other attorney
4  that might be brought into this matter by the Morses
5  would not be able to find this?
6       A   Yes. And so that Carol couldn't find it, yes.
7       Q   It was designed to make this top secret;
8  correct?
9       A   It was designed in a manner - I knew that what I
10  was doing by forging a federal judge's signature, the
11  Marra signature, the Black signature, and the Seltzer
12  signature, I was forging - I was actually having someone
13  cut and paste, but still my responsibility. I was in
14  essence forging the federal court orders of three
15  extremely distinguished, extremely ethical judges. I
16  didn't want anything coming back to haunt me. This was -
17  of all the things I did, other than stealing all that
18  money from all those people, this was - not only just
19  plain stupid, it was ignorant and embarrassing.
20      Q   This is what ultimately was pointed to by Judge
21  Cohn in the sentencing as probably the most disturbing
22  part of the whole scheme; wasn't it, these fake orders?
23      A   Yes. Looking back at what I did, it's one of
24  the most disturbing things to me.
25      Q   In fact, you probably went through more time and

Page 1038

1  trouble and effort to pull the wool over the Morses' eyes
2  than any other investors or participants in the scheme?
3       A   No, that's not even close to being true. You're
4  very, very far off base.
5       Q   Okay. Let's look at Paragraph 2 of this order.
6  It says: That Jones is liable to Morse for punitive
7  damages for fraud in the amount of 21 million dollars
8  modified from a prior order of this Court finding the
9  liability of three million in punitive damages. Is that
10  right?
11      A   Yes.
12      Q   So, that's what you were telling the Morses,
13  that there was a finding of 21 million in punitives?
14      A   I want to make sure every time that you're
15  saying the Morses, you're only referring to Ed and Carol
16  Morse.
17      Q   I'm talking Ed and Carol Morse who are the
18  Plaintiffs in this case and my clients.
19      A   I want to make sure for my head.
20      Q   That's fine.
21      A   Yes, that's what I told them what's in Paragraph
22  2.
23      Q   And you are saying in Paragraph 4 that there's
24  currently in excess of 10 million dollars in funds
25  clearly belonging to Jones frozen in various bank

23 (Pages 1035 to 1038)

Page 1039

```
 1   accounts in South Florida.  Was that designed to give Ed
 2   and Carol Morse some comfort in knowing that you had
 3   actually clearly frozen that amount of money from Jan
 4   Jones and that it was available?
 5       A   Yes.
 6       Q   Why did you put Paragraph 9 in there that the
 7   IRS has provided competent testimony and might be
 8   partially entitled to the funds.  Is that so that you
 9   could be able to take money out for your Ponzi if need
10   be?
11       A   Just give me one second.
12       Q   Sure.
13       A   I don't remember why I put that in there.  I
14   remember discussing some IRS issues with Carol, but I
15   don't remember why.  You have to go back and look through
16   all my e-mails.
17       Q   Obviously, virtually everything in this entire
18   document is false though; correct?
19       A   Without sitting here reading every paragraph,
20   the order was designed to look real and it was false.
21   And just so you know, putting the thing in for the IRS to
22   justify taking money out, I don't believe as I sit here
23   today that's why I did it because let's remember, I was
24   taking all the money anyway.
25       Q   You would have taken it anyway?
```

Page 1040

```
 1       A   Yes.
 2       Q   I understand.  Going to paragraph --
 3       MR. SCHERER:  Witness nods his head.
 4       A   Yes.
 5       Q   Paragraph 22:  Following the posting by Morse of
 6   15 million.  So at this point you were putting this
 7   number in there to try to make sure you could get an
 8   additional 15 million of bond premiums from the Morses?
 9       A   Yes.  As a matter of fact, when this was going
10   on, we were frantic for funds in the Ponzi scheme.  I
11   remember right around this time - actually I was standing
12   outside my building on my cell phone talking to Ted about
13   this particular incident and ultimately getting on the
14   phone with Ted and Ed to discuss this.
15       So, yeah, we were beyond frantic.  We were
16   almost out of money.  If you look at our financial
17   ledgers, huge payments were due and we did not have the
18   funds.
19       Q   Turn to Paragraph 29 for a minute.
20       A   Okay.
21       Q   Pursuant to the Bank Secrecy Act as amended on
22   October 21, 2008, The Freedom of Information Act, the
23   United States Patriot Act II, The Currency and Foreign
24   Transactions Reporting Act of 1970 as amended on November
25   11, 2006, USC5311-5300, and the USA Patriot Act Title
```

Page 1041

```
 1   III, and the judgment of this Court based upon
 2   information received under oath, this Order, the facts of
 3   and amounts contained herein, the findings hereof, and
 4   any and all other matters surrounding same shall be held
 5   in strict confidence so as not to jeopardize any
 6   potential investigation by the appropriate governmental
 7   agencies.  Violation of this portion of this Order shall
 8   result in civil and criminal penalties.
 9       A   Yes.
10       Q   Do all of those statutes even exist?  Did you
11   make that up as you were dictating that or are there
12   actual -- do those numbers and dates of amendments
13   correspond to actual dates?
14       A   Which one of the questions do you want me to
15   answer?
16       Q   Well, make it a compound question.
17       MR. SCHERER:  Object to form.
18       A   I can explain it to you if you want.  Ask me to
19   explain it and I'll explain away.
20       Q   Explain away.  First, what was the purpose of
21   adding this confidentiality provision into this fake
22   order?
23       A   There came a point in time when in our office
24   and with Ted, we began to call all these confidentiality
25   paragraphs the "Carol Clause" like Santa Claus, but with
```

Page 1042

```
 1   Carol, the Carol Clause.
 2       Q   You basically were making sure that neither Ed
 3   nor Carol Morse was able to speak to a sole about this
 4   under threats of civil and criminal penalties; isn't that
 5   right?
 6       A   It was really directed towards Carol, that's why
 7   we called it the Carol Clause.  I was not -- understand.
 8   I was the person that was afraid as were some of my
 9   partners.  I was the person mainly afraid of being
10   detected.
11       So, I know who I was afraid of.  I wasn't afraid
12   of Ed ever hurting me, despite the fact I was hurting
13   him.  I was afraid of Carol hurting me.
14       Q   But whether or not you really felt Carol was the
15   one more likely to speak to another party or Ed, the fact
16   of the matter is by putting this in here you were
17   basically warning both Plaintiffs in this case, Ed and
18   Carol Morse that if you speak to anybody about this, you
19   face civil and criminal penalties; it that right?
20       A   That is what it does.  That was -- I want you to
21   understand --
22       Q   Carol was the --
23       MR. SCHERER:  Objection.
24       A   I agree with you.  It absolutely had the effect,
25   okay, of what you just said.  Just in my mind wouldn't
```

24 (Pages 1039 to 1042)

Page 1043

1    have been -- I was dealing with Ed, Mr. Mullin, I likely
2    would never have put that in there because it wouldn't
3    have been a problem with Ed. That's just the way I felt
4    based on all the dealings I had with Ed and Ted. Carol,
5    it was a different story.
6       Q    Does this have any basis or reason why you put
7    the IRS provision in there earlier in the document? Was
8    it because you were going to refer to governmental
9    agencies and reporting requirements in the Paragraph 29?
10      A    It's very possible. You also asked me a
11   question as to all these statutes and stuff.
12      Q    That was my next question. Out of curiosity, do
13   they exist?
14      A    I believe they do. It actually tells me
15   something important about the order and that is you need
16   to look through the e-mails and see who else assisted me
17   because. I don't know what these are in. And my general
18   rule of thumb during the course of the Ponzi was when I
19   was going to include something that required citation to
20   specific statutes and the like, I would enlist the help
21   of another member of the firm. So you need to take a
22   look at that.
23      Q    You don't recall sitting here today who helped
24   you with that though?
25      A    I don't.

Page 1044

1       Q    Now, the next document is global release of all
2    claims. This was the Jan Jones settlement agreement from
3    March of 2009; is that correct?
4       A    Give me one second.
5       Q    Sure.
6       A    This is the real settlement agreement.
7       Q    This is the real settlement by which they are
8    supposed to pay Jan Jones 500,000; correct?
9       A    Yes.
10      Q    And I believe we touched about upon this
11   previously but Ed and Carol Morse never knew about the
12   existence of this settlement agreement and never agreed
13   to pay $500,000 to Jan Jones?
14      A    Correct.
15      Q    They were being told they had judgments in their
16   favor of million dollars and not that they owed them any
17   money?
18      A    Correct.
19      Q    Did you come up with the idea of this settlement
20   agreement to basically stop this litigation and keep the
21   case at bay?
22      A    Actually, no. Steve Osber was handling the real
23   part of the case and he actually came to me, he had
24   settled the case. He had a settlement offer for this
25   amount of money. And I said, okay, let's settle it.

Page 1045

1       Q    Why would he settle a case that was offensive in
2    nature for a $500,000 obligation, was that --
3       A    It wasn't only offensive --
4       Q    Is that how he settled his cases?
5       A    I don't remember whether there were counter
6    claims in the case or not, but regardless, Jan Jones,
7    according to what I was being told by the people that
8    were actually working on the case on a regular basis, was
9    entitled and was owed money.
10      Q    Was Mr. Osber sending you internal e-mails at
11   R.R.A. asking if you could get the Morse's signature on
12   this document to save him trips to the Court when there
13   were motions to compel execution of the settlement
14   agreements?
15      A    Yes.
16      Q    You recall those e-mails?
17      A    I do.
18      Q    Did you ever tell Mr. Osber the whole thing is a
19   sham that the Morses never agreed to settle and you have
20   to buy time?
21      A    What I told Mr. Osber was that I was going to be
22   having Ted execute them or Ted would get Ed to execute
23   them and he just needed to continue to stall.
24      Q    And in fact nobody ever executed this document
25   on behalf of the Morses; isn't that accurate?

Page 1046

1       A    I believe you're correct, yes.
2       Q    And at some point, did you fund the settlement
3    to get Jan Jones off your back?
4       A    I believe we did, yes.
5       Q    And so you would 500,000, give or take a couple
6    of thousand dollars to the law firm of Mr. McGinley;
7    correct?
8       A    The records should show that I did. I believe
9    that I did, yes.
10      Q    Did you have any discussions with Mr. McGinley
11   or anyone at his firm on what he should do with that
12   money and whether he should disburse it or not?
13      A    I didn't know, if anyone was talking to him it
14   would have been Mr. Osber. I don't recall having
15   conversations with him directly, suppose I may have but I
16   don't have any recollection of it.
17      Q    Did you have any conversations with Mr. Osber
18   saying, tell them to hold the money in escrow because the
19   Morses weren't aware and didn't approve the payment?
20      A    No, no, no, we never told them that.
21      Q    So you have any recollection sitting here today
22   or any idea what happened to that money?
23      A    I do not.
24      Q    Next is a motion to seize and release funds, do
25   you recall that document?

25 (Pages 1043 to 1046)

Page 1047

1    A  I do.
2    Q  It's a four-page motion, looks like it was
3 signed by Barry Stone of your firm?
4    A  No, he didn't sign that, someone signed it for
5 him.  You can see it says, "Barry Stone A.A. for."
6    Q  Mr. Stone never signed this motion or filed it?
7    A  No, sir.
8    Q  And you're not insinuating or in no way
9 suggested that Mr. Stone played any part in your
10 fraudulent activity?
11    A  Barry Stone is right up there with Judge Marra,
12 Judge Seltzer, Judge Black, one of the most ethical
13 individuals I've ever met.
14    Q  Obviously this motion was never filed with any
15 Court, correct?
16    A  No, there was no place to file it.
17    Q  Right.  And again, it has an under seal case
18 number designed to make sure nobody including Carol could
19 find that on the Internet; is that right?
20    A  Correct.
21    Q  And what was the purpose of preparing a
22 three-page motion in May of 2009 that nobody was going to
23 file?
24    A  To make the Morses believe there was actual
25 activity.

Page 1048

1    Q  And did you in fact send it to them?
2    A  I did.
3    Q  And again, it's reiterating that there's an
4 order awarding the Plaintiffs the sum of 20 million
5 dollars in damages.  So you were telling them that their
6 case was worth a lot more than it really was; correct?
7    A  Yes, I was trying to keep them pumped up, that's
8 correct.
9    Q  Do you recall what their reaction was when they
10 saw this motion?
11    A  I don't.
12    Q  It says in Paragraph 15 of this motion that the
13 sum of 20 million dollars, which had been seized from the
14 Defendant's accounts in the Cayman Islands, are presently
15 held in the registry of the Court; is that right?
16    A  Yes.
17    Q  Obviously there was no funds held in the
18 registry of any Court no doubt, right?
19    A  Yes.
20    Q  Next, let's get to the Judge Black Order.  It
21 was an emergency -- sorry, first you filed what you
22 purported to file an emergency motion for writ of
23 mandamus; is that right?
24    A  Yes.
25    Q  And obviously there was no pending action in the

Page 1049

1 11th Circuit Court of Appeals, so again this pleading is
2 another sham pleading designed to fool the Morses into
3 thinking you were trying to get their bond money back;
4 correct?
5    A  Yes.
6    Q  This one has your signature and it's dated in
7 July 2009.  Obviously everything in this motion is
8 false?
9    A  It's a fake order, yes.
10    Q  And did you in fact send this to the Morses to
11 show the progress that you were supposedly making in
12 getting their money?
13    A  Yes.
14    Q  Were you explaining to the Morses that despite
15 Judge Marra's Order you were not able to get funds from
16 the Court and you were frustrated and that's why you
17 went to the 11th Circuit?
18    A  Yes.
19    Q  Can you describe - I don't want to put words in
20 your mouth - what you were telling them about that, why
21 did you have to file an extraordinary writ of mandamus
22 when Judge Marra's Order said what it said?
23    A  I have no independent recollection of what I was
24 telling them.
25    Q  Let me - I'm going to take this a little out of

Page 1050

1 order because I think the dates being what they are.  Let
2 me show you the proposed order from Judge Black and then
3 we'll come back to the last part of this exhibit.
4    A  Okay.
5       MR. WALKER:  Composite including an e-mail where
6    you're e-mailing to him, and the order, purported
7    order, entitled order on emergency writ of mandamus.
8    And I'm marking it Morse 162, Plaintiff Exhibit.  And
9    the top e-mail is dated October 9, 2009.
10       THE WITNESS:  Thank you.
11       (Whereupon, Morses' Exhibit No. 162 was marked
12    for identification.)
13 BY MR. MULLIN:
14    Q  Is this the -- I'll let you look at it first.
15 I'm sorry.
16    A  Okay.
17    Q  Is this the Court Order forging the signature of
18 the Appellate Judge Susan Black that we talked about
19 before, Mr. Rothstein?
20    A  It is.
21    Q  And obviously, your e-mail - the first page is
22 your e-mail to the Morses, to Dolores and looks like to
23 Ted enclosing a copy of this order and the writ; correct?
24    A  Yes.
25    Q  And it says in your e-mail, "This is the order

26  (Pages 1047 to 1050)

Page 1051

1    on the writ, please remember that we are not supposed to
2    have this copy. Read the order carefully. Love Scott."
3    And then you attach the order.
4         You sent it to them in October 9 of 2009, that's
5    pretty close to the end of everything imploding for you;
6    correct?
7    A    Correct.
8    Q    Do you recall who at your office helped you
9    prepare this order?
10   A    I have a vague recollection, yes.
11   Q    Who is -- what does your vague recollection tell
12   you with respect to who helped you?
13   A    Start from the back. Earlier I said that I
14   thought that we had selected Judge Black because we had a
15   facsimile of her signature. That has to be an incorrect
16   statement by me, I was mistaken. Because this signature
17   is either the handwriting of Deb Villegas, Pam Dominess,
18   or Adelita Cavello, I recognize it was one of their
19   handwritings.
20   Q    Okay.
21   A    The front of this, all of the way it's set up --
22   Q    Right.
23   A    -- had to have been done by one of my other
24   lawyers in conjunction with another secretary or
25   paralegal. I didn't -- let me tell you why, I didn't

Page 1052

1    have at that time as my secretary or paralegal, anyone
2    who had experience setting up a caption for an appellate
3    case.
4    Q    You needed to have a prior Court order that
5    looked like an order from the 11th Circuit with the
6    proper spacing and caption and heading; right?
7    A    The language looked like mine, but the
8    formatting would have had to have been done by someone
9    with experience to make it look like that type of order.
10   Q    I noticed that you have this thing supposedly
11   signed on August 13, 2009 and yet you sent it to Ed Morse
12   on October 9, do you recall why the difference of dates?
13   Was it actually prepared in August and sent three months
14   later or did you back date it and just prepare it in
15   October; if you recall?
16   A    I don't recall.
17   Q    But again, this was something that you sent to
18   the Morses to give them some false hope with respect to
19   progress via the Courts and getting your bond money back;
20   correct?
21   A    Correct.
22   Q    And this actual signature or fake signature of
23   Judge Black was again, one of the extenuating
24   circumstances at your sentencing; correct?
25   A    I believe so, yes.

Page 1053

1    Q    Now, the final document that I was going to show
2    you where it was part of the prior composite exhibit I
3    think was the Judge Seltzer. We talked about this
4    or you talked about this a little bit the other day, but
5    can you go back to that composite exhibit and look at
6    that, please?
7    A    I'm looking at it.
8    Q    Is that a true and correct copy of the Order
9    that you created on or about September 8 for Judge
10   Seltzer's signature?
11   A    Yes.
12   Q    And again, this is an under seal case so there
13   would be no way for anybody who got a copy of this trace
14   the case number according to the case --
15   A    Yep. That was my intention.
16   Q    I believe you testified previously that Barry
17   Seltzer's signature was forged by Debra Villegas; is that
18   right?
19   A    She cut and pasted it.
20   Q    And what you did was when you went to go see
21   Magistrate Judge Seltzer, I believe your testimony is
22   that, at some point you went behind closed doors, you had
23   the order with you and you got a book from Judge Seltzer
24   which was his qualification for a judgeship and you
25   tucked the order into that book; is that your testimony?

Page 1054

1         MR. SCHERER: Object to the form.
2    Q    Does that accurately reflect the way you
3    remember what you did with this order?
4    A    I'm not sure. Let me see if I can lay it out
5    for you. Would you like me to?
6    Q    I don't want to waste everyone's time, I mean
7    you testified at length; right?
8         MR. SCHERER: Objection to form. Let him answer
9    the question, Counsel.
10        MR. MULLIN: I'll rephrase my question so I can
11   get to the point.
12        THE WITNESS: Okay, go ahead.
13   BY MR. MULLIN:
14   Q    You had this document -- you prepared this
15   document with the help of the paralegal at your office
16   the morning of September 8, you testified about that;
17   right?
18        MR. SCHERER: Objection, form.
19   A    I prepared this order on September 8th, I'm not
20   sure what time it was finished.
21   Q    And my only question to you was, you took this
22   order and you secretly had, with the signature that was
23   put there, Photo-shopped by Debra Villegas. And your
24   testimony is that you tucked it into the book that you
25   got from Magistrate Judge Seltzer that you obtained when

27 (Pages 1051 to 1054)

Page 1055

1  you went to see him about his possible candidacy for a
2  federal judgeship; is that right?
3       MR. SCHERER: Object to form.
4       A  I don't know for certain that it happened that
5  way. I have a vague recollection of having an order like
6  this with me and then going - not this one - and then
7  going back to the office, working on some additional
8  language with Ted and then ultimately utilizing that
9  order as the final order.
10      Q  Okay.
11      A  But I really need to look at all the e-mail
12  traffic to make sure I'm a hundred percent accurate.
13      Q  Obviously Judge Seltzer had no idea that when
14  you visited him on September 8 it was part of anything
15  elicit or improper?
16      A  Oh, my God, no. Judge Seltzer, I took advantage
17  of a good relationship that I had with a very good man.
18      Q  Yes, sir. And he didn't even have a case
19  pending in front of you so it's not like he was having ex
20  parte communications, he wasn't assigned to the case;
21  correct?
22      MR. SCHERER: Object to the form.
23      A  No. We didn't discuss anything about that.
24  Judge Seltzer - in a minute, if Judge Seltzer thought for
25  a minute that I was doing something wrong, I would have

Page 1056

1  been in shackles in his chambers.
2       Q  No one suggests otherwise.
3          At some point later that day you testified you
4  took Ted out to T.D. Bank for what you commonly referred
5  to as a show; correct?
6       A  No. Ted was not coming out there for a show.
7  That would have been what it was if Ted wasn't in the
8  know as to what was going on.
9       Q  Let me ask you this. Forgetting about the trip
10  on September 8 for a minute. I just want to talk to you
11  about what constitutes the show, in general.
12      A  Okay.
13      Q  Your testimony previously, I think, summarized
14  it a little bit. What did it entail when you were going
15  to bring an investor or interested party out to T.D. Bank
16  for a show?
17      A  It entailed preparation of a false bank
18  statement, contacting Ms. Caretsky.
19      Q  In advance?
20      A  In advance.
21      Q  Would it typically be the day before or the same
22  day?
23      A  Either one.
24      Q  And was the contact usually done by you or
25  Mr. Brock or some third party?

Page 1057

1       A  Usually Mr. Brock or Ms. Stay, probably more
2  often Mr. Brock, I think now.
3       Q  Did you typically bring the investor or the
4  interested party yourself or did a third party usually
5  bring them to the bank?
6       A  I usually brought them.
7       Q  So you went with a party to the bank and was it
8  always the same branch?
9       A  Always except for one occasion or two occasions.
10      Q  Which branch would it be?
11      A  Weston.
12      Q  Was that where Ms. Caretsky had her office?
13      A  Yes.
14      Q  Was Ms. Kerstetter there was well?
15      A  For a period of time she was and then she was on
16  17th Street.
17      Q  Would you particularly or specifically ask for
18  Ms. Caretsky when you showed up out there?
19      A  I would ask for whoever I was told was going to
20  be there in advance.
21      Q  And there would be a signed letter waiting for
22  you which was an original, what was commonly referred to
23  as a lock letter; correct?
24      MS. SKOLNICK: Object to the form.
25      A  Yes.

Page 1058

1       Q  That letter, would it have any numbers or
2  balances attached to it?
3       A  Can you read me the last question he asked me?
4       Q  I'll repeat it.
5          The letter that you would get when you go out
6  there for the show, it was usually a one page letter or
7  one paragraph letter from Ms. Caretsky; correct?
8       A  Yes, I just thought you might have used the term
9  lock letter and it's not a lock letter.
10      Q  Okay, so just a letter. Was there a document
11  attached to the letter that you would get from
12  Ms. Caretsky with balance or account screen information?
13      MS. SKOLNICK: Objection as to form.
14      A  Yes.
15      Q  Is that the document, in that format, that you
16  would provide to your guests?
17      A  Yes.
18      Q  At some point did you or somebody working on
19  your behalf, substitute a different account statement or
20  screen shot for the one that was attached to the original
21  letter?
22      MR. SCHERER: Object to the form.
23      A  You have to reask me that question.
24      Q  When you got the letter from Ms. Caretsky, what
25  did it usually have?

28 (Pages 1055 to 1058)

Page 1059

1    A   By the time I got it, the fake bank statement
2   was already with her real letter.
3    Q   That's what I'm trying to get at. I'm sorry.
4    A   Okay.
5    Q   Not asking it very artfully. It's late in the
6   day.
7    A   I know it is.
8    Q   How did the fake account statement get attached
9   to the original letter from Ms. Caretsky or whoever else
10  signed it?
11   A   Someone from my office would deliver it to
12  Ms. Caretsky and Ms. Caretsky would put it in an envelope
13  with her real original letter.
14   Q   Did Ms. Caretsky or anyone else working for T.D.
15  Bank see the switch and see the fake account statement
16  attached to her letter?
17   MS. SKOLNICK: Objection to form.
18   Q   To your knowledge did Ms. Caretsky see the fake
19  statement being attached to her signed letter?
20   MS. SKOLNICK: Objection to form.
21   A   She's the one who attached it. Unless she
22  closed her eyes when she attaching it, of course she saw
23  it.
24   Q   Why would Ms. Caretsky attach what she obviously
25  can see is a fake account balance to her letter?

Page 1060

1    MS. SKOLNICK: Objection to form.
2    A   Because she was paid to do it.
3    Q   Ms. Caretsky knowingly, your testimony, just so
4   I understand it, Ms. Caretsky knowingly took a false
5   document that had been prepared by someone from your
6   staff and attached it to a one paragraph or one page
7   letter that she had prepared?
8    MS. SKOLNICK: Objection to form.
9    A   Yes, repeatedly.
10   Q   Was Ms. Caretsky there, in person, meeting the
11  clients when the letter was provided to the client in
12  your presence?
13   MS. SKOLNCIK: Objection, form.
14   A   If Ms. Caretsky was the person there and the
15  person that prepared the letter and put it in the
16  envelope for me, then she would be the one meeting the
17  client unless she left, then someone else could do it.
18   Q   And I recall your testimony about the benefits
19  of the rock star lifestyle provided to some of the
20  banking clients. I don't need to go over it again, but
21  refresh my recollection what were the benefits you
22  provided to Ms. Caretsky to supposedly induce her to
23  participate in that activity?
24   A   It wasn't supposedly, it's what I gave her, 25
25  to $30,000.

Page 1061

1    Q   Did you give that money to Ms. Caretsky before
2   or after September 8 of 2009?
3    MR. NURIK: Can I just ask for a clarification
4   as to the procedure for these depositions? It was my
5   understanding that Counsel was not going to be going
6   over, again, matters that were asked by multiple
7   other attorneys before.
8    In other words, is my client going to be
9   subjected to the same subject matter by every Counsel
10  that's going to come and ask questions?
11   It's my understanding that was not the case.
12  This was the subject of extensive examination
13  previously. So, I would like some clarification on
14  this.
15   It's my understanding that was not going to
16  happen. If it was, I would have addressed this to
17  the Court way before we were here.
18   MR. MULLIN: I don't think I've gone over too
19  much --
20   MR. NURIK: No, not you. I'm talking about
21  this, this particular subject.
22   MR. MULLIN: It's been five minutes of
23  questioning, Mr. Nurik, and --
24   MR. NURIK: I don't care if it's one minute of
25  questioning.

Page 1062

1    MR. MULLIN: With respect to T.D. and Gibraltar
2   Banks, those are the cases I've been allowed to come
3   and question on. So, if I get too repetitive about
4   it and I spend a day's worth of testimony wasting
5   everybody's time, I think it's A valid objection.
6   But I think I can touch upon this and then I'm going
7   to move on to another subject and move on to the
8   visit on September 8.
9    MR. NURIK: Well, can somebody else give me --
10  I'm asking of the body assemblage here --
11   MR. SCHERER: We are not supposed to ask the
12  questions over and over again. And you're supposed
13  to try to limit it to new matters with a broad range
14  of professionalism. So, you are right. And of
15  course, I think that I covered it and I think the
16  Trustee covered it.
17   Also I mean, obviously he can cover, seems to
18  me, within the spirit of that order, Ted's visit with
19  Mr. Rothstein at that time as related to Morse, but I
20  mean, to go back and ask him generally again what the
21  procedure was for a show, that's been covered
22  repeatedly.
23   MR. NURIK: Maybe because I'm not as aware of
24  all the details of all the actions that some of you
25  are, maybe you can explain to me, Mr. Mullin, is that

29 (Pages 1059 to 1062)

Page 1063

1    related to any of the claims that involve your
2    clients?
3         MR. MULLIN:  They absolutely are.  Yes.  That's
4    where I'm going with it.
5         MR. NURIK:  All right.
6         MR. MULLIN:  I don't think I'm abusing the
7    privileged.  However, Mr. Nurik, your objection is
8    noted, but I would like an answer to the question.
9         THE WITNESS:  I paid Ms. Caretsky to put the
10        letters - to put the fake balance statements with the
11        letters, which she did for me on a regular basis
12        whenever I required her to.
13   BY MR. MULLIN:
14        Q   In fact, on September 8 you did bring Mr. Morse
15   out there, you didn't print up letters from the privacy
16   from your office, you went out to Weston after you left
17   the judge's chambers and you drove what, 20, 25 miles out
18   there to go visit Rosanne Caretsky at T.D. Bank on
19   September 8; correct?
20        MS. SKOLNICK:  Objection as to form.
21        MR. SCHERER:  I object to form.
22        A   I don't know what time or when I went out there,
23   but yes, I did go out there with Ted to the bank to see
24   Ms. Caretsky.  It was just a completely different
25   scenario.

Page 1064

1         Q   And you came back with Mr. Morse and with a
2    letter that was a one page letter from Ms. Caretsky with
3    a screen shot designed to tell the Morses that they had
4    57 million in trust sitting in T.D. Bank?
5         A   The purpose of going to the bank --
6         Q   I didn't ask you that, sir.
7         A   I'm answering the question.  The purpose of
8    going to the bank -- listen to the answer and then you'll
9    see it's answering your question.  The purpose of going
10   to the bank was so that I could take that letter and send
11   it to Ed and Carol to convince them their money was safe.
12        Q   That's exactly what you did, correct?
13        A   Correct.
14        Q   That is what I was asking.
15        A   I told you I was going to answer your question.
16        Q   Sometimes we get lucky; right?
17            Did you actually have a separate stipulated
18   confidentiality order in the supposed Federal Court Jan
19   Jones action in addition to that confidentiality
20   provision we talked about in Paragraph 19?
21        A   I believe I did, yes, sir.
22        Q   I'm going to show you a copy of it.  I'm marking
23   it Morse Plaintiff's Exhibit 163, MOI 008738 through
24   MOI 008752.
25        A   Okay.

Page 1065

1            (Whereupon, Morses' Exhibit No. 163 was marked
2        for identification.)
3    BY MR. MULLIN:
4         Q   Does this appear to be a true and correct copy
5    of the stipulated confidentiality order that you told the
6    Morses to sign?
7         A   I did.
8         Q   And it fact, it has several notarized signatures
9    including Ed Morse, Carol Morse, Ted Morse, Dennis
10   McGinnis, and I think Mike Kelly, Michael Kelly.
11        A   Yes.
12        Q   Who all works for M.O.I; is that correct?
13        A   Correct.
14        Q   What was the purpose of getting the stipulated
15   confidentiality order in March of 2009?
16        A   It goes with what I was talking - called
17   earlier, the Carol Clause, it's to try to stop me, myself
18   from getting in criminal trouble.
19        Q   And did you also try to chill Mr. Morse - not
20   Mr. Morse - Mr. McGinnis and Mr. Kelly from talking to
21   anybody about this as well, by having them sign it?
22        A   No.  You have to know Dennis and Mike to know I
23   didn't need to chill them of anything, they were
24   terrified of Ted.
25        Q   Well, don't you think it was a little overkill

Page 1066

1    then to get their signatures as well?
2         A   No, absolutely not.  Actually I thought in order
3    to make Carol believe that this was a real order and that
4    Ed believed it was a real order that I would have to have
5    anyone that had any dealings with something that might be
6    confidential sign it, made sense to me.  So, I don't
7    think it was overkill, no.
8         Q   Does this further re-enforce what Paragraph 29
9    of that other Judge Marra judgment or fake order that
10   said, which was that they were not to tell anybody at all
11   about anything that was going on in the Jan Jones case?
12        A   What was the date of that?
13        Q   This would have been March 24 of 2009.
14        A   The other order was dated what?
15        Q   I have to look at it.
16        A   That's okay.  They were meant to re-enforce each
17   other.
18        Q   So, they were kind of working hand and hand with
19   one another; right?
20        A   Yes.
21        Q   Moving off the topic a little bit.  When you
22   were handling litigation matters that did not involve
23   these matters for Ed and Carol Morse, didn't involve the
24   house, what type of cases did you typically have?
25        A   I don't recall.

30 (Pages 1063 to 1066)

Page 1067

1    Q   Isn't it true that the cases that your firm
2  handled for Morse Operations would have involved vehicle
3  claims, warranty claims, relatively small matters of
4  litigation?
5    A   You just said Ed and Carol.  For Morse
6  Operations, yes, automotive claims.  Yes.
7    Q   And the type of cases that Mr. Stracher handled;
8  what was his expertise at the firm?
9    A   His specialization was automotive but he handled
10  real estate, commercial litigation, commercial
11  transactions, he was a very bright lawyer.
12    Q   Would he have any expertise in handling these
13  cases with Mr. Osber with respect to the Boca property or
14  outside of his --
15    A   I didn't mean to cut you off.  Yeah, he did
16  construction litigation as well.
17    Q   Now, to your recollection was Ed Morse or Carol
18  Morse or even Ted Morse the principle witness in any of
19  those cases?  Did you ever have to bring any of those
20  individuals to Court to testify on behalf of the any of
21  cases that you handled for R.R.A.?
22    A   Did I?
23    Q   Yes or, anybody that worked for you, to your
24  knowledge?
25    A   I don't know.  I didn't -- I didn't track who

Page 1068

1  they were bringing as witnesses.  I know that Ted had
2  testified a bunch of times according to what he told me.
3  Ed had told me that he had testified a bunch of times.  I
4  believe even Dennis told me he had to testify in
5  something.  That was in just general chatter with them
6  over the years.
7    Q   You had no personal knowledge of their active
8  involvement in any litigation matters; did you?
9    A   Are you asking me if they are litigation savvy?
10    Q   No.  I'm asking you if you know of them actively
11  participating as witness, corporate representatives, like
12  a 30B6 representative.  Would they be the people that
13  would go into Court on behalf of M.O.I. or would it be
14  somebody else that had more knowledge about it?
15    A   As far as actually going into Court I don't know
16  how many times they went in but I did have conversations
17  with them about them having testified, it came up as just
18  general conversation.
19    Q   Okay.
20    A   More laughing about things that occurred to
21  different people at different times.
22    Q   Did you ever sign Mr. Spinosa's name to any
23  documents?
24    A   No.
25    Q   Okay.

Page 1069

1    A   I cut and pasted his name onto certain
2  documents.
3    Q   Did he ever approve or authorize you to do that?
4    A   There was one occasion that I can remember of
5  where he actually told me to just sign his name, yes.
6    Q   Okay.
7    A   I don't remember what it was for but if you
8  depose Debra Villegas I think she'll be able to tell you
9  when that was.
10    Q   Now, you testified briefly the other day about
11  some due diligence that was undertaken with respect to
12  your investment scheme by the Clifford Chance law firm.
13  Do you remember that testimony, I think on Monday?
14    A   I have a vague recollection of it I've been
15  asked a lot of questions over the last couple days.  I
16  remember Clifford Chance's came name coming up and
17  talking about due diligence, but I don't remember the
18  specific questions.
19    Q   I don't think you were asked very many
20  questions.  I just wanted to follow up with you a bit.
21  Do you remember who hired that law firm?
22    A   At this moment I don't have any recollection.
23  You have to go back and take a look at the record, who it
24  was or show me some documents.  I believe the guys that
25  your talking to me about, Cliff Chance and Gersten

Page 1070

1  Savage, were showing me documents with their names on
2  them, so it related to something.
3    Q   Do you have any recollection as to who at the
4  Clifford Chance law firm participated in the due
5  diligence, who came to speak with you?
6    A   I don't recall the person's name as I sit here
7  without a document in front of me or e-mail, something to
8  refresh my recollection.
9    Q   Do you have any recollection that the Clifford
10  Chance law firm was retained to do due diligence and
11  abruptly resigned and refunded their $50,000 retainer?
12    A   Now I know who it was.
13    Q   All right.  So now that that refreshes your
14  recollection, who retained Clifford Chance, if you
15  recall?
16    A   It was the Clockwork, Discala type group.  They
17  were using them, all the people associated with
18  Clockwork, Discala, the Von Allmens, that whole group.
19    Q   And do you recall how late in the Ponzi this
20  took place?  Was it in 2009?
21    A   Yes, it was in 2009.
22    Q   And now that you recall who hired them, do you
23  recall anything about the individuals at Clifford Chance
24  who were engaging in due diligence?
25    A   I don't recall who was engaging in due

31 (Pages 1067 to 1070)

Page 1071

1  diligence. I do recall them resigning.
2      Q   Do you recall them specifically asking you for
3  information or meeting with you?
4      A   I don't specifically recall it, but I'm sure
5  they did. They weren't a schlock company, and they were
6  a due diligence.
7      Q   They were a major international law firm,
8  correct?
9      A   Yes.
10     Q   Do you recall the types of information they
11 asked for?
12     A   I do not.
13     Q   So certainly you don't recall what you gave
14 them?
15     A   What, what?
16     Q   You don't recall what you gave them if you don't
17 recall what they asked for?
18     A   No. If you have it I'll take a look at it and I
19 can tell you if I gave it to them.
20     Q   I don't think I have it either.
21         Do you recall the issue of them resigning
22 abruptly causing a hiccup or causing a problem with your
23 investment scheme?
24     A   Yes. We called it the spook.
25     Q   Describe what you mean by that.

Page 1072

1      A   It spooked some of the people that were doing
2  business with Discala, specifically Bob Mazzeo - I think
3  his name is Bob Mazzeo, something Mazzeo - to the point
4  where we actually had to give Mazzeo more money to get
5  him back on board.
6          Something happened and they were out, and then
7  we were out looking for new due diligence people to
8  approve all these documents so that we could get some
9  investors in.
10     Q   Did you bring in or did the investors bring in
11 the Morgan Lewis law firm, do you recall?
12     A   That sounds right.
13     Q   And do you have any recollection of the due
14 diligence that the Morgan Lewis firm engaged in?
15     A   I don't.
16     Q   Do you recall what they asked for and what you
17 provided them?
18     A   No, I don't.
19     Q   Did they bless or give their approval as to the
20 recommendation or do you recall what their findings were?
21     A   I don't know. Some firm eventually did,
22 Mr. Mullin. I just don't remember which one. Someone
23 eventually said, okay, we're good to go. I just don't
24 remember who it was.
25     Q   Do you have any recollection of any of the

Page 1073

1  investors writing and saying that the interest rates
2  needed to be scaled back because they looked too
3  outrageous?
4      A   I don't know if they wrote to me about that, but
5  I absolutely remember having conversations with Preve
6  about that where we were joking around about someone --
7  either he got an e-mail to that effect or there were
8  people writing and we read those e-mails together or we
9  were talking about people wanting to reduce the interest
10 rate because it was scaring off investors.
11     Q   Did you ever reduce the interest rate late in
12 the Ponzi to keep the investors comfortable?
13     A   No, no, no. That's not what it was about. It
14 was the people that were selling the product, the feeder
15 funds, that would have been Discala's group, I suspect,
16 whoever was trying to reduce the rate, they were going to
17 reduce their return to their customers.
18         In other words, instead of offering them 20 or
19 25 percent, they were going to offer them 15 or 18
20 percent. That's my recollection to the best of my
21 knowledge.
22     Q   When you say Mr. Discala, what fund or entity
23 was he with? Was he with Clockwork?
24     A   He was Clockwork. He was Canvas. But they
25 didn't do business with us. He was involved with D-3.

Page 1074

1  He was involved with the Von Allmens. He talked to
2  Bekkedam. He was all over the place.
3      Q   Did the Von Allmens to your knowledge invest
4  through Banyon or through the feeder funds?
5      A   You know, I don't recall exactly. They invested
6  in a number of different ways. I just don't recall off
7  the top of my head without seeing documents. It's far
8  too complicated to remember these transactions off the
9  top of my head.
10     Q   Do you recall someone by the name of Dean
11 Kretschmar?
12     A   Dean, yes. That's Doug's step-son, yes.
13     Q   And what entity was he involved with or what
14 role did he play?
15     A   Well, he was involved with D-3. He was involved
16 with Clockwork. And he was involved I think individually
17 and with his parents.
18     Q   Was he an investor through the hedge funds as
19 well?
20     A   Through the hedge funds?
21     Q   Yes, sir.
22     A   If he did, I don't know. He may have.
23     Q   Okay.
24     A   I don't know.
25     Q   Now, Ted Morse wasn't involved in any way in the

Page 1075

1 due diligence that the Razorback entities were engaged in
2 in 2009; is that right?  You didn't have Mr. Morse meet
3 or speak to any of those investors?
4     A  The way you're asking the question, did I have
5 him speak to them?  The answer would be no.
6     Q  To your knowledge did he speak with them?
7     A  Yes.
8     Q  How do you know that?
9     A  I was there.
10     Q  Was he asked to participate in any due diligence
11 exercises?
12     A  No.  It was casual conversation.
13     Q  Now, you indicated that the Ponzi increased when
14 Mr. Levin and the Banyon entities became involved; is
15 that right?
16     A  That's when I really got wings, yeah.  It really
17 got a lot of traction when that occurred.
18     Q  Was it Mr. Levin who brought in the Razorback
19 and Von Allmen investors?
20     A  You know, I don't know exactly who brought them
21 in because Barry Bekkedam and Levin and AJ and some
22 others, they were all fighting to take credit for
23 Von Allmen.  I couldn't have cared less who brought him
24 in, but there was a big fight.
25     As a matter of fact, I think Von Allmen and

Page 1076

1 Mr. Bekkedam had a big falling out over that whole thing
2 or something related to it.  It was a mess.
3     Q  Did you perform, quote, unquote, shows with
4 Gibraltar like you did with TD or was that limited to TD
5 Bank?
6     A  You mean go and get bank statements with them?
7     Q  Going to get bank statements and substituting
8 account statements.
9     A  The only thing I did with Gibraltar was have
10 John Harris lie about the firm and the amount of money we
11 had.
12     Q  But you didn't have to bring investors to a
13 Gibraltar branch and have somebody hand deliver letters
14 like you did with TD?
15     MS. SKOLNICK:  Object to form.
16     THE WITNESS:  No.  That was a creation that
17 occurred as a result of enhanced due diligence with
18 investors while I was doing business with TD.
19     MR. MULLIN:  I may be wrapping up, and I'm going
20 to turn it over to my co-counsel in a minute.  But
21 maybe it's a good time for a five minute break and I
22 may be done and let Ms. Deutsch ask questions.
23     (Thereupon, a short break was taken.)
24 BY MR. MULLIN:
25     Q  Mr. Rothstein, I'm going to show you one more

Page 1077

1 exhibit, and then I'm going to turn it over to
2 co-counsel.  So, we're going to show you Exhibit 164,
3 which I believe is e-mails from yourself to Mr. Morse and
4 Dolores.  And then there's an attachment from TD Bank I
5 want to ask you about.  It's dated October 12, 2009, and
6 it starts with Bates number MOI- 9151.
7     (Whereupon, Morses Exhibit No. 164 was marked
8 for identification.)
9     THE WITNESS:  Okay.
10 BY MR. MULLIN:
11     Q  Do you recall sending this to Carol Morse and to
12 Mr. Morse?  It looks like in the middle of the page
13 there's an e-mail message from yourself to Cammissy.
14 That's Carol Morse, correct?
15     A  Yes.
16     Q  Do you recall sending Mrs. Morse, Carol Morse,
17 this e-mail dated September 30, 2009?
18     A  I do.
19     Q  If you look at Page 2 of this exhibit, it
20 purports to be an e-mail from Frank Spinosa, an e-mail to
21 frank.spinosa@yesbank.com with account information.
22     Was this an actual e-mail from Mr. Spinosa you
23 were forwarding or was this a Photoshop?
24     A  It's a fraud.
25     Q  This was not actually an e-mail from

Page 1078

1 Mr. Spinosa, your office prepared this?
2     A  Yes.  That's what it looks like to me.
3     Q  And then the TD deposit account details that are
4 set forth on pages 9153, 9154, and I guess it ends on
5 9155, were those a fraud as well?
6     A  I'm sorry.  Say that again.
7     Q  The TD Bank deposit account details, the final
8 three pages --
9     A  Yes, that's a fraud.
10     Q  That's my question.  So this was made up, when
11 you sent it to the Morses, Ed and Carol Morse - this was
12 not a true correspondence from Mr. Spinosa?  These were
13 not true account details; correct?
14     A  Correct.
15     Q  Do you recall any reaction or discussion with
16 either Ed or Carol Morse about this after you sent it?
17     A  I do not.
18     Q  It was obviously designed to mislead them as to
19 the security of their funds with TD Bank?
20     A  It was actually sent in response to a request
21 from Carol.
22     Q  Okay.
23     A  She wanted to see the exact details in and out,
24 so I created this and sent it.
25     Q  Did this keep her quiet for a while?

33 (Pages 1075 to 1078)

Page 1079

```
1    A   No.
2        MR. MULLIN: I don't have any further
3    questions. I'll turn it over to Roberta Deutsch.
4    Thank you.
5        THE WITNESS: Okay. Thank you, sir.
6        Excuse me, Ms. Deutsch, are we going to be using
7    these same exhibits or are we going to be using new
8    ones?
9        MS. DEUTSCH: We're going to be using new ones,
10   and I just have one that I want to show you again,
11   but I'm not there yet.
12            FURTHER DIRECT EXAMINATION
13   BY MS. DEUTSCH:
14   Q   Good afternoon, Mr. Rothstein. My name is
15   Roberta Deutsch. And I am Carol Morse's attorney. I'm
16   also co-counsel for Ed and Carol Morse and for Morse
17   Operations and Ted Morse.
18   A   Nice to meet you.
19   Q   Nice to meet you, too. How are you doing so
20   far?
21   A   A little tired, but I'm good.
22   Q   All right. Now, Monday you testified to the
23   trustee that the reason that you returned from Morocco
24   was so that your family was not left to deal with the
25   situation by themselves, right? Do you remember that?
```

Page 1080

```
1    A   That wasn't the only reason, but one of the
2    reasons I gave, yes.
3    Q   I believe there were two reasons. You said so
4    your family didn't have to deal with it by themselves
5    and so you could tell the truth. Do you remember that?
6    A   I remember that being part of the reason, yes.
7    Q   You also testified later on that you made your
8    bed and you had to lie in it?
9    A   Correct.
10   Q   And then you proceeded to identify your closest
11   friends and implicate them so that they could lie down
12   with you as well; is that true?
13       MR. SCHERER: Object to form.
14       THE WITNESS: I proceeded to implicate my
15   friends so they could lay down with me? No, no.
16   BY MS. DEUTSCH:
17   Q   Well, you identified --
18       MR. NURIK: Let the record reflect that was a
19   question and not an answer.
20       THE WITNESS: Yes, that was a question, not an
21   answer. That's like right off the movie.
22   BY MS. DEUTSCH:
23   Q   Did you identify --
24   A   Wait, wait. Let me answer your question. I
25   don't want you getting rolling. I want to answer your
```

Page 1081

```
1    question.
2        What I did was, I came back, I told the
3    government in no uncertain terms I would tell them the
4    100 percent truth about everything, and they meant
5    everything. I implicated my uncle, okay, my mother's
6    brother, somebody that I lived with. So I came back.
7    I've done ever single thing that the government asked me
8    to do and told them the 100 percent truth from the moment
9    I came back because otherwise I'll die in prison. It's
10   not a complicated process.
11   Q   We'll get there.
12   A   Hopefully I'm not going to get there.
13   Q   The real reason that you left Morocco was
14   because you were not safe there; isn't that correct? You
15   received death threats in Morocco; is that not correct?
16   A   I did not.
17   Q   You did not receive any threats of any kind?
18   A   That's different. You said death threats. I
19   received no threats saying they were going to kill me or
20   kill my family.
21   Q   Did you receive of any threats at all while you
22   were in Morocco? It's a yes or no question.
23   A   I want to think about it. I received -- one of
24   my bodyguards was threatening me for money. Somebody
25   had - during a conversation or something, my friend Ovi
```

Page 1082

```
1    Levy told me that, you know, how crazy my father can get,
2    something like that. But nobody threatened to kill me or
3    harm my family.
4    Q   Now, on Tuesday in the afternoon you were
5    questioned by the Trustee as to whether or not you had
6    been offered anything for your testimony. Do you
7    remember that?
8    A   Yes.
9    Q   He asked specifically if Mr. Lichtman had
10   offered you anything. And you responded, no. Do you
11   remember that?
12   A   Yes.
13   Q   He asked you if Mr. Genovese had offered you
14   anything. And you responded, no.
15   A   Correct.
16   Q   He then asked you if Mr. Scherer had offered you
17   anything in exchange for your testimony. You responded,
18   no.
19   A   That's correct.
20   Q   Do you remember that?
21   A   Yes.
22   Q   To your knowledge, has Mr. Scherer been offered
23   anything by Mr. Nurik in exchange for your testimony here
24   today?
25   A   No, sir.
```

34 (Pages 1079 to 1082)

Page 1083

1  Q  I'm a woman, but that's okay.  Now, to your
2  knowledge has Mr. Scherer been offered anything by
3  Mr. Nurik?
4  A  Has Mr. Scherer been offered anything?  I want
5  to make sure I have the question.  Has Mr. Scherer been
6  offered anything by Mr. Nurik for my testimony?
7  Q  Yes.
8  A  No.
9  Q  Are you aware that Mr. Scherer filed a motion to
10  have your fees paid by the participants in the bankruptcy
11  estate?
12  A  I don't have any fees.
13  Q  Sorry.  Your attorney's fees.  Are you aware of
14  that?
15  A  I was just told that, yes, the other day.
16  Q  Now, let's talk about the government.  Have you
17  been offered anything by the government in exchange for
18  your testimony here today?
19  A  No, ma'am.
20  Q  So you have no expectation of any benefit as a
21  result of any of the testimony that you're going to give
22  here today, you're going to give for these next two
23  weeks?
24  A  I don't know what you mean by "expectation."
25  Q  Has anyone discussed in your presence a Rule 35

Page 1084

1  motion?
2  A  That's a very broad question.  There has been
3  conversation about a Rule 35 motion, yes.
4  Q  Tell us what you think a Rule 35 motion means.
5  A  It's a motion filed by the government for the
6  purpose of requesting of the Court a reduction in a
7  sentence for substantial assistance in criminal
8  investigations.
9  Q  To be more specific, it is a motion that is only
10  filed by the government post sentencing and post
11  testimony by the defendant, that would be you, and that
12  provides the government with information that implicates
13  different individuals and for specific purposes so that
14  they can --
15  A  I don't think that's correct actually.  I've
16  read the statute a few times, and I think it's the
17  government's motion, as you said, and only the
18  government's motion.  It's 35, so it's clearly after
19  sentencing.  I think that they can file it at any time
20  during my cooperation and file as many as they want.
21       And I also believe that it's for substantial
22  assistance in the investigation or actual prosecution of
23  criminal cases.
24  Q  Okay.
25  A  I'm pretty sure that's pretty close to the exact

Page 1085

1  language.
2  Q  All right.  I don't want to toss around language
3  with you, as you say.  Tell us what you spoke with them
4  about, the Rule 35 motion, in that you haven't spoken to
5  us, you've spoken to them?
6       MR. NURIK:  Wait.  Is your question the
7  substance?
8       MS. DEUTSCH:  Asking him to discuss with us, all
9  of us here and the jury, what he's been offered by
10  the government in exchange for his testimony these
11  two weeks because he's discussed it with the
12  government and not with us.
13       THE WITNESS:  Nothing.
14  BY MS. DEUTSCH:
15  Q  It's your testimony that nothing has been
16  discussed with you about a Rule 35 motion?
17  A  That's not what you just asked me.
18  Q  What discussions were had in your presence about
19  a Rule 35 motion with the government?
20  A  When?
21  Q  At any time subsequent to your flight from
22  Morocco?
23  A  The only thing that's been discussed is that if
24  I cooperate fully, if I tell everything I know, if the
25  government deems my cooperation to be substantial, they

Page 1086

1  have the discretion to file a Rule 35(b) motion on my
2  behalf which guarantees me a total of nothing.  That's
3  what I've been told.
4  Q  We know that the government doesn't make
5  promises, sir.  But you testified that you don't intend
6  to die in jail.  That's not a hope.  You must have a
7  basis for that statement?
8  A  No, no.  That is a hope.  You're not sitting
9  here.  That is a hope I have.
10  Q  Actually, you testified that you didn't intend
11  to die in jail.
12  A  Listen, I don't want to die in jail.  When I say
13  I don't intend to die in jail, that means I don't.  I
14  have no control over it.
15       The only thing I can do is to testify, be
16  truthful, do the best I can do and hope that the
17  government files the motion.  And then I have to have a
18  whole second level of hope.  I have to hope that Judge
19  Cohn, who has already sentenced me to 50 years, which is
20  ten more than the government was asking for, decides to
21  be fair with me and reduces my sentence to a point where
22  I'm out in the real world before I'm dead.
23  Q  You mean, even though you forged two judges'
24  signatures and a general magistrate's signature on Court
25  orders, phony Court orders?

35 (Pages 1083 to 1086)

Page 1087

1       A    Even though I've done all those terrible things,
2   that's right.
3       Q    You testified before that that was the most
4   disturbing thing of all of that, was that you forged
5   these judges' signature?
6       A    That's not what I said.
7       Q    We can have the Court Reporter read it back to
8   us that that is what you said.
9           MR. SCHERER:  Object to form.  Object to
10   argument.
11   BY MS. DEUTSCH:
12       Q    It is the most disturbing part of it all, is
13   that I forged --
14       A    I said it was one of the most disturbing.
15       Q    But, interestingly enough, you didn't say how
16   disturbing it was that you proffered these to your
17   clients.
18       A    That I proffered?
19       Q    You gave them to your clients and induced them
20   to rely on it?
21       A    Oh, no.  I talked about the judge's signatures,
22   and I talked about the fact that I had taken all this
23   money from people.
24           If you're trying to imply that I don't feel
25   badly about what I've done to the Morses, you're wrong.

Page 1088

1       Q    After all, being best friends is way more
2   important than being a fiduciary; isn't that what you
3   said?
4           MR. SCHERER:  Object to form.
5           THE WITNESS:  Being best friends?
6   BY MS. DEUTSCH:
7       Q    You testified --
8           MR. NURIK:  Let him finish what he was saying.
9           MS. DEUTSCH:  He's really not answering.
10           MR. SCHERER:  Object to the form.
11   BY MS. DEUTSCH:
12       Q    You testified --
13           MR. SCHERER:  Do you want to know what the
14   objection is or not?
15           MS. DEUTSCH:  I'm just assuming it's an
16   objection.  Go ahead.
17           MR. SCHERER:  It's object to form.  I don't make
18   a speaking objection unless you want me to tell you
19   what's wrong with the question.  I'll be happy to do
20   that, or even try to clean it up.  Otherwise, I
21   object to form, which is the proper way to make an
22   objection.
23           MS. DEUTSCH:  Let me restate then.
24   BY MS. DEUTSCH:
25       Q    Previously today you testified that better than

Page 1089

1   a fiduciary you were best friends?
2       A    I think said more than.  I was Ted Morse's and
3   Ted Morse was my best friend.
4       Q    Do you know what fiduciary means, sir?
5       A    The legal definition?
6       Q    Yes.
7       A    To owe the highest obligation under the law.
8       Q    And it's a special obligation that's owned
9   between a client and an attorney, owed from an attorney
10   to a client?
11       A    Yes.
12       Q    All right.  Moving on.  You've been described as
13   a master of making things appear what they are not.  Have
14   you heard that?
15           MR. SCHERER:  Objection, form.
16           THE WITNESS:  I've heard that, yes.
17   BY MS. DEUTSCH:
18       Q    And your opinion, sir?
19           MR. SCHERER:  Objection, form.
20   BY MS. DEUTSCH:
21       Q    Is that a true statement?
22           MR. SCHERER:  Object to form.
23           THE WITNESS:  That I was a master?
24   BY MS. DEUTSCH:
25       Q    At making things appear as they are not.

Page 1090

1       A    During the course of my Ponzi scheme I was a
2   master of fraud, yes.
3       Q    And on a scale of 1 to 10 how do you rate
4   yourself at manipulating money in and out of accounts?
5       A    I was definitely --
6           MR. SCHERER:  Excuse me.  Object to form.
7   BY MS. DEUTSCH:
8       Q    It's a simple question.
9           MR. SCHERER:  Object to form.
10           THE WITNESS:  To your question on the movement
11   of money in and out of accounts, me personally, I was
12   probably a 4 or 5.  But I had bankers and accountants
13   to assist me that elevated me to a 10.
14   BY MS. DEUTSCH:
15       Q    On a scale of 1 to 10 how do you rate yourself
16   at manipulating people?
17       A    I was unfortunately a 10.
18       Q    Now, you testified Monday morning to the trustee
19   that you distinguished between those who sought
20   information and those who did not.  On various times
21   during your testimony you testified that you didn't give
22   answers, that you didn't give full answers, that you
23   actually left a bank because they asked too many
24   questions.  You prepared answers to scripted questions.
25   Do you remember those various answers?

36 (Pages 1087 to 1090)

Page 1091

1    MR. SCHERER:  Object to form.
2    THE WITNESS:  I'll take your word for it --
3    MR. SCHERER:  Object to form.
4    THE WITNESS:  -- that I said all those different
5  things.
6  BY MS. DEUTSCH:
7    Q   Now, how did you view those who sought
8  information in contrast to those who did not?
9    A   A threat to my freedom.
10    Q   Now, you testified that Carol Morse asked
11  questions and sought documents that you didn't have; is
12  that correct?
13    A   Correct.
14    Q   I'm going to show you what we're going to mark
15  as a series of e-mails.
16    MR. WALKER:  There's no Bates stamp on this
17  one.
18    (Whereupon, Morses' Exhibit No. 165 was marked
19    for identification.)
20    THE WITNESS:  Okay.
21  BY MS. DEUTSCH:
22    Q   Take a look through these.  They are e-mails
23  from you to Carol Morse and from Carol Morse to you.  Do
24  you recognize them?
25    A   Give me one second and I will let you know.

Page 1092

1    Okay.
2    Q   Now, can you identify these as e-mails that
3  you've sent or received?
4    A   I can.
5    Q   And could you read for us, please, on Page 1 the
6  text of the e-mail from Carol Morse to you on Sunday
7  September 6 2009?
8    MR. NURIK:  Which page?  A lot of them say one
9    and two.
10    MS. DEUTSCH:  On the first page.
11    THE WITNESS:  Here we go.  September 6th.  The
12  one from Carol first?
13  BY MS. DEUTSCH:
14    Q   The one from Carol first.
15    A   Scott, I want the following information by
16  5:00 p.m. on Monday September 7th.
17    One:  All Court orders requiring monies for all
18  the bonds.
19    Two:  Court Order requiring Leonard's bond money
20  be added to Jan's bond money.
21    Three:  An accounting of money that is
22  supposedly held in trust.  Please provide all accounting
23  of deposits and withdrawals from the trust accounts in
24  our name, provide bank verification of all transactions,
25  i.e., deposit tickets, copies of transfer orders front

Page 1093

1  and back, if applicable.  Verify all balances in accounts
2  with bank verification.  In other words, I want a
3  complete paper trail.  This should have been provided on
4  a monthly basis.
5    Four:  Final Court Order regarding the custodial
6  issue.  I'm sure it is quite confusing to find the
7  document with all the documents you must have in your
8  computer.  Let me help you.  It was attached to an e-mail
9  sent to Ted on March 30, 2009, at 5:53 p.m.  For the
10  record, the statement "as agreed to by Morse" is
11  incorrect.  I was unaware of a custodial agreement or
12  issues.  Correct this with the courts.
13    Five:  Copy of the final Court order.  I believe
14  it was dated May 5, 2009.
15    Six:  Court documentation on the case that is
16  supposedly in the 17th Judicial Circuit Court.
17    Seven:  Court documentation on the case that is
18  supposedly in the appellate court.
19    Eight:  Copy of writ of mandamus.
20    Nine:  IRS documentation and correspondence on
21  the bond money.
22    10:  The following settlement agreements:
23  Marvin Windows, Maine Air-Demons, Closets, Etc.
24    Next page, number 10:  Forward the contract on
25  the sale of Mizner.

Page 1094

1    If I don't receive the information by the above
2  date and time, I am prepared to take another avenue.  If
3  everything you have done is ethical, it won't be an issue
4  to provide this information.  So, this is your choice,
5  either you provide me the requested information or I will
6  get it myself.  Please advise on how you want to handle
7  this.  Carol.
8    Q   Now, this wasn't the first time that Carol had
9  contacted you, correct?
10    A   No.
11    Q   This did however --
12    A   Yes, that's correct, it's not the first time.
13    Q   It did cause you some concern, you testified; is
14  that correct?
15    A   Tremendous amount of concern.
16    Q   In fact, you testified that you were absolutely
17  positive she had an attorney, correct?
18    A   Yes.
19    Q   I'm her attorney.  She did not have an
20  attorney.
21    MR. SCHERER:  Object to form.
22  BY MS. DEUTSCH:
23    Q   Would it surprise you to learn that she did not
24  have an attorney to draft this?
25    A   Yes.

37 (Pages 1091 to 1094)

1      MR. SCHERER: Object to form of the question.
2  BY MS. DEUTSCH:
3      Q   Well, I can assure you that she did not.
4      MR. SCHERER: Object to form of the question.
5      MS. DEUTSCH: That's okay.  Withdrawn.
6  BY MS. DEUTSCH:
7      Q   You said that this e-mail was not like any prior
8  e-mails.  You testified that it was not like any prior
9  e-mails.  Do you remember that?
10     A   I don't specifically recall that.  But looking
11 at it now, it's not like the other e-mails.  It was the
12 sternest e-mail because it raised these ethical issues,
13 used the word "ethics," threatened to go get things in
14 other ways.  That's what made it not like the other
15 e-mails.  It was the most threatening e-mail she ever
16 sent me.
17     Q   But, it didn't come out of nowhere.  She had
18 tried other avenues; is that not correct?
19     A   Yes.
20     Q   Turn to the next page.  This would be
21 MOI-009071.
22     A   Okay.
23     Q   This e-mail is dated 9/13/09 at 8:37.44 p.m.
24 please read this to us.
25     A   Good evening, Scott and Ted.  I want to share a

1  growing concern of mine.  Every day I can see the effect
2  of the stress on Ed of losing his wealth.  The anguish he
3  is feeling over the bond money, the settlement of the
4  cases, and everything he has worked his whole life to
5  accumulate is slipping away from him out of his control.
6  I'm sure you are aware of how this is affecting Ed, but I
7  would feel negligent if I did not point out that the
8  stress is slowly killing the man.
9      If there is anything you can do to bring all
10 this to a close in a quick manner, I would very much
11 appreciate it.  The empty promises that he gets on a
12 regular basis is really affecting his physical health and
13 his life.  It is very painful to watch what this is doing
14 to Ed on a daily basis.  Carol.
15     Q   Turn to the next page, which is an e-mail
16 written on 9/30/09 at 8:31 a.m.
17     A   Okay.
18     Q   Please read that.
19     A   Scott, please ask the bank for a statement of
20 account on our trust accounts held with your firm.
21 Attached is the e-mail that requests the statement of
22 accounts.  Please see number three.  To clarify the
23 request, I want a complete history of our all trust
24 accounts from the bank.  When is the bond money going to
25 be wired to Ed?  Have a nice day.  Carol.

1      Q   The now the last in this batch, please?
2      A   Scott --
3      Q   9/30/09.  This is only a few hours later,
4  11:05 a.m.
5      A   Scott, this is the last time I'm going to
6  request our trust account history/account summary.
7  Please don't send me the balance again.  Thanks for your
8  help.  Carol.
9      Q   Now, a couple of minutes ago you were looking at
10 an e-mail that was attached to Carol that involved an
11 e-mail from Mr. Spinosa.  Do you recall that?
12     A   You mean the one with the balance thing on it?
13     Q   Yes.
14     A   With that long account history on it?
15     Q   Yes.
16     A   Yes.
17     Q   That was also 9/30/09, was it not?
18     A   I have to look at it.  But, yeah, I'll take your
19 word for it.  Yes.
20     Q   Did you ever provide Carol Morse with a true and
21 accurate statement of the trust account ending in 0923?
22     A   No.
23     Q   Carol even turned off the phone so you wouldn't
24 be able to contact her, do you remember that, you would
25 have to do it in writing?

1      A   Yes.
2      Q   And you were not happy about that, do you
3  remember?
4      A   I do.
5      Q   I'm going to next show you --
6      A   I actually had extensive conversations with Ted
7  about it.
8      MS. DEUTSCH: Move to strike.
9      (Whereupon, Mores Exhibit No. 166 was marked for
10 identification.)
11 BY MS. DEUTSCH:
12     Q   I'm showing you now the next exhibit, 166.
13 Could you read that out loud to us?
14     A   Scott, you handled the courts and the IRS in
15 less than eight hours.  Is that a miracle or what?
16 Please e-mail an update on the Jan Jones settlement
17 money.  Thanks.  Carol.
18     Q   Did you ever provide her with an answer to that,
19 an update?  Did you ever provide her with an update?
20     A   I don't know if I did or not.  You have to show
21 me an e-mail and tell me.
22     Q   Do you recall Carol Morse asking you if you
23 wrote fiction or non-fiction?
24     A   Yes.
25     Q   You testified that Carol's sister or her

Page 1099

1 sister-in-law were with her and she was up in Maine. Do
2 you recall that?
3     A   Say that again.
4     Q   You testified that Carol had her sister or her
5 sister-in-law and she was up in Maine with all sorts of
6 time on her hands to focus on the information that she
7 was seeking. Do you recall that?
8     A   Do you remember the time frame?
9     Q   It was in September of 2009.
10     A   Like around what date? I'm trying to pinpoint.
11     Q   Shortly around the time when these e-mails were
12 sent.
13     A   Yes.
14     Q   Okay.
15     A   I do. I remember because of conversations I had
16 with Ed and Ted.
17     Q   You perceived Carol as a threat at that point,
18 didn't you?
19     A   I did.
20     Q   So you decided to isolate her, didn't you?
21     A   I don't know what you mean, "isolate her."
22     Q   Isolate her away from what was going on down
23 here, keep her at bay.
24     A   No. Now I'm losing you. I didn't isolate her.
25 She was asking me things all the time. She was writing

Page 1100

1 me e-mails requesting documents and she was writing me
2 these nonsensical e-mails about Ed. So she was on the
3 warpath.
4     Q   And you weren't giving her anything back in
5 return? You weren't responding to her, correct?
6     A   I was as responsive as I thought I needed to be.
7     Q   Which is to say, not at all?
8     A   Okay. But I was perpetrating --
9     Q   Let me show you the last one. Thank you.
10     A   Hang on a second. Let me finish my answer
11 because you said thank you while --
12     Q   That's okay. I had enough, really.
13         MR. NURIK: You may have had enough, but he's
14     allowed to finish his answer. So finish your
15     answer.
16         THE WITNESS: I don't remember what I was
17     answering now at this point. What's your next
18     question. I apologize for whatever I did.
19 BY MS. DEUTSCH:
20     Q   While you isolated her you terrorized her, do
21 you remember that?
22         MR. SCHERER: Object to form.
23 BY MS. DEUTSCH:
24     Q   You threatened to send a U.S. Marshal to serve
25 her with a subpoena. You were going to have her arrested

Page 1101

1 because she had violated the confidentiality order. Stop
2 me if I'm getting warm.
3         MR. SCHERER: Object to form.
4         THE WITNESS: Are you asking me a question or
5     are you just making statements?
6 BY MS. DEUTSCH:
7     Q   Yes.
8         MR. SCHERER: Object to form.
9         (Whereupon, Morse Exhibit No. 167 was marked for
10     identification.)
11 BY MR. SCHERER:
12     Q   Take a look at what's been marked as 167. Why
13 don't you read these series of e-mails so we can all
14 participate in this.
15         MR. SCHERER: Object to the form of the
16     question.
17         THE WITNESS: I don't know what you mean, "so we
18     can all participate in this." You're losing me.
19 BY MS. DEUTSCH:
20     Q   Could you read the e-mail starting with the top
21 page, please.
22     A   Yes. You want me to read them out loud?
23     Q   Yes, please.
24     A   This is from me to Ted Morse, Dolores Daoust,
25 and Carol.

Page 1102

1         I have been asked a very direct question by
2 Mr. Judge Seltzer, United States Federal Magistrate. I
3 need an answer via e-mail in writing. Has anyone done
4 anything in violation of the confidentiality order?
5 Please respond immediately. He is expecting a direct and
6 prompt response. Thanks. Scott.
7     Q   And the next one?
8     A   This is to Ted and to Dolores. Actually, would
9 you like me to read it from the bottom up so it stays in
10 order?
11     Q   No. The top one is just fine. Thank you.
12     A   It's incomplete like that, but okay.
13         MR. SCHERER: Object to form.
14     A   Strange. I have been trying to reach Carol all
15 day and she told me that the phones in the house were not
16 working properly and that her cell did not work in the
17 house. I am so tired of this.
18 BY MS. DEUTSCH:
19     Q   Because Carol wanted you to put it in writing,
20 correct?
21     A   I suspect that's why, but I don't know that for
22 a fact.
23     Q   The next page is a subject, confidentiality
24 order, from Carol to you. This is on 9/30/09. This was
25 all when she was up in Maine. Would you read it?

39  (Pages 1099 to 1102)

Page 1103

1  A  Scott, I have done nothing to violate the
2  confidentiality order issued by the District Court. As
3  you are well aware, I don't have any knowledge of what is
4  going on. If you have any other questions, please let me
5  know. Carol.
6  Q  So clearly the confidentiality order that was
7  signed by the parties, the attorneys, Dennis McGinnis
8  Mike Kelly, didn't have any effect of her. She didn't
9  still didn't know what was going on; is that correct?
10  A  At this stage I don't know what she knew and
11  didn't know. She was trying to follow as best she can.
12  I was trying to, to use the words I used before, keep her
13  at bay and keep her appeased because I believed that she
14  was on the verge of exposing the Ponzi scheme.
15  Q  You clearly testified that there were Carol
16  Clauses. These were the confidentiality provisions?
17  A  Yes.
18  Q  You remember that?
19  A  I do.
20  Q  You testified that you went to great lengths to
21  create a confidentiality order which we've shared which
22  has the signature of not only the parties, but the
23  attorneys, random people who work in the office, and all
24  because you wanted to ensure that she understood that it
25  had to be confidential. Do you remember that?

Page 1104

1  A  Yes.
2  Q  And now she's telling you in an e-mail that she
3  doesn't know what's going on.
4  A  I don't know what the question is.
5  Q  Clearly your confidentiality order was not all
6  that effective.
7  MR. SCHERER: Object to form.
8  THE WITNESS: I still don't know what the
9  question is.
10  BY MS. DEUTSCH:
11  Q  All right. Now, I just need to ask you if you
12  can identify, please, for me, do you know who Jan Jones
13  is?
14  A  Dan Jones?
15  Q  Jan Jones.
16  A  I don't know him personally. I know he's an
17  interior designer.
18  Q  And what about Leonard Albanese?
19  A  A builder.
20  Q  Do you know where Jan Jones is now?
21  A  No, I don't.
22  Q  Did you at any time ever use another attorney's
23  trust account in order to move money in and out?
24  A  The only other attorney's account, and I don't
25  believe it was a trust account, that I used was Steve

Page 1105

1  Lippman's from his old firm.
2  Q  Who is Hubert McGinley?
3  A  I don't have a clue.
4  Q  Who is Alan Yesman?
5  A  That name sounds familiar. I know the name. I
6  don't know who it is.
7  Q  What about Andy Dector?
8  A  Andy Dector is a lawyer up in Boca Raton.
9  Q  Are you aware that on June 12th of 2009, the
10  $500,000 in the Jan Jones settlement money was wired in
11  and out of Mr. McGinley's account in a matter of hours?
12  A  You mean that I wired it to him?
13  Q  Do you think you did?
14  Q  How do you say his name, Mr. McGinley?
15  Q  McGinley. He represented Jan Jones.
16  A  Okay. At some point in time we had a fake
17  settlement of the Jan Jones case. At some point -- hang
18  on.
19  At some point in time we had a real settlement
20  of the Jan Jones case that we decided to pay $500,000 to
21  Jan Jones to make the case go away.
22  Whoever Jan Jones' lawyer was, we sent him
23  $500,000. What Mr. McGinley, or if that's his name,
24  whatever Jan Jones' lawyer did with that 500 grand
25  afterwards had nothing to do with me.

Page 1106

1  Q  So that also, the whole thing was a lie, the
2  settlement of Jan Jones was a lie?
3  A  That makes no sense. I told you what part was a
4  lie and what part was real.
5  Q  Okay. Who is Michael Kent?
6  A  Michael Kent is a friend of mine -- was a friend
7  of mine that lives in Rhode Island.
8  Q  Do you remember hiring Mr. Kent and sending him
9  up to pose as an expert in the Camden property
10  litigation?
11  A  I asked Mr. Kent as a favor to me -- Mr. Kent is
12  a fabulous, fabulous builder. He builds all kinds of
13  homes all over Rhode Island and New England and a very
14  old and dear friend of mine.
15  I called him as a favor to Ed. This is having
16  to do with the real stuff that was going on at the
17  house. I called Mr. Kent as a favor to Ed to intervene
18  to try to talk to Carol and to try to talk to the other
19  people who were working at the house with the HVAC and
20  the windows and stuff to try to assist in really doing
21  something at the house. And I believe he, of his own
22  time, actually went to the home and visited there.
23  I know he spoke to Carol because -- well, if you
24  want to know what he said, I can tell you. And I believe
25  he actually went there to do it.

40 (Pages 1103 to 1106)

Page 1107

1       And I had actually discussed formally retaining
2   him, but he did not want to take money from me. Why are
3   you shaking your head at me?
4       Q   I was waiting for you to finish. Is that it?
5   Are you testifying that Mr. Kent doesn't own nightclubs
6   with you? Didn't own nightclubs with you rather?
7       A   You did not ask me that question.
8       MR. SCHERER: Object to the form of the
9   question.
10      Q   Did Mr. Kent own nightclubs with you?
11      A   Ms. Deutsch, maybe we're on the wrong foot.
12  Please don't throw your glasses. I've been nothing but
13  polite to you. I've been nothing but polite to every
14  lawyer who has questioned me.
15      Q   I'd like you to answer my questions.
16      MR. NURIK: Please don't interrupt him. Okay?
17  We've all been very civil here. Let's continue with
18  that.
19      THE WITNESS: I feel terrible about what I did
20  to the Morses. If you just ask me the questions in a
21  polite fashion, I'll give you all the truthful
22  answers. Just ask me the questions.
23  BY MS. DEUTSCH:
24      Q   Mr. Rothstein, I've had an opportunity to look
25  through all of these court files. Would it surprise you

Page 1108

1   to learn that the litigation in Camden, the house in
2   Camden, was because the Morses were unhappy with the work
3   that had been done by the builder, and you told them to
4   withhold the last payment. Do you recall that?
5       MR. SCHERER: Object to form.
6       THE WITNESS: I may have. I don't know. Is
7   that part of the real stuff we were doing?
8   BY MS. DEUTSCH:
9       Q   The builder then foreclosed on the house, filed
10  a lien and foreclosed on the lien. Do you recall that?
11      A   I recall something going on with the home in
12  Camden. I recall -- Hang on. I recall there being a
13  problem with the home and someone putting some type of
14  lien on it for work done. If you have some documents to
15  refresh my recollection I could probably answer your
16  questions a lot faster and a lot more clearly.
17      Q   I ask you to just assume for the purposes of
18  this question the following facts: That the foreclosure
19  was completed; that you sent up Mr. Osber or Mr. Osber
20  went up at your behest; that he filed a notice of
21  appearance pro hac vice; that he then manipulated the
22  litigation for a great deal of time, perhaps 18 months;
23  during that time that Mrs. Morse and Mr. Morse responded
24  to interrogatories where they delineated all of the
25  specific problems in the house. And, thereupon, you

Page 1109

1   called Mr. Kent, you dispatched him to go there. He
2   posed as an expert and trashed their case. They then had
3   to pay the builder anyway.
4       Now, assume all those facts to be true. Do you
5   have of any recollection of that?
6       MR. SCHERER: Object to form.
7       THE WITNESS: That statement about that Mike
8   Kent thing is a blatant lie.
9   BY MS. DEUTSCH:
10      Q   Actually it's true, sir.
11      MR. SCHERER: Object to form.
12      THE WITNESS: No, I did not dispatch him to pose
13  as an expert. Mr. Kent is an expert in building.
14  BY MS. DEUTSCH:
15      Q   To your knowledge --
16      A   He's been building homes, expensive homes,
17  multi-million-dollars homes for well over 20 years.
18      Q   To your knowledge did Mr. Osber know Mr. Kent?
19      A   Yes, he did. He represented Mr. Kent actually
20  and was friends with him.
21      Q   Now, you testified that you had Mr. Osber handle
22  these various pieces of litigation, the five cases; is
23  that true?
24      A   I had Mr. Osber handle actual litigation for the
25  Morses.

Page 1110

1       Q   That would include the Builder's Services case,
2   the Jan Jones case, the Mizner Lakes case, the Omni
3   Construction case, and the Digby Bridges case, correct?
4       A   I'll take your word for it. It does not sound
5   incorrect to me.
6       Q   Would it surprise you to learn -- and you also
7   testified that Mr. Stracher was somehow involved in these
8   cases.
9       A   He was. He oversaw every single one of them.
10  You have to know Mr. Stracher. He was not letting loose
11  of the Morse files. And he actually took Steve Osber
12  quite a bit, and Osber took him quite a bit. They worked
13  well together.
14      Q   What kind of experience did Steve Osber have
15  before he came to work for you?
16      A   I don't remember which firms he worked for.
17  He's a very good lawyer. As a mater of fact I remember
18  hiring him because he was on the other side of a case
19  from me and was kicking the living crap out of me and I
20  made him an offer. He's a very good lawyer.
21      Q   Would it surprise you to learn that if you look
22  in the dockets of these cases and through the filings
23  that all he did was stall, nothing was actually
24  accomplished?
25      MR. SCHERER: Object to form.

41 (Pages 1107 to 1110)

Page 1111

1      THE WITNESS:  You'd have to be more specific for
2   me.  There were certainly points in time when
3   Mr. Osber stalled because I was instructing him to
4   stall because Ted Morse, Ed's son and I were
5   attempting to do certain things.
6   BY MS. DEUTSCH:
7      Q    You testified a little bit ago that you kept the
8   Morses in the dark.  Do you recall that?
9      A    When you're saying Morses, you mean Ed and
10  Carol, correct?
11     Q    Ed and Carol.
12     A    I tried to keep them in the dark as much as I
13  possible could, yes, regarding the fraud.  The real
14  things we were doing, I tried to keep them as well
15  apprised as I could absent the fraudulent issues.
16     Q    Were you aware then that there were multiple
17  situations in which actions were taken which were
18  directly adverse to their interest, sir?
19     A    Yes, sir.
20     Q    For instance, did you know that there were
21  orders entered against them because they failed to show
22  up for depositions --
23     A    Yes.
24     Q    -- which they were never told about?
25     A    I discussed that at length with Mr. Osber and

Page 1112

1   Ted Morse.
2      Q    You just testified a little bit ago that they
3   appeared at hearings and what not.
4      MR. SCHERER:  Objection.
5      THE WITNESS:  I never testified to that.  I've
6   never in all four days testified to that.  No one
7   asked me about them appearing at anything.
8   BY MS. DEUTSCH:
9      Q    You didn't testify that you had conversations
10  with them laughing about stuff that happened court?
11     A    No.  You're confusing my conversations with
12  them.  We were talking about the series of questions by
13  Mr. Mullin about he was getting around talking about
14  their litigation savvyness.
15     Q    So you --
16     A    Hang on.  Let me finish my answer, please.
17     And I responded that they had been deposed
18  before and they had testified in other cases.  But I
19  never testified at all about them testifying or being
20  deposed in any of these cases.
21     Q    In reality they never appeared for deposition in
22  these cases.  They were never told about the depositions
23  in these cases, is that correct, specifically the Mizner
24  Lakes, specifically in Jan Jones?
25     A    I don't think they were ever deposed.  I don't

Page 1113

1   think I would have in a million years allowed them to
2   have been deposed given the magnitude of the fraud I was
3   involved in.
4      Q    I want to show you now what was previously
5   marked as 151.  Now, you've testified that that was a
6   settlement agreement in the Mizner Lakes case that was,
7   in your words, also a fraud, correct?
8      A    Give me one second to take a look.
9         This is the fake settlement agreement, yes.
10     Q    Now, would it surprise you to learn that that
11  actually was filed in the state court action by
12  Mr. Osber?
13     A    That wouldn't surprise me, no.
14     Q    So, at that point you perpetrated a fraud on
15  your clients as well as on the court, correct?
16     A    Now, I'm lost.
17     Q    You're holding in your hands what you testified
18  was a fake settlement agreement, correct?
19     A    This is the fake settlement agreement.  Are you
20  telling me that this is the actual one that got filed?
21     Q    Yes, it is, sir.
22     A    Then Osber filed it by mistake.  He was supposed
23  to file the one where we --
24     MR. NURIK:  Don't assume.
25  BY MS. DEUTSCH:

Page 1114

1      Q    Could you turn to the next page.
2      A    Yes.
3      Q    The second page.
4      A    The second page?
5      Q    Yes.  Mr. Leonard Albanese's signature is on
6   that, is it not?
7      A    Not on the second page.
8      Q    The signature page.
9      A    Here's what I've got.  You have page four.  It's
10  a signature page from the settlement agreement.  Assuming
11  that what you're telling me is the truth --
12     Q    I have to qualify -- Excuse me.  Let me strike
13  what I said.  This was not filed in the action.
14     Just take a look at the signature page and tell
15  me if you see Mr. Leonard Albanese's signature on that
16  page.
17     A    Hang on.  Since I'm the deponent I just want to
18  make sure the record is clear.  What you're saying to me
19  now is that the settlement agreement that I said is a
20  fraud, that you said was filed in the Circuit Court, that
21  I perpetrated another fraud on the Court, is actually not
22  filed?
23     Q    I'm going to clarify.  Just look on the second
24  page, the signature page, and tell me whether you see
25  Mr. Albanese's signature.

42  (Pages 1111 to 1114)

Page 1115

1     A   I want to know whether this was the one that was
2   filed or not.
3     Q   Please look at the second page and tell me if
4   you see signatures by the Morses and Mr. Albanese?
5     A   I do.
6     Q   That settlement agreement was circulated and was
7   signed by the parties; is that correct?
8     A   That's incorrect.
9     Q   Why is that incorrect?
10    A   It's incorrect because what happened was I had
11  Mr. Osber circulate this in the following fashion:  We
12  had a real settlement agreement where we were paying them
13  money signed by the Albaneses and whoever else signed it,
14  Leonard Albanese.
15        Then we took the page from the real settlement
16  agreement, put it on the fake settlement agreement, and
17  sent it to the Morses so the Morses would believe that
18  they were winning, and then they signed it.
19        That's why the signature page is completely
20  separate, and that's why the fake order, fake settlement
21  agreement and release and the real settlement agreement
22  looks so much the same.
23    Q   Now, the Morses at no time knew that this was
24  not a real settlement agreement, correct?
25    A   Ed and Carol did not know.

Page 1116

1     Q   Ed and Carol signed the settlement agreement
2   believing it to be a true and correct settlement
3   agreement, correct?
4     A   The one where they were getting the money?
5     Q   A settlement agreement was circulated to Ed and
6   Carol and they were asked to sign it?
7     A   Yes.  To the best of my knowledge they believed
8   that was absolutely true.  I have no reason to doubt that
9   they believed it was true.
10    Q   They had no way of knowing that there was
11  another settlement agreement, correct?
12    A   No.  We hid it from them.
13    Q   Now, would it surprise you to learn that
14  Mr. Osber agreed to hold the Morses in contempt for never
15  signing that order?
16    A   That doesn't surprise me, no.  I believe I
17  instructed him to let it happen and pay the contempt
18  order.
19    Q   The contempt order, as it were, was a rate of a
20  continuing amount of contempt per day, per diem, as well
21  as a judgment for that amount should they not sign by a
22  specific date; is that what you understood it to be?
23    A   I have no independent recollection one way or
24  another, but I'll take your word for it.
25    Q   Did you agree to allow your clients to be held

Page 1117

1   in contempt of court and pay a contempt order in a case?
2     A   Can you repeat that?
3     Q   I'm just asking you to clarify that you agreed,
4   you instructed Mr. Osber to pay the contempt order and
5   allow the agreed order or enter into the agreed order to
6   hold them in contempt for not signing a settlement
7   agreement that you knew that they had signed; is that
8   correct?
9     A   No, that's not correct.  I never instructed
10  Steve Osber to pay anything.
11    Q   Didn't you just testify that you agreed to pay
12  the contempt order?
13    A   I agree to paid it.  You said, "You instructed
14  Steve Osber to pay a contempt order."  I never instructed
15  Steve Osber to pay anything.
16    Q   You didn't go to the hearing, did you, sir?  The
17  hearing --
18    A   No.
19    Q   -- in which the agreement order was entered, did
20  you go to that hearing?
21    A   No.
22    Q   Mr. Osber went on your behalf; is that correct?
23    A   I believe that's correct.
24    Q   He was representing the plaintiffs on behalf of
25  R.R.A., on behalf of you and R.R.A.; is that correct?

Page 1118

1     A   Correct.
2     Q   Now, you testified -- Switching gears for a
3   minute.  You testified that you fled to Morocco with an
4   associate.  Who was that associate?
5     A   I fled to Morocco with an associate?
6     Q   The first day you testified that you fled to
7   Morocco with an associate.
8     A   I didn't say it like that.  I just said I went
9   with Anick Kahlid and my uncle.
10    Q   And those were the only two people on the plane?
11  Were there others?
12    A   No.  There were three of us on the plane; me, my
13  Uncle Bill Brock, actually Bill Boockvor, and Mr. Kahlid.
14    Q   And when you returned who came with you?
15    A   Me, my uncle.  Ahnick remained behind.  Steve
16  Caputi came back with us and Robert Scandiffio came back
17  with us.
18    Q   I just want to clarify a few things on Bates &
19  Koppel.  That letter that Doug Bates wrote, actually you
20  wrote it and gave it to him, he signed it, do you
21  remember that letter on the HVAC, the fake settlement
22  with Demons?
23    A   Yes.
24    Q   You sent him an e-mail that contained the
25  content of what you wanted him to put in the letter?

43 (Pages 1115 to 1118)

Page 1119

1    A    Who, "him"?
2    Q    Doug Bates.
3    A    Yes.
4    Q    He was in your pocket. Remember, you said that?
5    A    Yes.
6    Q    And you had him send it on his letterhead and
7    sign it, correct?
8    A    Yes.
9    Q    You then asked him to send it again, but
10   backdate it. Do you remember that?
11   A    No, I don't specifically recall that. But that
12   certainly would not have been beyond the scope of what I
13   had Doug doing for me. If I needed to change a date on
14   it, I'm certain that I have would have done something
15   like that.
16   Q    Just to clarify on the Kusnick, Marvin Windows,
17   you made a comment earlier about the windows and Carol
18   Morse. Would it surprise you to learn, sir, that Marvin
19   Windows has an entire history of communications whereby
20   they sent sashes and asked you to go and inspect them so
21   that they could deliver them to the Morses, and you did
22   not respond?
23   A    I have no idea.
24   Q    No independent recollection of that?
25   A    I don't have any independent recollection of

Page 1120

1    them sending me that correspondence. That's not to say I
2    didn't receive it. As I sit here today I don't
3    specifically recall it. It's certainly possible that it
4    happened.
5    Q    Now, when Howard Kusnick sent the letter
6    purporting to be the counsel for Marvin Windows, you
7    testified about that, correct?
8    A    I did.
9    Q    And he utilized his home address and a phone
10   number. Do you recall that?
11   A    Actually I put his home address and phone number
12   on it.
13   Q    Okay.
14   A    He just signed the letter.
15   Q    But, you transposed two digits. Do you recall
16   that?
17   A    I don't recall that one way or the other.
18   Q    Do you recall that Carol called the phone number
19   and went to Carnival Cruise Lines?
20   A    I don't --
21   Q    Do you recall that --
22   A    Hang on. Let me answer your question. There
23   was so much going on at that point in time in the Ponzi
24   scheme I just don't have an independent recollection of
25   numbers being transposed and someone speaking to Carnival

Page 1121

1    Cruise Line, but it certainly could have happened.
2    Q    You don't remember telling Ed and Carol that it
3    was a mistake in the letterhead and picking up the phone
4    and calling and purporting to speak to counsel for Marvin
5    Windows on their behalf, do you recall that?
6    A    You've got me confused. It's very possible that
7    the numbers were transposed. It's very possible that
8    that turned out to be the number to Carnival Cruise
9    Lines. If that is in fact the case, I definitely do not
10   deny it. And it's certainly possible that if that
11   happened it would have been well within what I was doing
12   at the time in the course of trying to keep the Ponzi
13   scheme together, that I would have made up a story to
14   tell Ed and Carol Morse.
15   Q    Not just a story, you did it right in front of
16   them. Do you remember that?
17   A    But that's still a story whether I'm doing it in
18   front of them or doing it while they're there or not
19   there, it's still a story.
20   Q    Just more fraud --
21        MR. SCHERER:  Object to form.
22   BY MS. DEUTSCH:
23   Q    -- for your clients, correct? I mean, clearly
24   it wasn't true?
25   A    Do you want an answer?

Page 1122

1    Q    Please.
2    A    Yes.
3    Q    Thank you.
4         Now you testified Monday that all Ponzies
5    explode. Do you remember that?
6    A    Yes. To my knowledge all Ponzi schemes explode.
7    Q    And you testified that you had an exit
8    strategy. Do you remember that?
9    A    I do.
10   Q    You testified that it was your intent, desire,
11   that you were going to repay the investors their
12   principle with some interest although likely a reduction
13   in what they originally had been promised. Do you
14   remember that?
15   A    Yes.
16   Q    Is it possible, sir, that that extended to
17   Razorback, your intent to repay these people for the
18   money that they invested?
19   A    My intent was to hopefully sell off the
20   legitimate businesses and pay everyone back as much as I
21   possibly could.
22        If you're asking me whether Razorback was going
23   to be paid before I paid the Morses, the answer is no.
24   The Morses would have been paid first.
25   Q    But, sitting here today you clearly are in

44 (Pages 1119 to 1122)

Page 1123

1 prison. You don't have any money. Where else are you
2 going to get the money from, but from other people to pay
3 back Razorback?
4     MR. SCHERER: Object to form.
5 BY MS. DEUTSCH:
6     Q   If your exit strategy --
7     A   No, no. I think you're confused. You're
8 talking about the exit strategy before I was in prison
9 while I was still running the Ponzi scheme, are you not?
10    Q   Actually, I was talking about the exit strategy
11 you had while you were on your way to Morocco?
12    MR. SCHERER: Object to form.
13    THE WITNESS: No, no. I don't think you
14 understood all my prior testimony for the last four
15 days. Would you like me to explain it to you?
16 BY MS. DEUTSCH:
17    Q   I want to know when you had this sudden epiphany
18 that things were going to end if it wasn't in that week
19 right before you went to Morocco?
20    MR. SCHERER: Object to form.
21    THE WITNESS: Let me see if I can clarify this
22 for you. I did not have and epiphany that it was
23 going to end. I had nightmares about it ending well
24 before it ended, probably a year before.
25    As I got closer to when it was ending, when it

Page 1124

1 was boiling over I was stealing all this money from
2 Ed and Carol, when I was running around stealing
3 money from the Von Allmens, stealing money from all
4 these other people, trying to keep the Ponzi scheme
5 alive, trying to bring in new investors, I had a
6 pretty good idea that it was going to blow up, but I
7 was still trying to keep my finger in all the holes
8 in the dike. I was hoping that something would
9 happen.
10    By this point in time as we're getting into
11 August, September, October of '09, my exit strategy
12 though probably in the back of my mind somewhere I
13 wanted it to still be a reality, it didn't exist.
14    So that we're clear, my exit strategy was during
15 all the years of the Ponzi scheme to accumulate a
16 series of legitimate businesses with a significant
17 net worth so that I could sell the businesses and pay
18 these people off. That was the idea. As foolhardy
19 as it was, it was the idea.
20    At the end when I realized it wasn't going to
21 happen, I had two choices as I saw it: One, kill
22 myself; two, flee. I didn't consider the third
23 choice at that time of turning myself in, which is
24 what I ultimately did.
25    Once I got to Morocco I had three choices: I

Page 1125

1 could stay in Morocco and let this come down on
2 family; two, I could kill myself which I thought
3 about doing and began to do; or, three, I could come
4 back and turn myself in. I selected option three,
5 came back, turned myself in.
6 BY MS. DEUTSCH:
7     Q   What happened to all your plans to open up
8 nightclubs in Morocco that you testified to?
9     A   I just told you, I made a decision in Morocco
10 after thinking about killing myself to come back and turn
11 myself in. I turned myself in.
12    Q   Why did you not kill yourself?
13    MR. SCHERER: Object to form.
14    THE WITNESS: Killing yourself is what I
15 consider to be the coward's way out, and I decided no
16 longer to be a coward. I was a coward when I got on
17 that plane and left my family and flew to Morocco.
18    I was no longer a coward in my own eyes, and
19 hopefully in God's eyes, when I got back on that
20 plane and came back here and turned myself in.
21    MR. SCHERER: Objection
22    MR. LAVECCHIO: We are done on time.
23    MR. SCHERER: Withdraw my objection.
24    (The proceedings were adjourned at 5:05 p.m.)
25

Page 1126

1         C E R T I F I C A T E
2
3
4 STATE OF FLORIDA  )
5 COUNTY OF BROWARD )
6
7
8     I, TERRI L. WRIGHT, Notary Public in and for
9 the State of Florida at Large, certify that I was
10 authorized to and did stenographically report the
11 foregoing proceedings and that the transcript is a true
12 and complete record of my stenographic notes.
13
14    Dated this 15th day of December, 2011.
15
16
17
18    _____
      Terri L. Wright
19
20
21
22
23
24
25